IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| DEFENDERS OF WILDLIFE; THE HUMANE SOCIETY OF THE UNITED STATES; WHALE AND DOLPHIN CONSERVATION SOCIETY; NATURAL RESOURCES DEFENSE COUNCIL; CENTER FOR A SUSTAINABLE COAST; FLORIDA WILDLIFE FEDERATION; SOUTH CAROLINA COASTAL CONSERVATION LEAGUE; NORTH CAROLINA WILDLIFE FEDERATION; ANIMAL WELFARE INSTITUTE; OCEAN MAMMAL INSTITUTE; CITIZENS OPPOSING ACTIVE SONAR THREATS; and CETACEAN SOCIETY INTERNATIONAL, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE NAVY; RAY MABUS, Secretary of the Navy; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; NATIONAL MARINE FISHERIES SERVICE; and GARY LOCKE, Secretary of Commerce. <br><br> Defendants. | COMPLAINT <br><br> C.A. No. _____ |

Plaintiffs Defenders of Wildlife, The Humane Society of the United States, Whale and Dolphin Conservation Society, Natural Resources Defense Council, Center for a Sustainable Coast, Florida Wildlife Federation, South Carolina Coastal Conservation League, North Carolina Wildlife Federation, Animal Welfare Institute, Ocean Mammal Institute, Citizens Opposing Active Sonar Threats, and Cetacean Society International, by and through their undersigned counsel of record, file this Complaint. In compliance with Local Rule 3.2, the Certificate of Interested Parties is attached hereto as Exhibit 1.

1

## INTRODUCTION

1. This action challenges the defendants' violations of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, in connection with the decision of the Department of the Navy ("Navy") to install an Undersea Warfare Training Range ("training range" or "USWTR") southeast of the Georgia/Florida border. The training range will require the construction of an extensive underwater system of cables, nodes, and other instruments over an area 500 square nautical miles in size and, once installed, will host hundreds of training exercises involving multiple ships, aircraft and submarines each year over its 20-year life. *See* Map attached as Exhibit 2. Despite the long-term environmental consequences of the Navy's proposal, and despite their repeated admissions that more environmental information must be obtained before any decision to operate the range in this location can be made, the defendants have approved construction of the $100 million training range adjacent to federally-designated critical habitat for one of the world's most endangered species of whales, in violation of NEPA and the ESA.

2. There is no dispute that construction and operation of the training range poses multiple threats to marine species, from collisions of endangered whales with fast-moving ships, to entanglements of marine mammals and sea turtles in range equipment, to widespread disruption of species from the extensive, year-round use of high-intensity sonar systems during training. While the Navy identified four alternative sites for the range that satisfied its purpose and need, it chose as its location an area adjacent to the only known calving grounds of the North Atlantic right whale. Defendant National Marine Fisheries Service ("NMFS") has characterized the North Atlantic right whale as one of "the world's most critically endangered large whale species

2

and one of the world's most endangered mammals" (73 Fed. Reg. 60,173, 60,173 (Oct. 10, 2008)), and has repeatedly affirmed that the loss of even a single whale, especially a mature female, could drive the species to extinction (*e.g.*, 69 Fed. Reg. 30,857, 30,858 (June 1, 2004); 73 Fed. Reg. at 60,176). Accordingly, the Georgia Department of Natural Resources has objected pursuant to the Coastal Zone Management Act, 16 U.S.C. §§ 1451 *et seq.*, to the Navy's plan of operations for the range, citing in particular the Navy's "fail[ure] to adequately protect North Atlantic right whales and their habitat." Ga. Dep't. of Natural Res., Objection to Negative Determination at 1 (June 26, 2009).

3. The Navy first announced its intent to prepare an Environmental Impact Statement ("EIS") in 1996, and identified its alternative sites no later than 2005; nonetheless, it began biologically surveying its selected location for right whales and other species only in February of 2009. Four months after surveys began and before any data were analyzed, on June 26, 2009, the Navy issued a Final Environmental Impact Statement ("FEIS") selecting the Jacksonville Operating Area – which encompasses waters off of northern Florida and Georgia ("Jacksonville Operating Area") – as its preferred alternative, and on July 31, 2009, issued a Record of Decision ("ROD") authorizing construction at the site. Yet the ROD specifically delayed a decision on operation of the $100 million range, stating that the Navy would make its decision whether or not "to implement training on USWTR . . . based on the updated analysis of environmental effects in a future OEIS/EIS…." ROD at 1.

4. Similarly, on July 28, 2009, NMFS released its Biological Opinion ("BiOp"), concluding that the training range's installation and operation was not likely to jeopardize the continued existence of any endangered marine species, including the highly endangered North Atlantic right whale, or adversely modify or destroy any designated critical habitat, while noting its

inability to estimate the number of animals exposed given the "limited empirical information available" and its expectation to conduct a more informed analysis "before training actually occurs." BiOp at 115, 132. Even as it obtains this site-specific information, which it admits is integral to its decision on whether to operate the range at all, *see* ROD at 1, the Navy intends to proceed with construction of the facility.

5. In making its decision to install the training range just outside the calving grounds and federally-designated critical habitat for the North Atlantic right whale, the Navy has failed to meet its obligations under NEPA to take a hard look at the environmental impacts of the proposed action, including impacts from vessel strikes of endangered whales and other marine mammals, entanglements of whales and sea turtles, and extensive use of high-intensity sonar and other acoustic systems on the training range. In addition, the Navy has failed to rigorously explore and objectively evaluate reasonable alternatives to the proposed action, to adequately evaluate measures designed to mitigate the environmental impacts, to obtain and include essential information in its analysis, and to fully and fairly discuss connected actions and cumulative impacts of the training range. The Navy has also unlawfully segmented its analysis of the impacts from installation and operations of the training range, limited its choice of reasonable alternatives prior to the issuance of a ROD for operations, and committed resources prior to the issuance of a ROD for operations.

6. In issuing a Biological Opinion that the installation and operation of the training range in the Jacksonville Operating Area is not likely to jeopardize the continued existence of the North Atlantic right whale and other marine species pursuant to the ESA, NMFS has arbitrarily and capriciously failed to establish a link between the facts found and conclusions made in its Biological Opinion. NMFS also has failed to include an Incidental Take Statement as required

4

by the ESA, based on its unsupported and irrational conclusion that installation of the training range will not cause the take of any listed species.

7. Plaintiffs seek a declaration that the Navy has violated NEPA and its implementing regulations by failing to take a hard look at the environmental impacts of its action and by illegally segmenting and committing resources to this action before the issuance of a ROD for operation of the training range. Plaintiffs also seek a declaration that the Biological Opinion issued by NMFS is arbitrary and capricious in violation of the APA and violates various provisions of the ESA. Plaintiffs ask this Court to remand the training range ROD and FEIS to the Navy, to remand the training range Biological Opinion to NMFS, and to order both agencies to comply with NEPA, the ESA, and the APA in connection with any further actions relating to this project.

## JURISDICTION AND VENUE

8. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (federal officer action), 28 U.S.C. §§ 2201 and 2202 (declaratory judgment), 16 U.S.C. §§ 1531 *et seq.* (ESA), and 5 U.S.C. §§ 551 *et seq.* (APA).

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e). The Jacksonville Operating Area selected as the Navy's preferred alternative for the training range includes the majority of the coast of Georgia and the federally-protected critical habitat for the North Atlantic right whale along the Georgia coast. The State of Georgia's Coastal Management Program has formally communicated with the Navy its concerns about the impact of the training range on Georgia's coastal resources. In addition, vessels stationed at Kings Bay, Georgia, will be actively involved in activities on the training range. Therefore, a substantial part of the events giving rise to the claim are occurring in this district, and a substantial part of property that is the subject of the

action is situated is in this district. Additionally, plaintiff Center for a Sustainable Coast is based in St. Simons Island, Georgia and thus resides in the Brunswick Division.

## PARTIES

**A.     Plaintiffs**

10. Plaintiff Defenders of Wildlife ("Defenders") is a national nonprofit organization dedicated to the protection and restoration of all native wild animals and plants in their natural communities. Based in Washington, D.C., and with offices spanning from Florida to Alaska, Defenders has over 415,000 members across the nation, including over 32,000 members in the states of Georgia and Florida. Defenders is a leader in the conservation community's efforts to protect and recover the critically endangered North Atlantic right whale, focusing on the two leading threats to the species' survival – human-caused deaths attributable to ship strikes and entanglement in fishing gear. Defenders also works to protect sea turtles, manatees, and other wildlife of the Southeast.

11. Plaintiff the Humane Society of the United States ("the HSUS") is a national nonprofit organization headquartered in Washington, D.C. The HSUS is the nation's largest animal protection organization, with over eleven million members and constituents, including over 190,000 members and constituents in the State of Georgia. The HSUS is committed to the goals of protecting, conserving, and enhancing the nation's wildlife and fostering the humane treatment of all animals. In furtherance of these goals and objectives, the HSUS and its members have demonstrated a strong interest in the preservation, enhancement, and humane treatment of marine mammals, including the North Atlantic right whale, as well as other marine species.

12. Plaintiff Whale and Dolphin Conservation Society (North America), Inc., ("WDCS") is the world's largest organization dedicated solely to the protection of whales, dolphins, porpoises

6

and their environment. WDCS has offices in the U.K., U.S., Australia and Germany with over 70,000 supporters world-wide, including 5,000 in the U.S. and 200 in the states of Georgia and Florida. WDCS and its supporters have worked extensively to preserve the critically imperiled North Atlantic right whale and its habitat.

13. Plaintiff Natural Resources Defense Council, Inc. ("NRDC") is a national environmental advocacy group organized as a New York not-for-profit membership corporation, with offices in New York, Los Angeles, San Francisco, Chicago, Washington, D.C. and Beijing, China. NRDC supports the enforcement of federal environmental laws, including NEPA and the ESA, and is committed to protecting marine mammals. Over the past decade, NRDC has made significant contributions to marine conservation and science and has advocated for measures to protect cetaceans and other marine life. NRDC has more than 447,000 members nationwide, over 5700 of whom reside in the State of Georgia.

14. Plaintiff Center for a Sustainable Coast ("the Center") is a nonprofit organization headquartered in St. Simons Island, Georgia. Founded in 1997, the Center's mission is to improve the responsible use, protection, and conservation of the Georgia coast's natural resources, including North Atlantic right whales present in the critical habitat off of the Georgia coast. The Center has approximately 200 members who live, work, and recreate off of the Georgia coast in the vicinity of the training range.

15. Plaintiff Florida Wildlife Federation ("FWF") is a Florida statewide non-profit conservation and education organization with 13,000 members dedicated to the preservation, management, and improvement of Florida's water resources and its fish, wildlife, and habitat. A substantial number of these members use and enjoy Florida's waters – both fresh waters and ocean waters – for recreational and economic activities, and to observe and enjoy wildlife that

rely upon these waters as habitat. Members fish, hunt, kayak, canoe, boat, and observe wildlife located in and around Florida, including the Atlantic Ocean off northeastern Florida. Federation members work to support sustainable management for fisheries and to protect marine mammals, sea turtles, and other wildlife that inhabits the Atlantic Ocean and the Gulf of Mexico.

16. Plaintiff South Carolina Coastal Conservation League ("the League") is a nonprofit organization founded in 1989. The League's mission includes the protection of marine wildlife species, including the North Atlantic right whale, and their habitats, and to conserving coastal and ocean resources. The League currently has approximately 4000 members, many of whom use and enjoy the marine species that will be impacted by the training range.

17. Plaintiff North Carolina Wildlife Federation ("NCWF"), an affiliate of the National Wildlife Federation, is a nonprofit organization founded in 1945. The NCWF's mission is to advocate for wildlife and its habitat. The NCWF's primary goal is to advocate for the protection and conservation of wildlife, including the North Atlantic right whale, and wildlife habitat. NCWF also advocates for education that increases public awareness of wildlife, its dependence on habitat, and the importance of both to human existence. NCWF has approximately 10,000 members, supporters, and affiliate constituents, many of whom use and enjoy the marine species that will be impacted by the training range. In 2009, the NCWF passed a resolution opposing the training range due to its potentially negative impacts on wildlife and habitat.

18. Plaintiff Animal Welfare Institute ("AWI") is a non-profit membership organization dedicated to eliminating the pain and fear inflicted on animals by humans. Organized in 1951, AWI has approximately 20,000 constituents in the United States. AWI constituents are engaged actively in a wide range of activities that further its mission, and AWI has members who work to minimize the impacts of all human actions detrimental to endangered species, including pollution

8

of the oceans destroying every kind of marine life. In addition, members of AWI work to protect all marine life against the proliferation of human-generated ocean noise including active sonar and seismic air guns.

19. Plaintiff Ocean Mammal Institute ("OMI") is a nonprofit organization founded in 1995 to conduct research on the impact of human activities on marine mammals, educate the public about these impacts and work to protect marine mammals and their environment. The Ocean Mammal Institute's research has been instrumental in developing legislation to protect marine mammals from thrill craft and OMI's research on vessel and noise impacts led to litigation to protect whales from intense ocean noise. The organization works in various national and international fora to protect marine mammals from anthropogenic impacts and offers research internships to study these impacts on marine mammals.

20. Plaintiff Citizens Opposing Active Sonar Threats ("COAST") is an association formed in Maine in 2000 by people who believe that Earth's ocean inhabitants, including the critically endangered North Atlantic right whale, have the right to lives lived in a healthy environment. COAST works to make the people of Maine and our government representatives and officials aware of the threats to marine life posed by human activity such as naval sonar. COAST has testified at numerous hearings, met with government representatives, and written comment letters and opinion editorials on the subject of harm to marine mammals occasioned by anthropogenic activities in the ocean, including comments on the proposed training range.

21. Plaintiff Cetacean Society International ("CSI") is a not-for-profit corporation organized under the laws of the state of Connecticut. Headquartered in the United States, its domestic and international membership includes professionals from the scientific and conservation

communities. CSI is dedicated to protecting whales, dolphins, porpoises, and the marine environment generally through conservation, education, and research.

22. Plaintiffs and their members and constituents regularly use, enjoy, and benefit from a healthy marine ecosystem and the presence of diverse marine life, including North Atlantic right whales, sea turtles and the marine mammals and other marine species that are likely to be killed, injured, harassed or disturbed by the Navy's construction and operation of the training range. Plaintiffs and their members and constituents derive recreational, aesthetic, economic and scientific benefits from marine life in the Jacksonville Operating Area. Defendants' failure to comply with federal law and the resulting harm to the marine environment, including the disturbance, injury, and death of marine life that is likely to result from that failure, harms the interests of Plaintiffs and their members and constituents.

**B.     Defendants**

23. Defendant Department of the Navy is an agency within the United States Department of Defense, organized and existing pursuant to Title 10 of the United States Code. The Navy is the federal agency that took the final agency action challenged pursuant to NEPA and the APA.

24. Defendant Ray Mabus is the Secretary of the Navy, and is sued in his official capacity as the head of the federal agency that took the final agency action challenged pursuant to NEPA and the APA.

25. Defendant National Oceanic and Atmospheric Administration ("NOAA") is an agency within the United States Department of Commerce with supervisory authority over the conservation and management of marine fisheries and habitat, marine mammals, and sea turtles pursuant to the Magnuson-Stevens Fisheries Conservation and Management Act, the Marine Mammal Protection Act, and the Endangered Species Act.

26. Defendant National Marine Fisheries Service is an agency within NOAA of the United States Department of Commerce. NMFS is the federal agency that issued the Biological Opinion challenged pursuant to the APA and the ESA.

27. Defendant Gary Locke is the Secretary of the Department of Commerce, and is sued in his official capacity as the head of the federal agency that issued the Biological Opinion challenged pursuant to the APA and the ESA.

## LEGAL BACKGROUND

### A.   National Environmental Policy Act (NEPA)

28. Congress enacted NEPA to "promote efforts which will prevent or eliminate damages to the environment . . . ." 42 U.S.C. § 4321. To achieve this goal, NEPA requires federal agencies to fully consider and disclose the environmental consequences of an agency action before proceeding with that action. *See id.* § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5. Agencies' evaluation of environmental consequences must be based on scientific information that is both "[a]ccurate" and of "high quality." 40 C.F.R. § 1500.1(b). In addition, federal agencies must notify the public of proposed projects and allow the public the chance to comment on the environmental impacts of their actions. *See id.* § 1506.6.

29. The cornerstone of NEPA is the EIS. An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. It must provide a "full and fair discussion of significant environmental impacts and . . . inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

11

30. In the EIS, the federal agency must identify the direct, indirect, and cumulative impacts of the proposed action, consider alternative actions and their impacts, and identify all irreversible and irretrievable commitments of resources associated with the proposed action. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.14, 1508.7, 1508.8. Direct effects are those "which are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative impacts are impacts from "past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

31. Agencies also must consider "[c]onnected actions," "[c]umulative actions," and "[s]imilar actions" together in one environmental impact statement. *Id.* § 1508.25(a)(1)-(3). Actions are "connected actions" if they:

      a. "[a]utomatically trigger other actions which may require environmental impact statements,"
      b. "[c]annot or will not proceed unless other actions are taken previously or simultaneously;" or
      c. "[a]re interdependent parts of a larger action and depend on the larger action for their justification."

*Id.* § 1508.25(a)(1)(i)-(iii).

32. NEPA requires agencies to consider "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii) & (E). The discussion of alternatives is the "heart" of the NEPA process and is intended to "provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. The alternatives analysis should "serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." *Id.* § 1502.2(g).

12

33. NEPA's implementing regulations also require agencies to disclose and analyze measures to mitigate the impacts of proposed actions. *See id.* §§ 1502.14(f), 1502.16(h). An agency's analysis of mitigation measures must be "reasonably complete" in order to properly evaluate the severity of the adverse effects of an agency's proposed action prior to the agency making a final decision. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).

34. Where an agency finds that there is incomplete or unavailable information concerning a potentially significant adverse effect, NEPA's implementing regulations require the agency to obtain the information if the cost of doing so is not exorbitant. If it cannot obtain the information, it must (1) state that such information is incomplete or unavailable; (2) state the relevance of such information; (3) summarize the existing credible evidence relevant to evaluating impacts; and (4) evaluate such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. *See* 40 C.F.R. § 1502.22.

35. NEPA's implementing regulations also require agencies to ensure the "professional integrity, including scientific integrity" of material relied upon in an EIS. *Id.* § 1502.24.

36. NEPA regulations forbid agencies from "commit[ting] resources prejudicing selection of alternatives before making a final decision . . . ." *Id.* § 1502.2(f). Additionally, "[u]ntil an agency issues a record of decision . . . , no action concerning the proposal shall be taken which would: (1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives." *Id.* § 1506.1(a).

**B.      Endangered Species Act (ESA)**

37. Recognizing that the nation's "species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," 16 U.S.C. § 1531(a)(3), Congress enacted the ESA in 1973 with the express purpose of

providing both a "means whereby the ecosystems upon which endangered and threatened species depend may be conserved" and "a program for the conservation of such endangered species . . . ." *Id.* § 1531(b). The Supreme Court has recognized that the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) ("*TVA v. Hill*"). As the Court found in *TVA v. Hill*, "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

38. Principal responsibilities for implementing the requirements of the Act have been delegated to the U.S. Fish and Wildlife Service ("USFWS"), an agency within the Department of the Interior, and to NMFS, an agency within the Department of Commerce. USFWS is responsible for implementing the ESA for terrestrial species and NMFS is responsible for implementing the ESA for marine species. *See* 16 U.S.C. § 1532(15); 50 C.F.R. § 402.01.

39. Section 7(a)(2), 16 U.S.C. § 1536(a)(2), is a critical component of the ESA's statutory and regulatory scheme to conserve endangered and threatened species, requiring federal agencies to "insure" that the actions that they fund, authorize, or undertake "[are] not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of their designated "critical habitat." 16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 400. In order to fulfill this substantive mandate, Section 7(a)(2) and its implementing regulations require that federal agencies engage in "consultation" with either NMFS of USFWS, depending on what species might be affected by the action. 16 U.S.C. § 1536(a)(2). NMFS's determination as to whether the action is likely to jeopardize a listed species or destroy or adversely modify its designated habitat is set forth in a biological opinion. *See* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). "Destruction or adverse modification"

14

has been defined as "a direct or indirect alteration that appreciably diminishes the value of critical habitat" for either the survival or the recovery of a listed species. 50 C.F.R. § 402.02. "Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical." *Id.*

40. In formulating its biological opinion, NMFS must evaluate the "effects of the action" together with "cumulative effects" on the listed species. 50 C.F.R. § 402.14(g)(3)-(4). This multi-step analysis requires NMFS to consider:

    a. the direct, indirect, interrelated, and interdependent effects of the proposed action, 50 C.F.R. § 402.02;

    b. the "environmental baseline" to which the proposed action will be added, which includes all "past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process," *id.*; and,

    c. any "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

41. If NMFS reaches a no-jeopardy/no-adverse modification finding for a proposed action, it must issue an incidental take statement for any take of a listed species that is likely to occur as a consequence of those actions. *See id.* § 402.14(i). Take of listed species that is consistent with an incidental take statement is not subject to the prohibition against take in section 9 of the ESA. *See* 16 U.S.C. § 1536(b)(4).

42. If NMFS concludes that the proposed action is not likely to result in jeopardy to a species, it must provide the action agency with an "incidental take statement." *Id.* § 1536(b)(4), (o); 50 C.F.R. § 402.14(i). The incidental take statement must: (1) specify the amount or extent of the incidental taking on the species, (2) specify the "reasonable and prudent measures" that the

expert agency "considers necessary or appropriate to minimize such impact," (3) set forth the "terms and conditions (including, but not limited to, reporting requirements) that must be complied with" by the action agency to implement the reasonable and prudent measures, and (4) specify the procedures to be used to handle or dispose of any individual animals actually taken. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

43. The ESA requires that the action agency report back to NMFS on an action's progress and its impacts on listed species, as specified in the incidental take statement, in order to monitor the impacts of incidental take. *See* 50 C.F.R. § 402.14(i)(3). The action agency must immediately reinitiate consultation with NMFS if the amount or extent of incidental taking is exceeded. *Id.* §§ 402.14(i)(4), 402.16(a).

44. Section 7(d) of the ESA, 16 U.S.C. § 1536(d), provides that once a federal agency initiates consultation on an action under ESA § 7(a)(2), it "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2)" of this section. The purpose of ESA § 7(d) is to maintain the status quo pending the completion of consultation. *See Conner v. Burford*, 848 F.2d 1441, 1455 n.34 (9th Cir. 1988).

## C.   Administrative Procedure Act (APA)

45. The APA confers a right of judicial review on any person that is adversely affected by agency action. *See* 5 U.S.C. § 702. The APA provides that the reviewing court "shall… hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

46. The Navy's issuance of an EIS and Record of Decision are "agency actions" subject to judicial review under the APA. Likewise, NMFS's biological opinion is an "agency action" and subject to APA review.

## STATEMENT OF FACTS

### A.    The North Atlantic Right Whale

47. The North Atlantic right whale (*Eubalaena glacialis*) is one of the world's most endangered large whales, with only 300 to 400 individuals remaining. *See* 73 Fed. Reg. at 60,173) (describing the North Atlantic right whale as "the world's most critically endangered large whale species and one of the world's most endangered mammals"). Despite its protection under the Endangered Species Act since 1970, *see* 35 Fed. Reg. 8495 (June 2, 1970), the North Atlantic right whale has never recovered to a sustainable population level.

48. Each November, female right whales return to the waters off the southeastern United States to give birth to their calves. This area is the only known calving ground for the North Atlantic right whale, making it "a location vital to the population" and "a very high-risk area for pregnant females, new mothers, and calves." Final Environmental Impact Statement to Implement Vessel Operational Measures to Reduce Ship Strikes to North Atlantic Right Whales at 4-4 (Aug. 2008) (noting that young whales are particularly vulnerable to ship strikes).

49. Waters from the Altamaha River in Georgia (north of Brunswick) to San Sebastian Inlet in Florida (south of Melbourne) are federally-designated as North Atlantic right whale critical habitat. *See* 59 Fed. Reg. 28,793, 28,803 (June 3, 1994) (designating southeastern U.S. critical habitat due to "the importance of the area to the reproductive potential (recovery) of the species"); *see also* Map attached as Exhibit 2. Southeastern waters have also been designated as special management areas to protect right whales from significant threats. *See, e.g.*, 73 Fed. Reg.

60,173 (designating SE Seasonal Management Area and requiring large non-sovereign vessels there to slow to 10 knots during the right whale calving season); 72 Fed. Reg. 34,632 (designating Southeast U.S. Restricted Area and banning gillnet fishing there during the right whale calving season). North Atlantic right whales remain in the area until April, when they migrate back to their summer feeding grounds in New England.

50. As NMFS has repeatedly stated, "the loss of even a single individual [North Atlantic right whale] may contribute to the extinction of the species" and "preventing the mortality of one adult female a year" may alter this outcome. 69 Fed. Reg. at 30,858; *see also* 73 Fed. Reg. at 60,176 ("[T]he population can sustain no deaths or serious injuries due to human causes if its recovery is to be assured."); 72 Fed. Reg. at 34,632 ("NMFS also agrees that … the loss of one right whale may potentially have implications for the right whale population and its ecosystem . . . ."); 66 Fed. Reg. 50,390, 50,392 (Oct. 3, 2001) ("Given the known human-caused sources of right whale mortality, their small population size, and their low reproductive rate, the loss of even one right whale, particularly a reproductively active female, may reduce appreciably the likelihood of the survival and recovery of this species.").

**B.     Other Marine Wildlife**

51. In addition to critically endangered North Atlantic right whales, five other species of endangered whales occur in the waters of the Jacksonville Operating Area and are likely to be affected by the training range: blue, fin, humpback, sei, and sperm whales.

52. Non-endangered species of marine mammals that regularly occur in these waters include, but are not limited to, minke whales, pygmy and dwarf sperm whales, four species of beaked whales, rough-toothed dolphin, bottlenose dolphin, pantropical spotted dolphin, Atlantic spotted dolphin, Clymene dolphin, common dolphin, Risso's dolphin, and pilot whales.

18

53. Five species of threatened and endangered sea turtles occur in these waters, including loggerhead sea turtles, leatherback sea turtles, green sea turtles, Kemp's ridley sea turtles, and Hawksbill sea turtles. "There could be an incidental take of these species as a result of vessel operations during cable installation and during training exercises on the range." FEIS at S-12.

54. Endangered West Indian manatees are expected in the freshwater, estuarine, and nearshore coastal waters of the Jacksonville Operating Area throughout the year. FEIS at 3.2-105.

55. Over two hundred and ninety species of fish are also expected to be found within the training range, including four species that are either endangered or species of concern. *See* FEIS at Appendix A, Table A-1.

56. Eight marine Essential Fish Habitats will be impacted by the training range. *See* FEIS at S-16, S-19, 3.2-12 to 3.2-21. In addition, approximately sixty-seven percent of the training range area is classified as biogenic reef community within Essential Fish Habitat designations. These biogenic reefs are used by thirteen fish species in three management units. The training range also overlaps with a designated marine protected area for the snapper/grouper complex, created as part of the fisheries management plan for a complex of seventy-three tropical and subtropical fish species including snappers, groupers, sea basses, porgies, grunts, tilefishes, triggerfishes, wrasses, and jacks. *See* FEIS at S-19, 3.2-17.

**C.    The Proposed Training Range and the Jacksonville Operating Area**

57. The Jacksonville Operations Area is located offshore of Georgia and Northern Florida. It extends from south of Savannah to San Sebastian Inlet in Florida. *See* Map, Exhibit 2.

58. The training range is a 500-square-nautical mile area of the ocean within the Jacksonville Operating Area that will be instrumented with approximately 300 underwater acoustic nodes –

19

either 4-foot domes or 25-foot tethered sensors – that transmit and receive acoustic signals given off by ships and submarines. The acoustic nodes are connected to each other by buried and unburied cables and to land with a large trunk cable. The result will be a large area of the ocean serving as an instrumented grid.

59. The Navy plans to conduct intensive anti-submarine warfare training on the training range, including exercises between up to three vessels and two aircraft. The Navy will conduct approximately 470 annual exercises on the training range, including during the months when North Atlantic right whales are present in the area. The range is designed to be operated for twenty years, and will be left in place at the conclusion of this period.

60. Vessels will transit to the training range from Naval Station Mayport in Jacksonville, Florida and Naval Submarine Base King's Bay in King's Bay, Georgia.

61. During these transits, Naval vessels will pass directly through the only known calving grounds for the highly endangered North Atlantic right whale. Naval vessels and submarines typically travel at a speed of 15 to 17 knots, despite speed restrictions that NMFS promulgated specifically to protect North Atlantic right whales from ship strikes, limiting non-federal vessels over 65 feet in length to speeds no greater than 10 knots from November 15 to April 15 every year off the southeastern coast of the United States, including waters within the Jacksonville Operating Area. *See* 73 Fed. Reg. at 60,179.

62. A variety of sound-emitting systems (ship and submarine sonars, dipping sonars from helicopters, sonobuoys), non-explosive exercise weapons (torpedoes, vertical launch antisubmarine rockets), target submarine simulators, and other hardware will be used repeatedly on the training range during the 470 annual exercises. Many of these acoustic systems, particularly mid-frequency sonar systems, are known to cause a range of impacts on marine

20

wildlife, including habitat displacement and disruptions in critical behavior such as foraging and, in some deep-diving whale species, injury and death.

63. Many of the Navy's expended materials – including 3000 sonobuoys and the parachutes used to deploy them from aircraft – will be left in the waters of the training range after training exercises are completed.

64. The training range will cost approximately $100 million to install.

**D.  The Navy's Decision to Install the Training Range Adjacent to the Right Whale Critical Habitat.**

65. On May 13, 1996, the Navy first published its Notice of Intent to prepare an EIS for the training range.

66. On October 5, 2005, the Navy released a draft EIS proposing to locate the training range off of the coast of North Carolina.

67. The Navy received comments on this draft EIS from state agencies, scientists, commercial fishermen, conservation organizations, and other members of the public, the majority of which were critical of the environmental analyses supporting the Navy's siting decision as well as the Navy's failure to fully and properly analyze environmental impacts, reasonable alternatives, cumulative impacts, and mitigation measures.

68. On September 12, 2008, the Navy released a new draft EIS changing the preferred alternative for the training range from the coast of North Carolina to the Jacksonville Operating Area, adjacent to the only known calving grounds for the highly-endangered North Atlantic right whale.  The new draft EIS did not resolve the defects and concerns raised in the numerous comment letters submitted on the 2005 draft EIS.

69. When the 2008 draft EIS was released, the Navy had not even commenced surveys to

21

assess marine mammal densities in the Jacksonville Operating Area. The Navy also had not commenced surveys of bottom habitat where cables and transducer nodes would be laid or buried within the Jacksonville Operating Area. *See, e.g.*, Fla. Dep't of Envtl. Prot, Comments on Draft EIS at 2 (Nov. 4, 2008) ("[T]he description of the affected environment is very general and not based on surveys or site-specific data collection. Therefore, no conclusive analyses of the effects of installing the grid or the long term use of the area can be made based on the information provided.").

70. Numerous entities, including the affected states of Georgia and Florida, commented on the draft EIS and raised concerns about, among other things, the proximity of the training range to the North Atlantic right whale critical habitat and the impacts of ship strikes, entanglements, sonar, and marine debris on a variety of marine species, including North Atlantic right whales, found in the Jacksonville Operating Area.

71. The State of Georgia noted, in particular, that "[p]rotection of the right whale calving habitat is critical for population recovery" and that

> [g]iven the importance of Georgia and Florida coastal waters to endangered North Atlantic right whales, and given the proximity of the proposed USWTR range to the right whale calving grounds, our chief recommendation would . . . be that the Navy avoid conducting USWTR activities between November 15 and April 15 each year (i.e. when right whales are present off Georgia and Florida).

Ga. Dep't of Natural Res., Comments on the Draft EIS at 1-2 (Oct. 27, 2008).

72. The State of Florida recommended that "based on the endangered status of the right whale and the importance of protecting their habitat along the U.S. eastern coast, our preferred alternative for this project is the 'No Action' alternative." Fla. Fish & Wildlife Conservation Comm'n, Comments on the Draft EIS at 3 (Oct. 20, 2008). Under the "No Action Alternative," no training range would be installed on the East Coast of the United States.

22

73. Numerous non-governmental organizations and scientific institutions such as the Marine Mammal Commission and New England Aquarium submitted comments critical of, among other things, the Navy's analysis of environmental impacts, cumulative impacts, reasonable alternatives, methodology and mitigation.

74. On June 26, 2009, the Navy issued its FEIS selecting the Jacksonville Operating Area as its preferred alternative for the training range. Other alternatives listed in the FEIS include the Charleston Operating Area (Site B); the Cherry Point, NC Operating Area (Site C); and the VACAPES Operating Area (Site D).

75. At the time of the FEIS's release, the Navy had not completed surveys to assess marine mammal densities in the preferred Jacksonville Operating Area (but instead had only initiated density surveys for two of the alternatives not selected).

76. The majority of the marine mammal density information in the FEIS was compiled from the Navy's Marine Resource Assessments ("MRA") program. *See* FEIS at 3.1-1-2.

77. The relevant MRA notes that the data on North Atlantic right whale density in the Jacksonville Operating Area is sorely lacking. *See* MRA at 3-10 (noting that "there is comparatively little effort conducted in other portions of the O[perating Area], particularly deep waters seaward of the continental shelf break"); *id.* at 3-16 ("There [are] also sparse survey efforts for North Atlantic right whales in offshore waters (and the [Jacksonville and Charleston Operating Areas] specifically.").

78. The Navy began conducting surveys to obtain "baseline occurrence information" for marine mammal species in the Jacksonville Operating Area in February of 2009. FEIS at H-153 ("Navy Response to Comments").

79. As the Navy acknowledges, "[i]t takes a significant amount of survey effort to determine marine mammal densities." *Id.* at H-105.  Scientists from the New England Aquarium who commented on the draft EIS noted that it would be "inappropriate" to release an FEIS selecting the Jacksonville Operating Area as the preferred alternative "[u]ntil appropriate survey effort is conducted in these offshore waters year-round for two years (as has been done with the Cherry Point USWTR site) with a more focused effort during the known right whale calving season in order to determine if right whales are routinely entering into or near the USWTR area . . . ." New England Aquarium, Comments of the Draft EIS, at 2 (Oct. 27, 2008).

80. Nonetheless, data from these surveys were not incorporated into the FEIS that was released in June 2009. *See, e.g.*, Ga. Dep't of Natural Res., Comments on the Draft EIS at 2 ("[W]e recommend that comprehensive marine mammal surveys be conducted within the proposed USWTR area across all seasons in order to calculate accurate season-specific estimates of marine mammal density.  This point is particularly important for North Atlantic right whales because the density of right whales beyond 30 N[autical] M[iles] of shore is unknown.  Accurate right whale density estimates for waters beyond 30 NM are needed in order to predict impacts to right whales.  The revised density estimates should be incorporated . . . prior to publication of the Final EIS; they should also be considered by NMFS prior to . . . consulting with the Navy under Section 7 of the Endangered Species Act.").

81. When the FEIS was released, not only had the Navy just begun conducting surveys to obtain baseline marine mammal density information, the Navy also had not completed surveys for the bottom habitat where cables and transducer nodes would be laid or buried. *See, e.g.*, Navy Response to Comments at H-75 ("The survey of the range area itself is not slated to begin

until mid to late 2009, so it [is] likely that the results of that survey will not be available until calendar year 2010.").

82. The FEIS did not consider reasonable alternatives that would have lessened or avoided the impact to right whales and other marine life. For example, the FEIS did not adequately consider a restriction on operations at the training range during the months when North Atlantic right whales are present in the calving grounds. To justify its need to train during the North Atlantic right whale calving season, the Navy explained that "any reduction of training (including seasonal, weather- or light-based restrictions) would not allow Sailors to achieve satisfactory levels of readiness needed to accomplish their mission." FEIS at 6-31. This is in direct contradiction to the Navy's assertion that the training range itself is not necessary to achieve antisubmarine warfare readiness for its sailors:

> Under the No Action Alternative, no USWTR would be installed off the east coast of the U.S. However, under the No Action Alternative, ASW training, including active sonar activities, would continue across Navy O[perating Areas] and adjacent areas in a manner that maximizes training and RDT&E opportunities.... *[A] No Action Alternative would not prevent the Navy from maintaining ASW readiness....*

*Id.* at 2-53. (emphasis added).

83. On July 31, 2009, Assistant Secretary of the Navy for Installations and Environment, B.J. Penn, signed the ROD formally announcing the Navy's decision to install the training range within the Jacksonville Operating Area. The ROD specifies that other alternatives not selected by the Navy are environmentally preferable to the Jacksonville Operating Area. *See* ROD at 19.

84. The ROD implements "only a portion of the proposed action, a decision to move forward with installation of the USWTR." *Id.* at 1. The ROD explicitly reserves the decision of whether to conduct training operations on the training range until a later time, after the Navy conducts additional analyses of the environmental effects of the operation of the training range in the

Jacksonville Operating Area. *See id.* ("The decision to implement training on USWTR will be based on the updated analysis of environmental effects in a future OEIS/EIS….").

85. The ROD admits that additional analyses of the environmental effects of operation of the training range are necessary to make an informed decision about whether to conduct training on the training range at this location.

86. These additional analyses will not be completed before installation of the training range has commenced.

**E.  The Navy's Final Environmental Impact Statement**

**i.  Analysis of Ship Strike Risk in the FEIS**

87. Right whales found in the critical habitat off the Georgia and Florida coasts consist primarily of females and their calves, the most vulnerable and important segment of the population.  According to NMFS, calving season is the most vulnerable time in the entire life of a right whale – any disturbance could affect calving, nursing, or other behaviors critical to the survival of the species.

88. According to NMFS, "[t]he effect of vessel-related deaths on [North Atlantic] right whale recovery is especially significant because a disproportionate number of ship strike victims are female right whales."  73 Fed. Reg. at 60,174.  Mothers and calves spend more time at the surface due to the calves' undeveloped lung capacity, and this may account for the disproportionately high number of female North Atlantic right whales struck by ships.  *See id.*

89. The Navy's FEIS explains that many large whales, including North Atlantic right whales are "hit commonly" and that "North Atlantic right whales are of particular concern" with regard to ship strike risk.  FEIS at 4.2-28, 29.

26

90. Nonetheless, the FEIS concludes that collisions with right whales are "not expected" in connection with activities. *Id.* at 4.2-30.

91. The FEIS reached this conclusion despite the fact that the Navy did not have baseline occurrence data for right whales in the training range area when the FEIS was released.

92. The FEIS fails to include any analysis of the heightened risk of mothers and calves, or of right whales subject to vessel noise, to being struck by ships.

93. The FEIS also fails to acknowledge that North Atlantic right whales subject to sonar operations are likely at an increased risk of being struck by ships. As explained in the Navy's own Marine Resource Assessment for the Jacksonville Operating Area, studies show that North Atlantic right whales "react strongly to alert signals produced by vessels. However, the typical reaction is a rapid surfacing behavior, which may make them more vulnerable to ship strike." MRA at 3-11 (citation omitted).

94. The FEIS also fails to include an adequate analysis of the risk of other marine mammals and endangered and threatened sea turtles to being struck by ships.

**ii.    Analysis of Entanglement Risk in the FEIS**

95. Entanglement is the second largest cause of mortality for North Atlantic right whales and a significant source of mortality for many endangered sea turtle species and cetaceans.

96. During operations on the training range, approximately 3000 sonobuoys and over 300 torpedoes will be deployed from aircraft and vessels.

97. The parachutes and air launch accessories used to deploy these sonobuoys and torpedoes will be left on the sea floor after exercises.

98. The FEIS acknowledges that parachutes on the sea floor could billow and pose an entanglement risk for marine species such as sea turtles and marine mammals if bottom currents are present.

99. The FEIS concludes that the probability of entanglement of a marine mammal or sea turtle in these parachutes is low "given the generally low probability of a sea turtle or marine mammal being in the immediate location of deployment . . . ." FEIS at 4.2-32.

100. The FEIS reaches this conclusion despite the fact that the Navy does not have baseline marine species occurrence data for the Jacksonville Operating Area.

101. The FEIS also concludes that entanglement is "unlikely" because parachutes "are expected to lay flat on the seafloor, as observed at other locations . . . ." *Id.* Yet the FEIS does not analyze ocean currents at the training range, disturbance from continued Naval operations in the area, or any other site-specific conditions that might cause billowing or otherwise prevent parachutes from laying flat.

### iii. Analysis of Other Impacts from Training Exercises in the FEIS

102. The FEIS acknowledges that systems used during training exercises on the training range, particularly mid-frequency sonar systems, can cause a range of impacts on marine mammals, fish, turtles, and other wildlife, including habitat displacement, disruptions in critical behavior such as foraging, and, in some cases, injury, strandings, and death. *See id.* at 4.3-2 to 4.3-19. The FEIS estimates that training exercises will significantly impact individual marine mammals in the vicinity of the site approximately 106,000 times each year. *See id.* at 4.3-28, 60.

103. According to the Navy's analysis, substantial numbers of these impacts are predicted to occur up to 24 nautical miles away from the Navy's vessels (FEIS at 4.3-38, H-31), and therefore can extend significantly beyond the boundaries of the training range itself.

28

104. Although the FEIS's impact estimates require information on the concentration of marine mammals in the area, the Navy did not begin to survey the Jacksonville Operating Area for marine wildlife until February 2009, and has not incorporated its survey data into its FEIS or ROD. NMFS has noted that, given the "limited empirical information available," it could not "estimate the number of endangered or threatened marine animals that might be exposed to the training activities the U.S. Navy plans to conduct on the [training range]." BiOp at 132.

105. Notwithstanding the FEIS's lack of information on species densities at the site, its reliance on the type of observational mitigation that NMFS and others have previously described as ineffectual (*e.g.*, 73 Fed. Reg. at 60,182), and its failure to meet NEPA's requirement of scientific integrity and objective review in its methodology estimating the number and severity of impacts, the FEIS concludes that the cumulative impacts of the Navy's training exercises on the range, either alone or together with impacts from other activities, would not significantly impact right whales or other marine mammals. *See* FEIS at 4.8-81.

### iv. Mitigation Measures in the FEIS

106. One of the primary means proposed by the Navy to avoid ship strikes and acoustic impacts is the use of Naval lookouts to spot marine mammals and report such sightings to the Officer of the Deck so that the marine mammal can be avoided. *See id.* at 4.2-28.

107. NMFS has noted the ineffectiveness of lookouts in detecting marine mammals in general, and North Atlantic right whales in particular given their dark coloration and lack of a dorsal fin:

> The ability of posted lookouts . . . to detect whales is limited by the difficulty of (1) Observing animals in low/no light conditions (e.g., night); (2) observing animals in sea states greater than Beaufort 3-4; and (3) observing whales beneath the surface (where they spend most of their time). ***Right whales rarely break the surface and their backs are black or dark grey, making them difficult to spot even under ideal conditions.***

29

73 Fed. Reg. at 60,182 (emphasis added). As noted above, the use of acoustic signals can leave right whales still more vulnerable to ship strikes. *See* MRA at 3-11.

108. The states of Georgia and Florida have similarly noted the ineffectiveness of lookouts in sighting marine mammals such as North Atlantic right whales. *See, e.g.*, Fla. Fish & Wildlife Conservation Comm'n, Comments on the Draft EIS at 5 ("The amount of dive time in conjunction with weather/visibility issues, however, will limit the ability of observers to detect marine mammals."); Ga. Dep't of Natural Res., Comments on the Draft EIS at 2-3 ("The Navy's emphasis on posting vessel lookouts as the primary operational means of avoiding marine mammal impacts is insufficient. Marine mammals are difficult to detect visually – even by trained observers. The probability of detecting marine mammals at night and in periods of inclement weather is even lower.").

109. The Navy has also proposed measures to mitigate the harmful acoustic impacts on marine mammals, including powering down and potentially securing its sonar system if a marine mammal is detected within 1000 yards. These safety zones are wholly dependent on the lookouts, with possible aid from aircraft, actually detecting marine mammals. *See* FEIS at 6-7.

110. Spatial and temporal restrictions – such as restricting training during the North Atlantic right whale calving season, during whale migration, at night, during poor sea states, and in areas with high-value marine habitat – are also critical to minimizing the potential for ship strikes and acoustic impacts on marine mammals. Spatial and temporal restrictions are generally acknowledged within the international scientific community to be the most effective available means of mitigation.

111. The State of Georgia recommended that "the Navy avoid conducting USWTR activities between November 15 and April 15 each year (i.e. when right whales are present off Georgia and Florida)." Ga. Dep't of Natural Res., Comments on the Draft EIS at 2.

112. The FEIS fails to consider any time or place restrictions or to adopt other means of mitigation that do not depend on the ability of lookouts to spot marine mammals, including the use of range sensors to monitor for species. *See* FEIS at 6-16.

113. Although the FEIS notes that "any reduction of training (including seasonal, weather- or light-based restrictions) would not allow Sailors to achieve satisfactory levels of readiness," FEIS at 6-31, the FEIS contradicts itself by finding that a "No Action Alternative [in which nothing would be installed] would not prevent the Navy from maintaining ASW readiness." *Id.* at 2-53.

114. Speed restrictions also are an important means to avoid and minimize the potential for ship strikes of right whales.

115. According to NMFS, "a 10-knot speed restriction would significantly reduce the risk of serious or lethal collisions for right whales . . . ." 73 Fed. Reg. at 60,177-78. NMFS requires non-federal commercial vessels greater than 65 feet in length to limit their speeds to 10-knots off the southeastern Atlantic seaboard of the U.S. from November 15 to April 15 each year (similar 10-knot restrictions apply during certain times and in certain locations along the rest of Atlantic seaboard where right whales may be present). *See id.* at 60,179, 60,185.

116. Naval ships and submarines generally transit at speeds between 15 and 17 knots. *See* FEIS at 2-36.

117. The FEIS fails to consider any concrete speed restrictions for transits to and from the training range or for operations on the training range.

118. In fact, the FEIS calls NMFS's speed restrictions aimed at minimizing right whale mortality "arbitrary." FEIS at 6-34; *see also* Ga. Dep't of Natural Res., Comments on the Draft EIS at 3 ("Contrary to the Navy's contention in the D[raft] EIS/OEIS, vessel speed limits are not arbitrary. The best available science indicates that whale mortality and serious injury is significantly reduced at speeds of 10 knots or less.").

**D.      NMFS's Biological Opinion**

119. On October 16, 2008, the Navy requested formal consultation with NMFS on the impacts of the training range on listed marine mammals and sea turtles. This consultation resulted in NMFS's Biological Opinion that is the subject of this Complaint.

120. On July 28, 2009, NMFS released its Biological Opinion on installation and operation of the training range in the Jacksonville Operating Area.

121. The Biological Opinion admits that NMFS's analysis of the training range is not complete and that it is not based on full information by explaining that NMFS "expect[s] to conduct new analyses of the potential effects of U.S. Navy training activities on the Undersea Warfare Training Range before training actually occurs" and that the agency "expect[s] those analyses to be based on substantially greater amounts of information." BiOp at 115.

122. The Biological Opinion again highlights the lack of data to support its conclusions in its Exposure Analysis, noting that NMFS cannot rely on "the limited empirical information available . . . to estimate the number of endangered or threatened marine animals that might be exposed to the training activities the U.S. Navy plans to conduct on the [training range]." *Id.* at 132. Yet the Biological Opinion concludes that the installation and operations of the training range will not pose jeopardy to any species.

123. The Biological Opinion does not include an Incidental Take Statement for the endangered species covered by the opinion, instead explaining as follows:

> The National Marine Fisheries Service is not including an incidental take authorization for marine mammals at this time because (1) we do not expect endangered or threatened species to be "taken" during the installation phase of the proposed action and (2) the incidental take of marine mammals that might occur during the operational phase of the proposed action has not been authorized under section 101(a)(5) of the Marine Mammal Protection Act of 1972, as amended.

*Id.* at 198.

124. The Biological Opinion does not specify the anticipated amount or extent of incidental takings of listed species from operations of the training range and does not set forth "take thresholds" for any listed species which if exceeded would trigger the immediate need to reinitiate consultation. Nor does the Biological Opinion contain any reasonable and prudent measures necessary to minimize the impact of any take, or monitoring measures to assess the extent or impact of any take.

### i. The Biological Opinion's Analysis of Installation

125. Despite the Navy and NMFS's admitted lack of data, the Biological Opinion concludes that installation activities are not likely not to adversely affect threatened or endangered species.

126. The Biological Opinion lists the following potential impacts on listed species that will be associated with the installation phase of the training range: (1) ship strikes during installation; (2) disturbance associated with movement of vessels; (3) alteration and disturbance of habitat with movement of vessels and placement of nodes and cables; and (4) risk of entanglement posed by cables and trunk line. *See id.* at 112.

127. The Biological Opinion fails to analyze the risk of ship strike for threatened and endangered sea turtles during the installation phase.

128. Without relying on any marine species density data, the Biological Opinion concludes that listed whales and turtles are not likely to be exposed to the installation activities and thus no takes will occur during installation. *See id.* at 114, 198. This is in direct contradiction to the FEIS's conclusion that "[c]able installation could result in the incidental mortality of sea turtles . . . ." FEIS at 4.2-20.

### ii. The Biological Opinion's Analysis of Operations

129. The Biological Opinion does not attempt to estimate take expected to be caused by operations on the training range and states that more information will be required to complete this analysis.

130. The Biological Opinion acknowledges that systems used during training exercises, particularly the use of mid-frequency active sonar, can have the same impacts as described in Paragraph 102 above. *See* BiOp at 151-85.

131. The Biological Opinion also acknowledges that it does not have the information necessary to estimate acoustic impacts on marine mammals. Given the "limited empirical information available," NMFS cannot "estimate the number of endangered or threatened marine animals that might be exposed to the training activities the U.S. Navy plans to conduct on the [training range]." *Id.* at 132.

132. The Biological Opinion documents the highly precarious status of the North Atlantic right whale. Consistent with NMFS's previous warnings, the Biological Opinion concludes that "the death or survival of one or two individual animals is sufficient to determine whether North Atlantic right whales are likely to accelerate or abate the rate at which their population continues to decline . . . ." *Id.* at 58. In other words, the death of just one or two North Atlantic right whales is likely to jeopardize the continued existence of the entire species.

34

133. The Biological Opinion also finds that North Atlantic right whales have "elevated extinction probabilities" because of risks from ship strikes and other threats, and that "[b]ased on the number of other species in similar circumstances that have become extinct (and the small number of species that have avoided extinction in similar circumstances), the longer North Atlantic right whales remain in these circumstances, the greater their extinction probability becomes." *Id.* at 58, 109.

134. The Biological Opinion explains that the rate at which North Atlantic right whales are killed or harmed by ship strikes and entanglements appears to be increasing.

135. The Biological Opinion explains that ship strikes represent one of the greatest threats to the continued existence of the North Atlantic right whale. *See id.* at 57; *see also* 71 Fed. Reg. 77,704, 77,710 (Dec. 27, 2006) ("Collisions with ships are the single largest cause of right whale mortality in the western North Atlantic.").

136. In rulemakings aimed at protecting North Atlantic right whales from ship strikes, NMFS has warned that "[f]or the North Atlantic right whale population to recover, vessel-related deaths and injuries must be reduced." *See* 73 Fed. Reg. at 60,174; *see also* 71 Fed. Reg. at 77,714 ("The available evidence strongly suggests that the western population of North Atlantic right whale cannot sustain the number of deaths that result from ship strikes and fishing gear interactions. If the impact of these activities continue[s] at current rates, it is likely to result in the extirpation of the western population of North Atlantic right whales.").

137. The Biological Opinion concludes that "[w]hen the vulnerability of right whales to ship strikes is combined with the density of ship traffic within the distribution of right whales, ***ship strikes seem almost inevitable***." BiOp at 98 (emphasis added).

35

138. Regarding the effectiveness of lookouts in detecting marine mammals, the Biological Opinion finds that the "the effectiveness of visual monitoring is limited to daylight hours, and its effectiveness declines during poor weather conditions . . . ." *Id.* at 140-41.

139. The Biological Opinion also finds that "[i]t is not clear . . . how the U.S. Navy's watchstanders and lookouts, who are specifically trained to identify objects in the water surrounding Navy vessels compare with observers who are specifically trained to detect and identify marine mammals." *Id.* at 141.

140. The Biological Opinion concludes that "most marine animals will not be detected at the ocean's surface." *Id.*

141. The Biological Opinion does not account for the increased risk that use of sonar poses for ship strikes of right whales (BiOp at 182), despite information to the contrary contained in the FEIS and other NMFS analyses. *See* FEIS at 4.3-29 to 4.3-31; 74 Fed. Reg. 4844, 4867 (Jan. 27, 2009).

142. Despite NMFS's earlier findings that "a 10-knot speed restriction would significantly reduce the risk of serious or lethal collisions for right whales," 73 Fed. Reg. at 60,177-78, the Biological Opinion does not require the Navy to limit its speed to 10 knots or less when transiting through the critical habitat or at other appropriate times, like all other non-federal vessels of 65 feet in length.

143. The Biological Opinion admits that North Atlantic right whales could be struck in connection with Navy vessels transiting to and from the training range as well as during training operations on the training range. The Biological Opinion states that NMFS is not "able to conclude that a strike would be impossible" during operation of the training range. BiOp at 134.

144. Despite this conclusion, and in the face of its own dire warnings that (1) the loss of even an individual whale could pose jeopardy to the continued existence of the species and (2) that ship strike risks must be reduced, the Biological Opinion arbitrarily concludes that the installation and operation of the training range is not likely to jeopardize the continued existence of the North Atlantic right whale. *See id.* at 197.

145. The Biological Opinion fails to include any Incidental Take Statement covering the potential takes of North Atlantic right whales or other marine mammals from ship strikes, acoustic impacts, or other adverse effects, as well as any reasonable and prudent measures to minimize the impacts of such take.

146. The Biological Opinion acknowledges that endangered sea turtles could become entangled in discarded gear, such as parachutes, on the training range. For example, the Biological Opinion states that "[s]ea turtles that occur on the [USWTR] might encounter one or more of the parachutes . . . and could become entangled as a result." *Id.* at 143.

147. The Biological Opinion states that NMFS "cannot . . . determine whether such interactions are probable . . . ." *Id.*

148. The Biological Opinion concedes that an interaction between a sea turtle and discarded gear on the training range could be fatal to endangered sea turtles. *See id.* at 196.

149. Yet the Biological Opinion concludes operations on the range are not likely to jeopardize the continued existence of sea turtles because training activities won't "interact with sufficient number of adult or sub-adult sea turtles . . . ." *Id.* The Biological Opinion cites no data to support this no jeopardy conclusion.

150. The Biological Opinion fails to include an Incidental Take Statement or reasonable and prudent measures to minimize the impact of sea turtle takes.

37

### iii.   The Biological Opinion's Analysis of Impacts to Critical Habitat

151. The coastal waters of southern Georgia and northeast Florida, which serve as the only known calving grounds for the North Atlantic right whale, have been designated as critical habitat for that species. *See* 59 Fed. Reg. at 28,803 (noting "the importance of the area to the reproductive potential (recovery) of the species"). In designating this area, NMFS identified a number of activities that could lead to degradation of this habitat, including "noise from seismic testing, drilling and support activity; and disturbance of the environment through vessel traffic" and noted that "[i]f these types of activities are proposed, their timing and location may also require special management considerations, including the establishment and maintenance of buffer zones." *Id.* at 28,796-97.

152. According to the FEIS, although the training range is not located within the designated critical habitat, that habitat would be affected by the burial of the trunk cable within the critical habitat area. *See* FEIS at 4.2-21. The FEIS also noted that the designated critical habitat would experience increased turbidity from displaced sediment caused by the burying of the trunk cable and the installation of approximately 300 transducer nodes. *See id.* at 4.2-21 to 4-2-22. Additionally, sonar could travel 80 nautical miles, a distance that would extend into the critical habitat, even though the use of sonar would occur outside that habitat. *See id.* at H-31.

153. In the BiOp, NMFS noted that there were multiple potential stressors associated with the construction and operation of the training range, including disturbance related to the movement of vessels during construction and training activities, habitat alteration and disturbance associated with the placement of various components of the training range, the use of mid- and high-frequency active sonar during training, and the use of parachutes during training. *See* BiOp at 20.

154. Despite identifying both vessel traffic and the use of sonar as potential stressors, the BiOp contains no discussion regarding why those activities would not adversely affect or modify right whale critical habitat.

155. Additionally, NMFS determined that the installation of the trunk cable would affect 500,000 square meters of ocean bottom. *See id.* at 114. However, it did not discuss whether it expected such an action to adversely affect the right whale critical habitat. Although NMFS cited multiple studies evaluating the short-term and long-term impacts of such cables on ecosystems, it did not attempt to analogize the results of those studies to the training range and the effects its installation would have on right whale habitat. *See id.* Instead, NMFS found that these and other installation impacts would not adversely affect right whales and other listed species because they were not likely to be exposed to the installations. *See id.*

156. NMFS ultimately concluded that "activities associated with the Installation and Operations Phases of the [USWTR] may affect, but are not likely to adversely affect critical habitat that has been designated for endangered . . . species in the action area," and that, as a result, "those activities are not likely to result in the destruction or adverse modification" of that critical habitat. *Id.* at 197.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### (Navy Failed to Consider Adequately the Impacts of the Installation and Operation of the Training Range in Violation of NEPA and the APA)

157. The allegations contained in paragraphs 1-156 are incorporated herein by reference.

158. NEPA and its implementing regulations require federal agencies to take a "hard look" at the direct, indirect, and cumulative environmental impacts of proposed actions using the best available scientific information. 42 U.S.C. § 4332; 40 C.F.R. § 1502.15; *see also* 40 C.F.R.

§ 1508.7 (EISs must assess all "reasonably foreseeable" impacts); 40 C.F.R. § 1508.8 (effects include ecological, aesthetic, historical, cultural, socioeconomic, social or health impacts, whether direct, indirect or cumulative); 40 C.F.R. § 1508.25(a)(2) (EISs must analyze the effects of actions "which when viewed with other proposed actions have cumulatively significant impacts"); 40 C.F.R. § 1508.25(c) (EIS shall consider three types of impacts, including direct, indirect, and cumulative effects).

159. In the FEIS, the Navy failed to take a hard look at the direct, indirect and cumulative impacts, of the construction and operation of the training range. The Navy failed to adequately consider, *inter alia*: the potential for increased ship strikes and acoustic impacts on endangered and threatened species and marine mammals caused by operations on the training range; the entanglement threats created by the use and abandonment of debris; reasonable alternatives for the siting of USTWR, and reasonable operational alternatives other than alternative sites. Additionally, the Navy failed to take a hard look at viable mitigation measures including, *inter alia*, seasonal closures of the training range.

160. The Navy's failure to adequately analyze the direct, indirect, and cumulative impacts of the proposed action in the FEIS violates NEPA and its implementing regulations and is arbitrary, capricious, and otherwise not in accordance with law within the meaning of the APA. *See* 5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332; 40 C.F.R. §§ 1502.14, 1502.15, 1502.16; 1505.2, 1508.7, 1508.8, 1508.25.

## SECOND CLAIM FOR RELIEF
### (Navy Violation of NEPA and the APA for Failing to Include Essential Information in the EIS)

161. The allegations contained in paragraphs 1-160 are incorporated herein by reference.

162. NEPA and its implementing regulations require that if information is essential to a reasoned choice among alternatives, and can be obtained without exorbitant cost, the agency must include the information in the EIS. *See* 40 C.F.R. § 1502.22(a). If the information cannot be obtained because the overall cost of obtaining it is exorbitant or the means of obtaining it are not known, the agency must (1) state that such information is incomplete or unavailable; (2) state the relevance of such information; (3) summarize the existing credible evidence relevant to evaluating impacts; and (4) evaluate such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. *See id.* § 1502.22(b). NEPA's implementing regulations also require agencies to ensure the "professional integrity, including scientific integrity," of the analyses included in an EIS. *Id.* § 1502.24.

163. Additional information is necessary for the Navy to make an informed decision regarding the environmental impacts, alternatives and the operations of the proposed range. *See* ROD at 1. Specifically, the Navy only recently – in February 2009 – began conducting surveys of marine mammal densities that are necessary to determine the impacts of the proposed actions in the Jacksonville Operating Area. No data from these surveys has been incorporated into the FEIS. The Navy's FEIS is further undermined by its failure to meet NEPA's requirement of scientific integrity and objective review.

164. The Navy's failure to comply with 40 C.F.R. §§ 1502.22(a) & (b) and 1502.24, is a violation of NEPA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of the APA. *See* 5 U.S.C. § 706(2)(A); 40 C.F.R. §§ 1502.22(a), (b), 1502.24.

## THIRD CLAIM FOR RELIEF
### (Navy Violation of NEPA and the APA for Impermissibly Segmenting Analysis of the Construction and Operation of the Training Range)

165. The allegations contained in paragraphs 1-164 are incorporated herein by reference.

166. NEPA requires the preparation of an environmental impact statement for all major federal actions significantly affecting the quality of the human environment. *See* 42 U.S.C. § 4332(2)(C). An agency must consider all phases of a project together as part of a single NEPA review. *See* 40 C.F.R. § 1508.25(a)(1)-(3) (requiring agency to consider all connected, similar, and cumulative actions together).

167. While an agency is in the process of preparing an EIS to evaluate the impacts of a proposed action, the agency may not take any "action concerning the proposal . . . which would . . . [h]ave an adverse environmental impact . . . or [l]imit the choice of reasonable alternatives." *Id.* § 1506.1(a). *See also* 40 C.F.R. § 1502.2(f) ("Agencies shall not commit resources prejudicing selection of alternatives before making a final decision . . . .").

168. The Navy has decided to move forward with the construction and installation of the training range, while delaying the issuance of a Record of Decision as to the operations of the range to a later time. The Navy was required to fully assess the operational impacts of the proposed range before committing to the construction of the range. *See* 40 C.F.R. § 1508.25(a)(1)-(3). Constructing the range prior to the issuance of a Record of Decision for the operations of the range will limit the choice of reasonable alternatives for operations and have an adverse environmental impact. *See* 5 U.S.C. § 706(2)(A); 40 C.F.R. §§ 1502.2(f), 1506.1(a).

169. The Navy's Record of Decision authorizing construction of the training range prior to the completion of NEPA review for operations of the range is a violation of NEPA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of the APA. *See* 5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.2(f), 1506.1(a), 1508.25(a)(1)-(3).

## FOURTH CLAIM FOR RELIEF
## (NMFS Violation of the APA for Failing to Support Conclusions in the Biological Opinion)

170. The allegations contained in paragraphs 1-169 are incorporated herein by reference.

171. Under the ESA, every federal agency is required to "insure that any action authorized, funded, or carried out by [the] agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species . . . ." 16 U.S.C. § 1536(a)(2). In furtherance of this requirement, an agency must consult with NMFS whenever an action "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). Absent a determination that "the action is not likely to adversely affected any listed species or critical habitat," *id.* §§ 402.13(a), 402.14(b)(1), NMFS is required to prepare a biological opinion assessing "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4), (h); *see also* 16 U.S.C. § 1536(b)(3)(A).

172. In the Biological Opinion, NFMS determined that the installation of the training range was not likely to jeopardize the continued existence of any listed species. Nor was it likely to result in the take of any listed species. In so concluding, NMFS arbitrarily determined that ship strikes and entanglement were unlikely to occur during installation because protected species were unlikely to be present during this phase of project.

173. NMFS also determined that the operation of the training range was not likely to jeopardize the continued existence of any protected species. In so concluding, NMFS failed to consider or address, *inter alia*, density data sufficient to estimate actual probability of ship strike encounters and acoustic impacts, the vulnerability of the North Atlantic right whale population,

43

and the entanglement risks posed by debris from operations on the training range.  In its no-jeopardy determination, NMFS also improperly relied on mitigation measures such as shipboard lookouts and Navy representations that vessels will obey an undisclosed "slow, safe speed" that are not reasonably specific, not certain to occur, and admittedly ineffective.

174. NMFS also determined that the installation and operation of the training range would not adversely affect the designated critical habitat for the North Atlantic right whale.  In so concluding, NMFS failed to analyze the impacts of vessel traffic, the use of sonar, and installation of the trunk cable on the conservation value of the species' only known calving grounds.

175. In sum, NMFS's determinations that neither the installation nor the operation of the training range are likely to jeopardize the continued existence of any threatened or endangered species, that installation is not likely to take any threatened or endangered species, and that installation and operations are not likely to adversely modify or destroy designated critical habitat have no factual or analytical basis in the Biological Opinion.  NMFS's failure in the Biological Opinion to articulate a rational connection between the facts found and the conclusions reached is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law, in violation of the APA, 5 U.S.C. § 706(2).

## FIFTH CLAIM FOR RELIEF
### (NMFS Violation of the ESA and APA for Not Issuing Incidental Take Statement)

176. The allegations contained in paragraphs 1-175 are incorporated herein by reference.

177. ESA § 7(b)(4) requires NMFS to issue an incidental take statement whenever a proposed federal agency action is not likely to jeopardize the continued existence of a listed species but is likely to result in incidental take of members of the species.  *See* 16 U.S.C.

44

§ 1536(b)(4). The incidental take statement must specify "those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact" and "the terms and conditions . . . that must be complied with by the Federal agency . . . to implement the measures . . . ." *Id.* The incidental take statement must also "[s]pecif[y] the impact, i.e., the amount or extent, of such incidental taking on the species." 50 C.F.R. § 402.14(i)(1)(i).

178. NMFS issued a Biological Opinion that concluded that neither installation nor operation of the training range was likely to jeopardize the continued existence of any listed species or adversely affect designated critical habitat. The Biological Opinion further concluded that no take of listed species was likely to result from installation, despite evidence in the Biological Opinion's analysis that take of listed species, in fact, is likely.

179. By issuing a biological opinion approving action where take is anticipated, but without providing an incidental take statement, NMFS has violated § 7(b)(4) of the ESA. *See* 16 U.S.C. § 1536(b)(4). NMFS's actions and omissions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law within the meaning of the APA. *See* 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.  Declare that the Navy Defendants are each in violation of NEPA as described above;

B.  Declare that the NMFS Defendants are each in violation of the APA and the ESA as described above;

C.  Vacate the Navy's June 26, 2009 FEIS and July 31, 2009 Record of Decision to construct the training range in the Jacksonville Operating Area;

D.  Remand the FEIS and ROD to the Navy for preparation of a supplemental EIS and ROD following a full review of environmental impacts, reasonable alternatives, cumulative impacts, and viable mitigation measures, and based on essential survey data in compliance with NEPA and the APA;

E.  Vacate NMFS's July 28, 2009 Biological Opinion;

F.  Remand the Biological Opinion to NMFS for preparation of a new Biological Opinion in compliance with the ESA and the APA;

G.  Order all Defendants to comply with NEPA, the ESA and the APA in connection with any further actions on the training range;

H.  Grant, in its discretion, Plaintiffs their costs of suit, including reasonable attorneys' fees and expert witness fees; and

I.  Grant Plaintiffs such further and additional relief as this court deems to be necessary and appropriate.

Respectfully submitted this 28th day of January, 2010.

/s Catherine M. Wannamaker
Catherine M. Wannamaker
GA Bar No. 811077
Southern Environmental Law Center
127 Peachtree St NE, Suite 605
Atlanta, GA 30303-1840
Phone: (404)521-9900
Fax:    (404)521-9909
Email: cwannamaker@selcga.org


COUNSEL FOR PLAINTIFFS
DEFENDERS OF WILDLIFE,
THE HUMANE SOCIETY OF
THE UNITED STATES; WHALE
AND DOLPHIN CONSERVATION
SOCIETY; THE CENTER FOR
A SUSTAINABLE COAST; AND THE SOUTH
CAROLINA COASTAL CONSERVATION
LEAGUE THE NORTH CAROLINA
WILDLIFE FEDERATION

/s Dana F. Braun
Dana F. Braun
Ga. Bar No. 078512
Callaway, Braun, Riddle, & Hughes
301 West Congress Street
Savannah, GA 31412
Phone: (912) 238-2750
Fax:    (912) 238-2767
Email:  DBraun@CBRHLAW.COM


COUNSEL FOR PLAINTIFFS