# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA
# BRUNSWICK DIVISION

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, et al., | ) | No. 2:10-cv-00014-LGW-JEG |
| | ) | |
| Plaintiffs, | ) | Judge Wood |
| | ) | |
| v. | ) | DEFENDANTS' OPPOSITION TO |
| | ) | PLAINTIFFS' MOTION FOR |
| UNITED STATES DEPARTMENT OF THE | ) | SUMMARY JUDGMENT AND |
| NAVY, *et al.*, | ) | CROSS-MOTION FOR SUMMARY |
| | ) | JUDGMENT |
| Defendants. | ) | |
| | ) | |

## INTRODUCTION

Defendants, the U.S. Department of the Navy ("Navy"), the National Marine Fisheries Service ("NMFS"), *et al.*, hereby oppose Plaintiffs' motion for summary judgment (Doc. 73) and cross-move for the entry of summary judgment in Defendants' favor.

Plaintiffs' brief creates the fundamentally erroneous impression that the Navy's Undersea Warfare Training Range ("USWTR" or "range") will bring an entirely new set of training activities to waters off the coast of Florida. In fact, the USWTR will be constructed in a relatively small portion of the Navy's existing Jacksonville Operating Area, where the Navy has been training for over 60 years. The USWTR is not expected to cause any significant change to training already occurring in the area, which has been studied extensively in comprehensive environmental analyses not at issue in this lawsuit. Thus, what the USWTR adds to the equation is not significant new risks of ship strikes, entanglements, and other impacts on marine life, as Plaintiffs would have the Court believe, but telecommunications lines and nodes that will allow the Navy to record and enhance existing training scenarios that are critically important to military preparedness, and which will not have any significant impact on the environment.

Moreover, while Plaintiffs assert that the Navy has "segmented" its environmental review under the National Environmental Policy Act ("NEPA") in an effort to dilute the perceived impact of the USWTR, the assertion is meritless. The Navy's Environmental Impact Statement analyzes the effects of both installation *and operation* of the USWTR, and while the Navy has deferred its *decision* to authorize operations, it is not for the duplicitous reason Plaintiffs allege. Rather, the Navy cannot operate the USWTR until NMFS promulgates regulations under the Marine Mammal Protection Act ("MMPA") authorizing the incidental take of marine mammals. By statute, the time limit on such regulations is five years – about the same amount of time required to construct the USWTR. Instead of wasting scarce resources pursuing regulations that would expire before the USWTR is even operational, the Navy reasonably deferred any decision to pursue the requisite MMPA regulations or authorize range operations until the USWTR is constructed. Contrary to Plaintiffs' arguments, the Navy's legitimate use of scarce funds does not run afoul of any provision of NEPA or the ESA.

Plaintiffs' contention that the Navy failed to consider certain "baseline" data in evaluating alternatives is also devoid of merit. The Navy assessed the best available information for marine mammal densities and bottom habitat in accordance with NEPA while acknowledging that future, in-depth surveys would benefit the MMPA rulemaking process. The Navy should hardly be faulted for funding these surveys or recognizing that emerging scientific information can be evaluated prior to any final decision to authorize range operations.

Plaintiffs' remaining arguments constitute an improper attempt to flyspeck the agencies' analyses for asserted technical deficiencies. This is not the purpose of judicial review under the deferential arbitrary and capricious standard contained in the Administrative Procedure Act ("APA"). Because the agencies' thorough analyses are rational and supported by the administrative record, summary judgment should be entered for Defendants.

## STATUTORY AND REGULATORY BACKGROUND

## I.      The National Environmental Policy Act

The purpose of NEPA is to focus the attention of the federal government and the public on a proposed action so that the consequences of the action can be studied before it is implemented.  See Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989).  NEPA's mandate to federal agencies is "essentially procedural. . . .  It is to insure a fully informed and well-considered decision. . . ."  Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 558 (1978).  NEPA imposes only procedural requirements and "does not mandate particular results."  Winter v. NRDC, 555 U.S. 7, 23 (2008) (citation omitted).

NEPA directs each federal agency to prepare an Environmental Impact Statement ("EIS") prior to taking any major federal action significantly affecting the quality of the human environment.  42 U.S.C. § 4332(C); 40 C.F.R. § 1508.18.  An EIS should include an analysis of alternatives to the proposed action, 40 C.F.R. § 1502.14, a discussion of direct, indirect, and cumulative impacts, id. §§ 1502.16 (a)-(b), 1508.7, 1508.8, and means to mitigate the adverse environmental impacts of the proposed action.  Id. § 1502.16(h).  The preparation of an EIS involves several steps.  First, the responsible agency prepares a draft EIS ("DEIS") and solicits public comments.  40 C.F.R. § 1503.1.  The agency must then "assess and consider" the comments in drafting the final EIS ("FEIS") and publish notice of availability of the FEIS in the Federal Register.  Id. §§ 1503.4, 1506.10(b).  When the agency makes its final decision regarding the proposed action and alternatives discussed in the FEIS, the agency must "prepare a concise public record of decision" ("ROD") identifying the agency's decision and the alternatives considered.  40 C.F.R. § 1505.2.

The Eleventh Circuit has made clear that a court's "only role [under NEPA] is to ensure that the agency has taken a 'hard look' at the environmental consequences of the proposed

action." Fund for Animals, Inc. v. Rice, 85 F.3d 535, 546 (11th Cir. 1996) (citation omitted).

"Courts may not 'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor. . . Allowing courts to seize upon any trivial inadequacy in an EIS as reason to reject an agency decision would permit undue intrusion into an agency's decisionmaking authority." Nat'l Audubon Soc'y v. Dep't of Navy, 422 F.3d 174, 186 (4th Cir. 2005) (internal citations and quotations omitted); accord Nevada v. Dep't of Energy, 457 F.3d 78, 93 (D.C. Cir. 2006). Rather, the court applies a "rule of reason" in determining whether an EIS has permitted a "reasoned choice among the various options." N. Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1541 (11th Cir. 1990); accord Isle of Hope Historical Ass'n v. U.S. Army Corp. of Eng'rs, 646 F.2d 215, 220 (11th Cir. 1981).

## II.      The Endangered Species Act

The ESA provides for the listing of species as threatened or endangered and the designation of their critical habitat. 16 U.S.C. § 1533. The Secretary of Commerce has responsibility for listed marine species (including marine mammals and sea turtles when in the marine environment) and administers the ESA through NMFS. The Secretary of Interior is responsible for listed terrestrial species, inland fish species, and (as is relevant here) manatees, and administers the ESA through the U.S. Fish and Wildlife Service ("FWS"). See id. § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b).

The ESA protects listed species in several ways. Section 9 generally prohibits any person from "taking" members of a listed species. 16 U.S.C. §§ 1538(1)(B), 1539(a)(1)(B). To "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." Id. § 1532(19). ESA Section 7(a)(2) directs each federal agency to insure, in consultation with NMFS or FWS, "that any action authorized, funded, or carried out by such agency. . . is not likely to jeopardize the continued existence of" a listed species or

destroy or adversely modify designated critical habitat.  <u>Id.</u> § 1536(a)(2).  Consultation is required if a proposed federal action "may affect" listed species or critical habitat.  50 C.F.R. § 402.14(a).  Formal consultation is required unless the action agency and NMFS or FWS (the "consulting agency") provides its written concurrence that the action is "not likely to adversely affect" listed species or critical habitat.  <u>Id.</u> §§ 402.13(b), 402.14(a).  The action agency may prepare a "biological assessment" to assist in determining the need for formal consultation.  <u>Id.</u> § 402.12(a).  At the conclusion of formal consultation, the consulting agency issues its "biological opinion" as to whether the proposed action is likely to jeopardize the continued existence of any listed species or destroy or adversely modify critical habitat.  <u>Id.</u> § 402.14(g)(4).

As the statutory language indicates, the relevant inquiry under the jeopardy standard is whether the proposed action "is likely to jeopardize the continued existence of the **entire** species, subspecies, or vertebrate population as listed."  <u>Endangered Species Consultation Handbook</u>, at 4–37-38 (1998) ("Consultation Handbook")[1]; 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02 (defining "jeopardize the continued existence of"); see <u>Audubon Soc'y of Portland v. NMFS</u>, 2011 WL 3273139, at *24 (D. Or. July 29, 2011).  "Adverse effects may exist without constituting jeopardy," 51 Fed. Reg. 19,926, 19,950 (June 3, 1986), and "adverse effects not rising to the level of 'jeopardizing the continued existence' of a listed species cannot be the basis for issuing a jeopardy opinion."  <u>Id.</u> at 19,934-35.

In 1982, the ESA was amended "to resolve the situation in which a federal agency . . . has been advised that the proposed action will not violate Section 7(a)(2) of the Act but . . . will result in the taking of some species incidental to that action."  H.R. Rep. 97-567, 97th Cong., 2nd Sess., at 26, <u>reprinted in</u> 1982 U.S.C.C.A.N. 2807, 2826 (May 17, 1982).  In that situation, the biological opinion must include an incidental take statement ("ITS") specifying the amount or

[1] The Handbook is available at http://www.nmfs.noaa.gov/pr/laws/esa/policies.htm.

extent of anticipated take. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). The ITS provides an

exception to take prohibition in ESA Section 9; any take in compliance with the terms and

conditions of the ITS is not unlawful. 16 U.S.C. § 1536(o)(2). However, where, as here, the

proposed action is likely to result in take of listed marine mammals, NMFS *is prohibited* from

issuing an ITS until the take has been authorized under the MMPA. Id. § 1536(b)(4)(c). In

relevant part, the MMPA authorizes NMFS to issue regulations permitting the incidental take of

marine mammals by persons "engage[d] in a specified activity . . . within a specified geographic

region" during periods of "not more than five consecutive years." Id. § 1371(a)(5)(A).

In fulfilling its obligations under ESA Section 7, NMFS must use the "best scientific and

commercial data available." 16 U.S.C. § 1536(a)(2). "The 'best available data' requirement

makes it clear that [NMFS] has no obligation to conduct independent studies," Sw. Ctr. for

Biological Diversity v. Babbitt, 215 F.3d 58, 60 (D.C. Cir. 2000), and "requires not only that

data be attainable, but that researchers in fact have conducted the tests." Am. Wildlands v.

Kempthorne, 530 F.3d 991, 998 (D.C. Cir. 2008).

### STATEMENT OF FACTS

The USWTR will be constructed within the Navy's Jacksonville Operating Area off the

coast of Florida, where the Navy has conducted anti-submarine warfare ("ASW") training for

over 60 years. DON185892.[2] The purpose of the USWTR facility is to enhance and improve the

Navy's ASW training exercises by providing real-time feedback to the units engaged in those

training activities. DON181855, NMFS AR 1588. These exercises are critical to the Navy's

ability to detect and defeat submarines operating in littoral (shallow water) environments where

---

[2] "DON _____" refers to the Navy's Administrative Record for its Record of Decision. "NMFS
AR ___" refers to NMFS's Administrative Record for its July 29, 2009 Biological Opinion.

environmental conditions coupled with new noise reduction technologies make detection increasingly difficult.  DON185887, 185893-95; DON181854-55.

The USWTR will consist of undersea, fiber optic telecommunications cables and up to 300 nodes over a 500 square-nautical-mile ("NM") area of ocean located approximately 50 NM off the northeast coast of Florida.  DON185886.  The nodes, or acoustic transducer devices, will transmit and receive acoustic signals from ships and submarines operating within the USWTR, which will allow the position of exercise participants to be determined and stored electronically for real-time feedback and future evaluation.  DON181857.  The USWTR will be linked by an underwater cable to an onshore facility at Naval Station Mayport, Florida, where the collected data will be used to evaluate performance.  DON185886, 181857-58.  Construction of the USWTR, which has not yet commenced, will be completed no sooner than 2014.  DON185885.

A wide range of ships, submarines, and aircraft that already conduct ASW training in the Jacksonville Operating Area will be the users of the USWTR.  DON185886.  While the Plaintiffs' claims focus on the allegedly harmful effects of ship traffic, the most frequent anticipated users of the USWTR will be Navy helicopters and aircraft based in Mayport and Jacksonville; of the 470 exercises expected to occur annually, 355 (over 75 percent) are projected to involve aircraft versus only one submarine target, with no surface vessels involved. DON185889-90.  There are no records of a submarine ever striking a whale.  DON183489.

A portion of the critical habitat for the North Atlantic right whale, an endangered species, has been designated off the coast of Florida 35 NM inshore of the proposed USWTR. DON182086.  The only portion of construction that will take place in the critical habitat is installation of the trunk cable connecting the USWTR with the onshore cable termination facility.  DON182352-53.  Cable installation will be suspended during the right whale calving season, and the trunk cable will be buried for its entire length.  DON182677; DON181857.

The USWTR is not expected to result in any increase in ship traffic in the Jacksonville Operating Area, including traffic across right whale critical habitat.  DON183901.[3]  Vessels using the USWTR will do so as part of their normally scheduled at-sea training, which has previously been analyzed in other environmental impact statements, biological opinions, and MMPA regulations not at issue in this lawsuit.  Id.; DON181951, 161835, 170482; NMFS AR 1578, 1729, 1752-53; 74 Fed. Reg. 4,844 (Jan. 27, 2009); 74 Fed. Reg. 28,349 (June 15, 2009).  Notably, since the Navy implemented various mitigation measures in 1997 for the protection of right whales and their critical habitat, Navy vessels have transited through critical habitat without incident.  Those successful protective measures include: 1) having specially trained lookouts on surface vessels; 2) maintaining a minimum distance of 500 yards from any sighted right whale, 3) during calving season, operating at as slow a speed as necessary consistent with essential mission, training and operational needs, and 4) reporting any sightings to the surveillance facility for distribution of sighting reports to other vessels in the area.  DON183907-08.

On October 28, 2005, the Navy announced the availability of a DEIS for the proposed installation and operation of the USWTR off the coast of North Carolina.  DON185896.  On September 21, 2007, after evaluating the public comments and considering new scientific data, the Navy announced its intention to issue a revised DEIS.  DON186897.  Notice of availability of the revised DEIS was published on September 12, 2008.  DON185897-98.  The revised DEIS identified the preferred site as the Jacksonville Operating Area.  Id.; DON185892.  On June 26, 2009, after evaluating public comments on the revised DEIS, the Navy issued its FEIS for the

---

[3] Ship traffic in and out of Mayport (the only vessel traffic that would traverse the right whale's critical habitat) will actually *decrease* by 2014 – prior to the USWTR commencing operation – as the result of the Navy's planned downsizing of Mayport's fleet from 22 vessels to 12 vessels by 2014.  DON182594, 156213 (Figure ES-1; showing number of ships homeported at Mayport in 2006 (22) and in preferred alternative 4 (12)); DON165419-20 (Mayport ROD describing decrease in homeported ships from 22 to 12).  In light of this future decrease in ship traffic out of Mayport, the USWTR EIS actually *overestimates* the amount of ship traffic that will traverse the right whale's critical habitat.

installation and operation of the USWTR at the preferred site in the Jacksonville Operating Area. DON185898. NMFS was a cooperating agency in the preparation of the FEIS. DON181852.

The Navy also prepared a biological assessment ("BA") and initiated formal consultation with NMFS pursuant to ESA Section 7(a)(2). DON160498, 185886. On July 28, 2009, NMFS issued its biological opinion ("BiOp"). NMFS AR 1731. NMFS concluded that USWTR installation is not likely to adversely affect listed species and, as a result, the BiOp does not include an ITS authorizing take of listed species during construction. Id. at 1731, 1846, 1929-30. NMFS also concluded that USWTR operations are likely to adversely affect listed species, but are not likely to jeopardize the continued existence of any listed species or destroy or adversely modify critical habitat. Id. at 1731, 1929-30.

Because range operations are likely to adversely affect listed species, the Navy is required to obtain an ITS from NMFS prior to commencing operations in order to avoid potential take liability under ESA Section 9. Id. at 1847. As NMFS explained, the BiOp does not include an ITS for the operations phase because the take of listed marine mammals must first be authorized under the MMPA. Id. at 1731, 1847, 1930; 16 U.S.C. § 1536(b)(4)(C). NMFS's issuance of any MMPA take authorization would trigger a new consultation under ESA Section 7(a)(2). Id. at 1731, 1847, 1930. "If and when such regulations or authorizations are issued, [NMFS] will prepare a new biological opinion to include an [ITS] for the endangered and threatened species that have been considered in [the BiOp], as appropriate." Id. at 1930.

On July 31, 2009, the Navy issued its ROD approving construction of the USWTR at the preferred site within the Jacksonville Operating Area, with construction expected to take at least five years to complete (i.e., until 2014). DON185885. The Navy deferred any decision to implement training on the USWTR because of the need to first obtain MMPA take regulations from NMFS, which are subject to a five-year time limit. DON185885. Had the Navy sought and

obtained MMPA take regulations covering USWTR operations in 2009, they would expire before operations even commenced. However, because no take is expected to occur during USWTR construction, no take authorization under the MMPA or the ESA is needed to proceed with construction. Accordingly, the Navy and NMFS reasonably determined that "their resources would be better utilized by the Navy delaying its application for appropriate take authorizations under the MMPA and ESA until the Navy has identified with greater specificity the time period for commencement of training on the USWTR." Id.

## STANDARD OF REVIEW

Judicial review of agency action taken under the ESA and NEPA is governed by the APA, 5 U.S.C. § 706. Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009); Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1169 (11th Cir. 2006). The reviewing court may set aside agency action only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Th[e] [arbitrary and capricious] standard requires substantial deference to the agency, not only when reviewing decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008); Miccosukee Tribe, 566 F.3d at 1264.

"A finding that a decision was arbitrary or capricious requires [a reviewing court] to find no rational basis for the decision. Once [the court] find[s] a rational connection between the evidence and the decision, [the court] must defer to the agency's expertise." Tackitt v. Prudential Ins. Co., 758 F.2d 1572, 1575 (11th Cir. 1985). In addition, "when an agency 'is making predictions, within its area of special expertise, at the frontiers of science . . . as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.'"

Miccosukee Tribe, 566 F.3d at 1264 (citation omitted).  The scope of judicial review is limited to the administrative record.  5 U.S.C. § 706; Pres. Endangered Areas of Cobb's History v. U.S. Army Corps of Eng'rs, 87 F.3d 1242, 1246-47 (11th Cir. 1996).

## ARGUMENT

**I.     The Navy's USWTR Decision Complied With NEPA In All Respects**

The Navy has conducted training in the Jacksonville Operating Area, including the area where the USWTR is proposed to be built, for 60 years.  DON185892.  The Navy has already exhaustively analyzed the environmental impacts of this training activity in two separate environmental impact statements, the Atlantic Fleet Active Sonar Training ("AFAST") FEIS and the Jacksonville Operating Area FEIS – both of which were incorporated by reference into the USWTR FEIS at issue here.  DON181864, 182596, 182588.  The baseline amount of current ASW training occurring in the Jacksonville Operating Area is contained in the AFAST FEIS. DON161937 (Table 2-3, Events per Year by Operating Area); compare with DON181945 (USWTR training scenarios).

With this in mind, the Navy performed the additional environmental analysis at issue here to assess the impact of installing and operating an undersea range designed primarily to record and enhance the effectiveness of ongoing training activities.  DON181852.  This third environmental analysis fully complies with NEPA because the Navy properly relied on sound scientific studies and reports, correctly deferred a decision on operations until it could receive the requisite MMPA authorization from NMFS, and fully analyzed the potential environmental impacts, including impacts on marine mammals and sea turtles.

**A.     The Navy Relied On Sound Information in the USWTR FEIS**

Plaintiffs attempt to mischaracterize the Navy's analysis of both marine mammal density and bottom habitat surveys by arguing that the Navy proceeded with its decision without

assessing this information.  This is not so.  The Navy considered complete and available information concerning both marine mammal densities and bottom habitat in the USWTR area, while also acknowledging that comprehensive, long-term monitoring efforts for marine mammal densities would be continued in the future, as well as additional, detailed bottom mapping required for designing the specific layout of the USWTR.

The Navy's decision to develop and conduct a new, more comprehensive monitoring program, see DON182663-66 (describing the Navy's new integrated comprehensive monitoring program),[4] does not *ipso facto* mean that all prior studies and surveys relied upon in the USWTR environmental review were inadequate or irrelevant.  See Am. Iron and Steel Inst. v. EPA, 115 F.3d 979, 1005 (D.C. Cir. 1997); cf. Marsh, 490 U.S. at 373 ("an agency need not supplement an EIS every time new information comes to light after the EIS is finalized.  To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made.").  Rather, the Navy relied on currently-available studies and reports concerning marine mammal density, including the North Atlantic right whale, in the course of the USWTR analysis.  For example, the Navy analyzed multiple reports concerning the right whale's concentration as part of its baseline description for that species.  See DON182086 (citing Winn et al. 1986; NMFS 2005a; Knowlton 1997), 182088 (Occurrence in the Site A USWTR: citing Gaskin, 1982; Kraus et al. 1993; NOAA Fisheries 2007), 125577 (NOAA Marine Mammal Stock Assessment 2007), 121653 (Navy OPAREA Density Estimates 2007).  The Navy also looked at specific studies on right whale occurrence levels in the course of analyzing the impacts resulting from sonar activities on the range.[5]

---

[4] The new marine mammal density surveys to be performed over the next several years are actually required as part of separate environmental review processes, including the Atlantic Fleet Active Sonar Training and Jacksonville Operating Area biological opinions.  See DON182662.

[5] Notably, the Navy conservatively chose to conduct its analysis for sonar impacts using the *maximum* number of right whales potentially on the calving ground as its basis in calculating the

DON182434 (citing Kraus et al. 1993; Gaskin 1982; NOAA Fisheries Service 2007); see also DON182655 (table depicting range of estimates for marine mammal species found in USWTR study area, including citations to three reports for right whales in the Atlantic – Palka 2006, Hain et al 1999, Palka 2005b). It is simply inaccurate to say the Navy did not consider any baseline marine mammal density data during the USWTR process.

Similarly, Plaintiffs have skewed the issue of bottom habitat surveys by implying that the Navy assessed no information concerning the seafloor. This is also not so. While the Navy does intend to perform a more comprehensive survey of the seafloor prior to range installation, this very time- and resource-intensive effort was not a necessary part of the Navy's overall environmental analysis of alternatives for the USWTR site. Rather, the purpose of the surveys is to determine the optimal layout of the USWTR telecommunications cables and nodes for purposes of design and construction. The Navy relied on multiple studies and surveys of bottom habitat to identify whether the seafloor at the alternative locations for the USWTR contained any habitats of special concern, were comprised of soft or hard bottom, and whether installation of a range would be feasible. See, e.g., DON182044-45, 182699, 182827 (all characterizing sea bottom habitat). Moreover, the Navy deliberated about the source of its hard bottom data and confirmed that the most recently-available data had been incorporated into the analysis. See DON123536. This is more than sufficient for taking a "hard look" at the issue of bottom habitat at each of the alternative locations. As stated, the purpose of the future in-depth bottom mapping is to determine the ultimate *design* of the USWTR, not to make the threshold determination of whether a range can be placed on that location at all. To conduct such a resource-intensive

---

density, and then applied that estimated abundance of right whales uniformly across the entire shelf region. DON182434. The result was, in fact, an *overestimate* of the density of right whales in the vicinity of the proposed USWTR location. Id. (noting also that right whales are rarely found in the deeper, offshore waters where the USWTR will be located).

survey for each alternative location, despite the fact that only one will house the USWTR, would amount to waste of public resources. NEPA does not require this outcome.

The cases cited by Plaintiffs offer no support for their position beyond stating unremarkable, general NEPA concepts, such as that an agency must consider detailed information concerning "significant environmental impacts" prior to reaching its decision. See Pls.' Br. 13 (citing Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989)); id. at 15. Notably, Plaintiffs attempt to rely on a case out of the Southern District of Florida, Sierra Club v. Strock, as an example of a federal agency which supposedly "rush[ed] to judgment" and failed to comply with NEPA. 495 F. Supp. 2d 1188 (S.D. Fla. 2007). But Plaintiffs overlook that this case was vacated by the Eleventh Circuit for the district court's failure to grant the federal agency the proper level of deference contemplated by the APA. Sierra Club v. Van Antwerp, 526 F.3d 1353 (11th Cir. 2008). Also distinguishable is Plaintiffs' reliance on Rock Creek Alliance v. United States Forest Service, 703 F. Supp. 2d 1152 (D. Mont. 2010). There, the federal agency openly admitted that its analysis was deficient, but claimed it had corrected this deficiency, in a post-hoc manner, after issuing its record of decision. Id. at 1180-81. Here, the Navy has made no such statement, despite Plaintiffs' strained arguments to the contrary. Rather, the Navy properly relied on all currently available marine mammal density and bottom habitat information while acknowledging that efforts to conduct more comprehensive surveys were being planned for the future. See DON182662.

In a situation more analogous to the case at hand, the Ninth Circuit in Churchill County v. Norton found that, although the agency had admitted that there was a need for further study of the groundwater resources that would be impacted by the proposed action, this acknowledgment did not mean that the studies the agency did rely on were somehow insufficient to comply with NEPA. 276 F.3d 1060, 1081-82 (9th Cir. 2001). The court noted that while "[a]dditional studies

undoubtedly would fill in relevant details regarding groundwater resources…[n]onetheless, the [federal agency] relied on current information" and this was sufficient to conduct a "reasoned analysis" consistent with NEPA.  Id.  (noting that while "the studies on which [the agency] relied were not definitive . . . [they] were sufficient . . . to permit the [agency] to make a reasoned decision as to which action alternative to select"); see also Miccosukee Tribe of Indians of Fla. v. United States, 420 F. Supp. 2d 1324, 1336 (S.D. Fla. 2006) (finding agency did not act arbitrarily by relying on limited available information); cf. Am. Iron, 115 F.3d at 1005 ("Possessing imperfect scientific information, [the agency] had to decide whether to proceed on that basis or to invest the resources to conduct the perfect study.  It chose to do the former.  This is the type of decision to which this court will generally apply the deferential standard of 5 U.S.C. § 706(2)(A)").  Here, the Navy considered similar, currently available information in support of its USWTR decision, and fully complied with NEPA in doing so.

**B.      The Navy Did Not Improperly Segment Its NEPA Analysis**

In preparing the USWTR FEIS, the Navy fully analyzed the impacts of both construction and operation of the planned range.  See DON181856 (FEIS prepared to "assess the potential environmental effects of installing and operating a USWTR").  The Navy did not segment this analysis.  Rather, the Navy approved the first half of the actions analyzed – the construction actions – while delaying a final approval of operations until a more practical point in time.

The Navy's rationale for deferring a final decision to authorize the operations phase of the USWTR project is fully set forth in the Record of Decision:

> Because of the anticipated four- to five-year period between now and completion of installation and the five-year limit on the period of NMFS' MMPA rulemaking, a MMPA rule related to training would likely expire before training could commence.  Therefore Navy and NMFS have determined that their resources would be better utilized by the Navy delaying its application for appropriate take authorizations under the MMPA and ESA until the Navy has identified with greater specificity the time period for commencement of training on the USWTR.  Delaying the application for incidental take authorizations will also allow for

incorporation of the best available science, as required by the MMPA and ESA, at that time in the analysis of potential environmental effects.

DON185885-86.

Contrary to Plaintiffs' insinuations, this bifurcated decision is not due to the Navy's belief that its analysis of range operations is somehow deficient and must be updated in the future before operations can be approved. Rather, the bifurcated decision is due to the Navy's need to obtain MMPA regulations from NMFS prior to commencing operations -- which, as discussed above, are subject to a statutory five-year time limit. See supra at 9-10. There was no need for the Navy to obtain take authorization under the MMPA (or ESA) in 2009, prior to authorizing construction, because construction is not expected to result in take of marine mammals or listed species. Id. Moreover, it would have been a waste of resources for the Navy to seek MMPA (or ESA) take authorization for range operations in 2009 because the USWTR is not expected to be operational until 2014 at the earliest. DON185885. As a result, MMPA regulations issued in 2009 would expire before operations even commenced. Id. It was hardly unreasonable or improper for the Navy to defer authorizing range operations in order to avoid pursuing regulations that would expire before they were needed.

Furthermore, the Navy's statement that delaying its take application would "also allow for incorporation of the best available science" was in no way an admission that the existing environmental analysis somehow did not include what was then the best available information. Rather, this was merely an acknowledgment by the Navy that it would likely not rely solely on the present operations analysis five years in the future. Deciding to incorporate additional studies into the eventual application for MMPA authorization is a recognition that the best available science is likely to change in the intervening years, and so the analysis should be updated accordingly. The Navy should hardly be punished for its acknowledgment of emerging scientific information, and its indication that it plans to consider that new information before

requesting final authorization for range operations.  The Navy did not improperly segment its analysis of the USWTR project.

### C.  The Navy Took a Hard Look at All Impacts and Effects of the Proposed USWTR

The Navy has thoroughly assessed the impacts and effects of the proposed USWTR and its associated training activities through not one, but three, environmental analyses.  See DON181852, 161835, 170482.  Plaintiffs have attempted to skew the perspective of the proposed action here.  The proposed action is not to install an undersea range and also commence brand-new training activities in the area.  Rather, the proposed action is to install an undersea range where training activities have been ongoing for years.  Accordingly, the Navy has thoroughly assessed and taken a "hard look" at the potential impacts of the USWTR for the North Atlantic right whale, sea turtles, and manatees.[6]

"An agency has met its hard look requirement if it has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1216 (11th Cir. 2002) (citing Motor Vehicle Mfrs. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  "NEPA [] does not require that all impacts be discussed in exhaustive detail but only that the [statement] furnish such information as appears to be reasonably necessary under the circumstances for the evaluation of the project."  Britt v. U.S. Army Corps or Eng'rs, 769 F.2d 84, 91 (2d Cir. 1985).  Flyspecking an environmental analysis for any asserted trivial deficiency is not proper, and constitutes an "undue intrusion into an agency's decisionmaking authority."  Nat'l Audubon Soc'y, 422 F.3d at 186 (internal citations and quotations omitted).

---

[6] To the extent Plaintiffs argue that the Navy failed to assess environmental impacts based on allegedly insufficient "baseline information" for marine mammal densities in the USWTR area, those arguments fail for the same reasons as discussed *supra* at 11-16.

### i. The Navy Comprehensively Analyzed All Potential Impacts to the North Atlantic Right Whale

The Navy has fully analyzed the question of ship strikes, entanglement, and sonar use in relation to the North Atlantic right whale. First, concerning ship strikes, the Navy addressed the risk of impacts to right whales and other marine life (including sea turtles and manatees) in section 4.2.4.4. of the USWTR FEIS, entitled "Navy Vessels." DON182358-62. The Navy assessed the available studies specific to the issue of ship strikes and whales, see, e.g., DON055849, and acknowledged that right whales are hit commonly and that one-third of all right whale strandings appear to involve ship strikes. DON182359 (citing Laist et al. 2001). The Navy also specifically identified ship strikes as an issue of concern for the right whale, and noted several studies documenting recent right whale fatalities from ship strikes. DON182360 (citing MMC 2008; Nelson et al. 2007). It also noted that marine mammals could alter their behaviors in response to the presence of vessels, such as by engaging in avoidance behavior or changing dive patterns. DON182358 (citing NRC 2003).

The Navy also considered impacts from vessel transits to the USWTR from various mid-Atlantic ports, which would require vessels to cross the migratory route of the right whale. Notably, additional protective measures are already in place for those transits, including the use of increased vigilance during months of migration, the use of two lookouts with specialized marine species awareness training, and the use of avoidance maneuvers when a right whale is sighted. DON182361-62 (noting vessels will keep at least 460 m (1,500 ft) away). The Navy unilaterally adopted these protective measures for the betterment of the species, even though the Navy accounts for only 2-3 percent of the overall large vessel traffic in the mid-Atlantic area. Id.

Furthermore, the Navy previously considered the impact of its training activities on the North Atlantic right whale, specifically including the issue of ship strikes, in the AFAST

environmental analysis for ASW training.[7]  DON162356-58, 162397.  There, the Navy outlined the various existing mitigation measures in place for all ASW activities along the Atlantic coast, including specially-trained lookouts, operating at a slow, safe speed within certain identified zones, and maneuvering to avoid spotted whales.  DON162399.  Similar to the USWTR FEIS, the AFAST FEIS also concluded that ASW training exercises would not have a significant impact on marine mammals due to vessel interactions during AFAST training exercises.  Id.

That being said, the Navy also fully analyzed in the USWTR FEIS the myriad protective measures which have been put in place to prevent ship strikes by Navy vessels.  Special protective measures and annual guidance for Navy ships off the southeast coast have been in place since 1997.  These efforts include annual funding for the Early Warning System, which includes daily aerial surveillance flights during the calving season.  DON182084, 182360.  Notably, and contrary to Plaintiffs' assertion that the protective measures are "of limited effectiveness," Pls.' Br. 19, in the 14 years since the Navy undertook various mitigation efforts for right whale critical habitat, Navy vessels have transited through the critical habitat area without incident.  DON183907.  The Navy also promulgated additional protective measures in 2004 for all Fleet ships along the mid-Atlantic, including those areas where ships transit between southern New England and northern Florida.  The Navy and NMFS coordinated to identify seasonal right whale "occurrence patterns," which resulted in guidance calling for "extreme caution and operation at a slow, safe speed within 37-km (20NM) arcs of specified [points]." DON182360.  This guidance requires Navy ships to post two lookouts, and at a minimum one of those lookouts must have completed the Navy's training for marine mammal recognition.  In the performance of these duties, the Navy emphasizes the need for utmost vigilance.  Id.

---

[7] Contrary to plaintiffs' statement that transit speed is typically 15-17 knots, planned use of the USWTR is estimated to involve ship speeds of approximately 10 knots.  DON182410.

Protective measures are also in place for the critical habitat itself. These measures include 1) an annual message sent to all ships prior to calving season, 2) movement through critical habitat in the most direct manner possible, avoiding north-south transits during the calving season, 3) vessels using extreme caution and operating at slow, safe speeds, and 4) transits and operations in the critical habitat and areas of concern limited to daylight and periods of good visibility, to the extent practicable and consistent with mission. Only in light of all these safeguards did the Navy conclude that collisions with right whales or other marine animals, while not impossible, are "not expected" in the area of the proposed USWTR. DON182360-61. The Navy thus took a hard, serious look at the risk of ship strikes to right whales.

Second, concerning entanglement, the Navy has fully analyzed this risk to right whales from the installation and operation of the USWTR. As stated earlier, this entanglement risk will remain essentially the same as that assessed in the AFAST FEIS, since the training activities to be conducted on the USWTR are largely identical to those that have historically occurred in the Jacksonville Operating Area. See DON162400 (analyzing risk of entanglement from parachutes in the AFAST FEIS). Even so, the Navy analyzed the risk to right whales in the USWTR FEIS from installation and operation of the range, and considered the impact from parachutes, torpedoes, and other expended materials to be left on the seafloor as a result of installation and training activities. DON162247 (Table 4-1 of Expended materials), 182318 (noting that, in regard to torpedoes, the "control wires and flex hoses will not easily loop or tangle, these materials are unlikely to result in the entanglement of any sea turtles, whales, or other animals"), 182352 (no risk from USWTR cables since cables will be buried under the seafloor).

Moreover, contrary to Plaintiffs' assertions, the Navy did consider the possibility that parachutes would billow at the seafloor due to ocean currents, noting that "[i]f bottom currents are present, the canopy may temporarily billow and pose an entanglement threat to marine

animals with bottom-feeding habits." DON182363. However, the Navy goes on to state that this is unlikely because, "[o]nce the expended parachute assembly has landed, it and its housing are expected to lay flat on the seafloor, as observed at other locations." Id. (citing ESG, 2005); DON096581 (ESG, 2005); see also DON162252 (noting that "[a]ll parachutes are weighted . . . , which causes the parachute to sink from the surface within 15 minutes"). The Navy also noted that, although entanglement is unlikely to occur, the use of parachutes may still affect marine mammals and sea turtles, but no significant impact or harm to those species would result.[8] DON182363. The Navy took a hard look and reasonably concluded, based on its analysis of and experience with the equipment used, that entanglement did not pose a significant impact.

Finally, concerning sonar use, the Plaintiffs' argument essentially rehashes their prior argument that insufficient marine mammal density surveys were conducted. For the same reasons as stated supra at 11-15, this argument fails and the Navy properly relied on the best available information at the time of the USWTR analysis. Plaintiffs also misstate the estimates in the FEIS. The FEIS does not estimate that sonar exercises will "significantly impact" individual marine mammals approximately 106,000 times per year. Pls.' Br. 21. As Plaintiffs should be well aware, the term "significant impact" is a term of art in NEPA documents. Here, the Navy acknowledged that exposure to sonar would result in "short-term effects to individuals exposed," but found no such "significant impacts" due to acoustic effects on either right whales or other marine mammals. See, e.g., DON182435 (right whales); DON182461 (bottlenose

---

[8] While Plaintiffs focus specifically on the entanglement risk allegedly posed by parachutes, this issue needs to be kept in perspective. The largest parachute to be used during USWTR operations ranges from 4 to 9 square feet. DON181948. The vast majority of parachutes will be used to deploy sonobuoys (small, expendable sonar systems) and range from 8-12 *inches* in diameter, with the suspension lines only two feet long. DON183387. An adult right whale is 45-55 feet long and weighs up to 140,000 pounds. Even at birth, calves are 13-15 feet in length. See http://www.nmfs.noaa.gov/pr/species/mammals/cetaceans/rightwhale_northatlantic.htm. Consequently, any notion that parachutes are likely to pose significant entanglement risks for right whales is implausible on its face.

dolphins).[9]  In sum, the Navy thoroughly considered the impacts to right whales from the use of sonar, and reasonably concluded that, with implementation of proper mitigation, no significant impacts would be anticipated.  DON182367.

### ii.   The Navy Considered All Potential Impacts to Sea Turtles

Contrary to Plaintiffs' argument, the Navy also thoroughly considered the potential impact of USWTR installation and operations on sea turtles.  As discussed above, at-sea construction consists of installing telecommunications cables and nodes.  Ships will be used to install the cable and a remotely-operated cable burial vehicle will be used to bury the trunk and interconnect cables.  The record demonstrates that the risk of a ship or the burial vehicle striking a sea turtle (or marine mammal) during cable and node installation is minimal given the slow speeds at which cable installation will proceed (0.5 to 2 NM per hour, with an average of one NM per hour).  DON182350, 181975.  Studies show that sea turtles evade vessels traveling at such slow speeds.  DON181934, 181975, 182508, 183566, 160620, 160629, 120388.  In addition, vessels will be required to have lookouts onboard to advise the captain when a marine mammal or sea turtle is in the vicinity, further reducing the already minimal risk of a ship strike during installation.  DON185910, 181934, 181975.

There is also little risk that cable burial could disturb a sea turtle brumating (burrowing into the sea floor to hibernate) in the area.  DON182351.  Although it is possible that a small number of sea turtles brumate in the area for short periods of time during cold winters, id.; DON183564, cable installation will be suspended between November 15 and April 15. DON182677, 185909.  Finally, cable installation will not require significant time at any

---

[9] Nor was it necessary, as Plaintiffs suggest, Pls.' Br. 21 n.7, for the Navy to determine the *exact* number of right whales potentially impacted by sonar activities instead of relying on estimates. See Little Lagoon Pres. Soc'y v. U.S. Army Corp. of Eng'rs, 2008 WL 4080216, at *22 (S.D. Ala. Aug. 29, 2008) (argument "approache[d] frivolity" to suggest that use of estimates rather than precise calculation for assessing impacts to species was arbitrary and capricious).

particular location, as one kilometer (0.54 NM) of cable can be installed in anywhere from 16 to 60 minutes. Thus, there would be a very limited period during which vessels or equipment could come into contact with sea turtles and other marine animals. DON182350.

Plaintiffs cite a comment by a Navy employee on a preliminary draft of the EIS stating that "the estimation [in a draft of the EIS] that interaction with the construction equipment is extremely low is a significant underestimate" because "it is well documented that sea turtle mortality occurs with this type of dredging and construction equipment (see beach renourishment and similar projects)." DON173700; Pls.' Br. 22. Plaintiffs' reliance on this comment is misplaced for two reasons. First, the Navy did assess and consider the comment, and responded by modifying its analysis. DON182351[10]; 167722-23 (Line 295). Moreover, the USWTR has been under development for years, with extensive public involvement and internal Navy review. It is neither surprising nor legally significant that the record contains comments reflecting disparate opinions. "That the administrative record . . . reflects a certain amount of disagreement among the countless individuals involved in developing or commenting on the [plan] is inevitable." Nat'l Fisheries Inst. v. Mosbacher, 732 F. Supp. 210, 227 (D.D.C. 1990); see Colo. Wild Heartwood v. U.S. Forest Serv., 435 F.3d 1204, 1222 (10th Cir. 2006) ("[t]he fact that the administrative record contains some evidence pointing to a different conclusion does not render the [agency]'s decision arbitrary and capricious."); Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1168 (10th Cir. 2002) (comments from agency employee expressing a "difference of opinion" did not render agency's final decision arbitrary or capricious).

---

[10] The modified language in the FEIS reads as follows: "Cable installation could result in the incidental mortality of sea turtles, and destruction or degradation of bottom habitat utilized by sea turtles. Although take level data is not available for cable installation activities, an annual incidental mortality rate of 95 adult and immature turtles - loggerhead, leatherbacks, greens, Kemp's ridleys, and hawksbills - is attributed to USACE dredging operations in the U.S. Atlantic (Braun-McNeill and Witzell, 2001)." DON182351.

Second, the record demonstrates that USWTR cable installation bears no resemblance to "beach renourishment and similar projects." The trunk and interconnect cables are extremely narrow, ranging from one to 2.3 inches in diameter, and will be buried in narrow trenches approximately ten inches wide and no more than three feet deep. DON181934-37, 182316. The trunk cable, which will extend from a point inland out to approximately 915 meters offshore, will be installed underneath the beach and shoreline by horizontal directional drilling involving little to no surface disturbance. DON181937. Beyond the 915 meter mark, and in soft sediment, the cable will then be buried using a jet or plow. Jetting "liquefies" and disperses the soil into the water column, after which it simply settles back to the ocean bottom. A plow uses the newly disturbed sediment as backfill to cover the trench. Id. Neither process involves suctioning or dredging massive quantities of sand or sediment from the ocean bottom, as in "beach renourishment and similar projects." On the contrary, modern equipment for trenching, jetting, and plowing is designed to minimize disturbance of the ocean bottom. Id.

As discussed above, the record also demonstrates that the Navy adequately considered the risk that sea turtles would become entangled in parachutes used during USWTR operations. As the Navy explained, most documented sea turtle entanglements are from interactions with active or discarded fishing gear, which generally take place at the surface or in the water column. DON182621-23; 160619; see also DON182518 (noting lack of interaction between USWTR structure on the ocean floor and fishing gear located above the ocean bottom in the water column). The parachute assemblies are weighted and will quickly sink to the ocean bottom, greatly limiting the amount of time that sea turtles may be exposed. DON162252; 160619. Furthermore, as discussed above, the Navy considered and rationally discounted the possibility of billowing based on a 2005 study documenting that parachutes lay flat on the sea floor. DON182363. In addition, the record indicates that sea turtle densities are low in the Jacksonville

Operating Area.  DON170869.  Accordingly, the Navy took the requisite hard look at the issue and rationally concluded that parachutes used to deploy Navy equipment do not pose a significant risk of entanglement to sea turtles.  DON182363, 160619-20.

Finally, as discussed above, the Navy thoroughly evaluated the risk of ship strikes involving marine animals, including sea turtles.  See supra at 18-20.   As the EIS indicates, the available data show that sea turtles are able to detect approaching water vessels via auditory and/or visual cues and avoid vessels traveling at slower speeds.  DON182508.  The Navy determined that its standard operating procedures and mitigation measures, including the use of lookouts specifically trained to detect marine mammals and sea turtles, would reduce the likelihood of such ship strikes involving sea turtles. DON182358-62; 160615-16.  The Navy acknowledged that shipboard observers cannot detect every sea turtle under all conditions and that "visual mitigation efforts for sea turtles will probably detect only those individuals that are very large or that spend a significant portion of their time at the surface."  DON182662.  However, sea turtles are most vulnerable to ship strikes when they are swimming or feeding at or just beneath the surface of the water, DON160615, meaning that those turtles most vulnerable to ship strike are also the most likely to be detected by an observer.  The record also demonstrates that trained observers are, in fact, capable of detecting sea turtles in a variety of conditions, despite their rare occurrence.[11]  Thus, while the Navy's trained observers and other mitigation measures cannot eliminate the *possibility* of a collision, the Navy took a hard look and rationally determined that ship strikes would not significantly impact sea turtles.  DON182362.

---

[11] See, e.g., DON180084-94, 183952-28 (April and June 2009 monitoring reports documenting sea turtle sightings during shipboard surveys, despite poor survey conditions); DON189028-29 (noting ability of observer-based aerial and shipboard surveys to "provide high quality data on the distribution and density of both marine mammals and sea turtles") .

### iii.  The Navy Fully Assessed Impacts to Manatees

The Navy also adequately considered the potential impacts on manatees of installing and operating the USWTR.[12] As explained in the USWTR FEIS, manatees are "shallow divers" that prefer seagrasses "mostly limited to areas of high light; therefore, manatees are fairly restricted to shallower nearshore waters" and manatees "occur in very shallow waters of 2 to 4 m in depth generally close to shore."  DON182135 (citing Beck et al. 2004, Wells et al. 1999).  In light of these well-known behaviors, the Navy concluded that manatees are only reasonably likely to occur in the shallow area where the trunk cable portion of the USWTR range may be installed. See DON182136; see also DON182273 (describing trunk cable installation area as from a point approximately 915 meters offshore to a point inshore of the sand dunes). The trunk cable is a single cable that will be installed via horizontal directional drilling, meaning no vessel will be used to install the trunk cable in the shallow, nearshore waters.  DON181937.

The Navy also analyzed the possibility of impacts on manatees from operation of the USWTR, including sonar use and ship strikes.  Due to the fact that manatees occupy very shallow, nearshore waters, the Navy reasonably predicted no potential effects for the manatee as a result of sonar use on the range.  As explained in the FEIS:

> Based on best available science, manatees would hear mid-frequency and high-frequency sonar, but would not likely show a strong reaction or be disturbed from their normal range of behaviors. Additionally, limited active sonar activities would take place in the vicinity of manatee habitat.  The distance from the USWTR to a manatee that, on rare occasions, could be in the open ocean would be almost 93 km (50 NM). At this distance, the sound levels from sonar use on the USWTR would have dropped below the levels that have been measured to have caused a reaction in manatees. As for the extralimital species listed above, therefore, for modeling purposes, the manatee has a functional density of zero and no potential effects are predicted.

---

[12] As explained infra at 32-33, the Navy consulted with the Fish and Wildlife Service concerning impacts to manatees.

DON182428.  Furthermore, with regard to ship strikes, the Navy did acknowledge that

manatees are vulnerable to vessel interactions, but the activities analyzed in the USWTR

FEIS do not implicate this concern to the same extent as for other marine mammals, such

as the North Atlantic right whale.  The USWTR will be located 50 NM offshore, far

afield of any typical manatee habitat, and any training activities, including vessel transits

to and from the range, will occur at roughly the same or with less frequency (in the case

of Mayport, due to the decreased number of vessels, supra at 8 n.3) as have historically

occurred for these same ASW training exercises.  Finally, all mitigation efforts outlined

with respect to marine mammals and sea turtles apply with equal force for manatees.

See, e.g., DON182359.  The Navy reasonably concluded there would be no significant

impacts to manatees from sonar activities or vessel interactions.  DON182428; 182362.

### D.  The Navy Analyzed a Full Range of Feasible and Effective Mitigation Measures

As a threshold matter, the Supreme Court has noted that "[p]roposed mitigation measures

need not be laid out in exhaustive detail within an environmental impact statement."  Robertson,

490 U.S. at 352 ("There is a fundamental distinction ... between a requirement that mitigation be

discussed in sufficient detail to ensure that environmental consequences have been fairly

evaluated ... and a substantive requirement that a complete mitigation plan be actually formulated

and adopted."); see Van Antwerp, 526 F.3d at 1362 ("Substantive issues like . . . what mitigation

conditions to adopt are irrelevant to NEPA compliance.").  The Navy included an exhaustive and

comprehensive examination of myriad potential and planned mitigation activities for the

USWTR project.  Furthermore, the Navy also recognizes that the mitigation planning process is

dynamic and ongoing, and has committed to further study and consideration of many mitigation

techniques.  See DON182677, 182662.

Plaintiffs' real complaint with the Navy's mitigation analysis is not that it is arbitrary and capricious, but that the Navy has not adopted certain of Plaintiffs' favored mitigation measures.[13] Plaintiffs attempt to cast the use of lookouts as "highly ineffective," but the record shows the use of lookouts has been an integral and successful part of the mitigation measures in place for ship transits through the right whale's critical habitat since 1997.  DON183907.  Since undertaking this and other mitigation efforts in 1997, the Navy has not struck a right whale while transiting through its critical habitat.  See DON183907-08.  The mitigation measures considered and adopted by the Navy in the USWTR FEIS are the same measures employed since 1997 for the same anti-submarine warfare training which has historically occurred in the Jacksonville Operating Area.  The mitigation efforts outlined in the USWTR FEIS are also in accord with mitigation measures for Navy exercises as discussed in related environmental analyses for training activities.  See DON145020 (discussing use of lookouts and taking "reasonable and practicable actions" to avoid ship strikes); 74 Fed. Reg. at 4,854, 28,353 (MMPA regulations for activities described in related AFAST and the Jacksonville Operating Area EISs concluding  that the Navy's mitigation measures are an adequate means "of effecting the least practicable adverse impacts on marine mammal species").

Moreover, the lookouts used by the Navy differ from those used by other commercial vessels.  Navy lookouts "are highly qualified and experienced observers of the marine environment," DON182359, and the Navy includes marine species awareness as part of its

---

[13] In a footnote, Plaintiffs accuse the Navy of failing to consider mitigation for the discarded debris which will result from the USWTR.  Pls.' Br. 25 n.8.  Notably, that very same footnote cites (in selected part) the Navy's response in consideration of this issue, which explained that 1) ocean currents can carry debris away, making retrieval difficult or impossible, 2) retrieval personnel are limited in diving depth due to safety concerns, and 3) the Navy has limited access to, and manpower for, a remotely operated retrieval vehicle.  DON182315.  Plaintiffs cannot reasonably accuse the Navy of failing to *consider* mitigation for marine debris.  Rather, they simply do not like the outcome.  For this, NEPA provides no recourse.  See Winter, 555 U.S. at 23 (NEPA "does not mandate particular results"); Van Antwerp, 526 F.3d at 1362.

training for lookout personnel on both ships and submarines. Id. Lookouts receive special training approved by NMFS on how to look for marine species, and are instructed to report their sightings to the appropriate officer so that avoidance actions can be taken or adjustment made to the training exercise to minimize effects to the species. Id. During periods of low light, lookouts are trained to use different techniques, including Night Lookout Techniques, and will have night vision apparatuses. DON183475. In addition, lookouts will be assisted by passive sonar (using all capable instruments) and aerial monitoring to detect marine animals. Id. Plaintiffs' claim that the Navy's use of lookouts as a mitigation method is arbitrary is completely unfounded.

Plaintiffs also complain that the Navy has not adopted their preferred approach of prohibiting operations during the right whale calving season. As the Navy explained in the USWTR FEIS, this mitigation option is not feasible in light of the Navy's mission. DON182678 ("any reduction of training (including season, weather- or light-based restrictions) would not allow Sailors to achieve satisfactory levels of readiness needed to accomplish their mission). The Navy's need to maintain battle-ready Sailors is not a conclusory statement. It is a hard fact not to be taken lightly, and one deserving the utmost deference from this Court.[14] See Winter, 555 U.S. at 23-24 ("We give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest."). Accordingly, the Navy rationally considered and appropriately dismissed this mitigation alternative as infeasible.

Similarly, the Navy properly considered and rejected specific ship speed reductions. While NMFS certainly believes speed reduction is effective, NMFS also acknowledged, as stated in its recent decision to impose speed restrictions for non-federal vessels, that for certain federal agencies including the United States Navy, it may "compromise the national security,

---

[14] Nor is this statement at odds with the No Action Alternative, as Plaintiffs claim. Under the No Action Alternative, an undersea range would not be installed, but ASW training activities would continue in the same manner as they have historically been conducted in the area, thus ensuring that the Navy could maintain ASW readiness.

navigational and human safety missions of some agencies" to adopt such a speed restriction. DON144634. The Navy considered and rejected the ship speed reduction mitigation measure, noting that "[t]raining differently than what would be needed in an actual combat scenario would decrease training effectiveness and reduce the crew's abilities." DON182680.[15] The Navy is mindful of its obligation to comply with NEPA. NEPA, however, does not require that the Navy sacrifice the effectiveness of its training activities.

## II.    Plaintiffs' ESA Arguments Lack Merit

### A.    The Navy Consulted With FWS Regarding Effects On Manatees

Plaintiffs first contend that the Navy violated ESA Section 7(a)(2) by failing to consult with FWS to insure that the USWTR will not jeopardize the continued existence of the West Indian manatee, an endangered species. Pls.' Br. 28-29. This claim has no merit because the Navy did, in fact, consult. See Ex. 1. By letter dated March 25, 2011, FWS concurred in the Navy's determination that the USWTR is not likely to adversely affect the manatee or its critical habitat. Id. FWS's concurrence terminated the consultation process, and no further action was required on the part of the Navy. Ex. 1 at 3; 50 C.F.R. § 402.13(a).

### B.    NMFS's "No Jeopardy" Opinion For The North Atlantic Right Whale Is Supported By The Record And Entitled To Deference

As discussed above, NMFS concluded in the BiOp that installation of the USWTR is not likely to adversely affect the North Atlantic right whale and that USWTR operations are not likely to jeopardize the continued existence of the species. NMFS AR 1846, 1923, 1925-26, 1929. NMFS also concluded that USWTR installation and operations are not likely to adversely affect right whale critical habitat. Id. at 1929. Plaintiffs do not challenge NMFS's determination that USWTR installation is not likely to adversely affect the species. Nevertheless, Plaintiffs

---

[15]   In any event, the Navy's planned use of the USWTR is nonetheless estimated to involve ship speeds of approximately 10 knots. DON182410.

contend that NMFS's biological opinion is arbitrary because the agency did not: (1) adequately assess the risk of ship strikes, sonar, and entanglement during USWTR operations; (2) analyze "the entire action"; or (3) consider impacts on critical habitat. Plaintiffs' arguments lack merit.

### i. NMFS Considered The Risk Of Ship Strikes And Adverse Impacts From Military Sonar

Initially, Plaintiffs' criticisms of the BiOp are based on several erroneous assumptions. First, Plaintiffs mistakenly assume that the jeopardy analysis under the ESA turns on whether the proposed action *could* harm *individual members* of a listed species. <u>See, e.g.</u>, Pls.' Br. 34 (alleging that NMFS's no jeopardy opinion is arbitrary because the agency was unable "to conclude that a [ship] strike would be impossible"). However, as discussed above, the relevant question under the ESA is not whether harm to individual animals is possible but whether the proposed action "is *likely* to jeopardize the continued existence of the **entire** species." Consultation Handbook at 4-36 (italics added); <u>supra</u> at 5.

Furthermore, contrary to Plaintiffs' repeated assertions, NMFS has never proclaimed that take of a single right whale can never be "legally authorized" under the ESA "because the loss of even one is likely to cause jeopardy to the species." Pls.' Br. 33, 35. Beyond failing to cite any record evidence containing such a proclamation,[16] Plaintiffs mistakenly equate "take" under the ESA with "loss." <u>Id.</u> As discussed above, take includes (among other non-lethal interactions) harm or harassment not resulting in "loss." 16 U.S.C. § 1532(19).

Nevertheless, NMFS has recognized that "entanglement in commercial fishing gear and ship strikes currently pose the greatest threat to the persistence of North Atlantic right whales." NMFS AR 1789. Therefore, NMFS carefully evaluated the risk of Navy ship strikes occurring

---

[16] Plaintiffs cite NMFS's summary in a 2004 proposed rulemaking of third party "modeling exercises" indicating "that the loss of even a single individual may contribute to the extinction of the species; likewise, according to the models, preventing the mortality of one adult female a year alters the projected outcome." DON086189.

during USWTR operations.  Id. at 1865-66.  Based on records of ship strikes involving Navy vessels dating back to 1945, reports on Navy training exercises from 2006-2008, estimates of annual Navy training time at sea and other data, NMFS estimated that Navy vessels operating on the Virginia Capes, Cherry Point, and Jacksonville operating areas off the east coast "would have a 0.0000472 probability of striking a whale in any year or a probability of 0.000236 over the five-year period of any [MMPA] permit [NMFS] might issue for the Operations Phase of the [USWTR]."  Id. 1866.  NMFS thus concluded that although the *possibility* of a Navy ship strike during USWTR operations cannot be eliminated, "these probabilities are sufficiently small . . . to conclude that a strike is 'not likely.'"  Id.

Plaintiffs do not identify any alleged flaw in NMFS's analysis.  Instead, Plaintiffs wrongly contend that NMFS "improperly rel[ied] on [the Navy's] mitigation measures" designed to avoid collisions with marine animals, which Plaintiffs believe are ineffective.  Pls.' Br. 34.  In fact, as the BiOp makes clear, NMFS's analysis did not take into consideration any of the Navy's mitigation measures, which will only further reduce the already minimal probability of a ship strike.  NMFS AR 1866-69; supra at 27-30; 74 Fed. Reg. at 4,861, 28,357 (AFAST and Jacksonville MMPA regulations concluding the Navy's mitigation measures "will allow the Navy to avoid colliding with large whales during their specified activities").

Plaintiffs also criticize NMFS for not "impos[ing] a specific speed restriction on Navy vessels" operating on the USWTR.  Pls.' Br. 34.  However, Plaintiffs cite no provision of the ESA directing or even authorizing NMFS to "impose restrictions" in these circumstances, where NMFS has determined that USWTR operations *as proposed* are not likely to result in jeopardy and the issuance of an ITS for range operations is prohibited because the take has been authorized under the MMPA.  See 16 U.S.C. 1536(b)(4)(C).

Finally, Plaintiffs challenge NMFS's reading of a scientific study (cited in the record as "Nowacek et al. (2004)") indicating that right whales responded to alert stimuli "by swimming strongly to the surface." DON148024. In Plaintiffs' view, the study demonstrates that the Navy's use of mid-frequency active ("MFA") sonar during USWTR operations will cause right whales to surface, where they will be more vulnerable to ship strikes and suffer other injuries. Pls.' Br. 19-20, 34-35. As the EIS indicates, there are no reported instances of sonar causing marine mammals to surface and subsequently collide with ships. DON183325. Nevertheless, Plaintiffs assert that NMFS "bizarrely discounted" the Nowacek study in a manner that contradicts the Navy's analysis in the EIS. Id. at 34-35. Plaintiffs are wrong.

After evaluating numerous sources, including the Nowacek study, NMFS determined that right whales are not likely to respond to MFA sonar:

> [T]he evidence is equivocal on whether North Atlantic right whales are likely to respond upon being exposed to [MFA] sonar or the nature of any responses they might exhibit if they respond at all. . . Nowacek et al. (2004) conducted controlled exposure experiments on North Atlantic right whales using ship noise, social sounds of con-specifics, and an alerting stimulus (frequency modulated tonal signals between 500 Hz and 4.5 kHz). . . . Whales reacted strongly to alert signals at received levels of 133-148 dB SPL, mildly to conspecific signals, and not at all to ship sounds or actual vessels. Although the alert stimulus caused whales to immediately cease foraging behavior and swim rapidly to the surface, *Nowacek et al. offer no information on whether the whales were probably responding to the low- or mid-frequency components of the signals*.

> Although North Atlantic right whales appear to be able to hear mid-frequency (1 kHz–10 kHz) sounds, the limited evidence available suggests that sounds in this frequency range appear to lie at the periphery of their hearing range. . . . Assuming that right whales will focus their attentional resources on the frequency ranges of their vocalizations, right whales seem less likely to devote attentional resources to stimuli in the frequency ranges of mid-frequency active sonar. As a result, they *are not likely to respond physiologically or behaviorally to sounds in this frequency range*.

NMFS AR 1913-14, 1925-26 (emphasis added). NMFS thus determined that the effects of USWTR operations, including impacts from sonar, "are not likely to adversely affect the population dynamics, behavioral ecology, and social dynamics of individual North Atlantic right whales in ways or to a degree that would reduce their fitness." Id. at 1926.

NMFS's conclusion is consistent with the Navy's analysis in the EIS. While the Navy used the Nowacek study to estimate the percentage of a marine mammal population that may experience non-injurious behavioral disturbances from sonar, the Navy also cautioned that "there are fundamental differences in the stimulus used by Nowacek . . . and tactical [MFA] sonar." DON182403, 182399. The Navy also concluded that sonar use "would result in short-term effects to individuals exposed and would likely not affect annual rates of recruitment or survival," DON182434-35, which is consistent with NMFS's "no jeopardy" opinion in the BiOp.

### ii.     NMFS Considered The Risk Of Entanglement

Plaintiffs next contend that NMFS's "no jeopardy" opinion for right whales is at odds with record evidence suggesting that marine animals may become entangled in parachutes used during USWTR operations. Pls.' Br. 36-37. However, both the Navy and NMFS rationally determined that the entanglement risk is minimal. NMFS AR 1853, 1875, 1928; DON160567-68; supra at 20-21, 24-25. That data supporting NMFS's opinion appears in the EIS and BA rather than the BiOp itself is immaterial. NMFS was a cooperating agency in the preparation of the EIS, DON181152, and the ESA regulations envision the coordination of ESA and NEPA review. 50 C.F.R. § 402.06. Moreover, because judicial review under the APA is based on the "whole record," 5 U.S.C. § 706, "there is no requirement that every detail of the agency's decision be stated expressly in the . . . BiOp. The rationale is present in the administrative record underlying the document, and this is all that is required." In re Operation of Mo. River Sys. Litig., 421 F.3d 618, 634 (8th Cir. 2005); Miller v. Lehman, 801 F.2d 492, 497 (D.C. Cir. 1986) ("[I]f the necessary articulation of basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, we will make the reference."); San Luis & Delta-Mendota Water Auth. v. Salazar, 666 F. Supp. 2d 1137, 1156 (E.D. Cal. 2009); Van Valin v. Locke, 671 F. Supp. 2d 1, 8 (D.D.C. 2009).

### iii.    NMFS Considered The "Entire Action"

Plaintiffs next assert that NMFS's "no jeopardy" opinion for right whales is flawed because NMFS "fails to consider the entire action" and "even acknowledges that another consultation will have to be completed." Pls.' Br. 37-38. This argument is baseless. NMFS clearly evaluated the entire action, including USWTR installation and operations. NMFS AR 1925-26, 1929-31. NMFS did acknowledge that its issuance of any MMPA take authorization covering USWTR operations would trigger a new consultation resulting in a new biological opinion. NMFS AR 1730, 1847, 1930. However, the fact that a future consultation will occur does not reveal any flaw in the existing BiOp. Likewise, the possibility that "substantially greater amounts of information" may be available during a future consultation (Pls.' Br. 37) is immaterial. As discussed above, "[a] decision about jeopardy must be made based on the best science available at the time of the decision; the agency cannot wait for or promise future studies." Consol. Salmonid Cases, 713 F. Supp. 2d 1116, 1158 (E.D. Cal. 2010); supra at 6.

Plaintiffs' assertion that NMFS cannot render a valid "no jeopardy" opinion without preparing an ITS quantifying any right whale take that will occur during USWTR operations (Pls.' Br. 37-38) also lacks merit. As discussed, no take of marine mammals is anticipated during USWTR installation, and the issuance of an ITS authorizing take of listed marine mammals during operations is both premature, since operations will commence no earlier than 2014, and prohibited by the ESA, which provides that an ITS authorizing take of listed marine mammals may only be issued after the take has been authorized under the MMPA. See 16 U.S.C. § 1536(b)(4)(A); 50 C.F.R. § 402.14(i); NMFS AR 1731. More generally, the preparation of an ITS is never a prerequisite for a "no jeopardy" opinion. In fact, the reverse is true: NMFS may prepare an ITS *only after* reaching a "no jeopardy" conclusion. See 16 U.S.C. § 1536(b)(4) (ITS required only "if after consultation" NMFS concludes that "the agency action will not violate"

the jeopardy standard contained in ESA Section 7(a)(2)).  Consequently, the lack of an ITS does not reveal any flaw in NMFS's "no jeopardy" opinion for right whales.

### iv.    NMFS Considered The Potential Impact On Critical Habitat

Finally, Plaintiffs challenge NMFS's opinion that the USWTR installation is not likely to destroy or adversely modify right whale critical habitat.  Pls.' Br. 38-39; NMFS AR 1825-26, 1845-46, 1872, 1877, 1929.  However, the record fully supports NMFS's determination.  The only construction activity in critical habitat is the installation and burial of the trunk cable connecting the USWTR to onshore facilities.  DON160538.  Cable installation will not occur during the right whale calving season (November 15 through April 15), NMFS AR 1746, and the record demonstrates that cable burial will cause only localized, short-term increases in turbidity that are unlikely to cause any permanent alteration of critical habitat.  Id. at 1736, 1845; DON181864, 182316, 182352-53.  NMFS also considered the potential impact of the cable itself, discussing a comprehensive study which found that even unburied cable has only "minimal statistically-significant effect on the biota of the cable route."  NMFS AR 1846 (citing Kogan study), 3838, 3853 (Kogan study concluding that "the biological impacts of the cable are minor at most"), 1994 (Int'l Cable Prot. Comm. report stating that "fibre-optic cables have a neutral to benign effect on the marine environment").  Plaintiffs cite no contrary record evidence.

Plaintiffs next assert that NMFS cannot render a valid opinion on critical habitat until the Navy completes bottom mapping and selects the specific path for the trunk cable.  Pls.' Br. 39. However, as discussed above, NMFS is required to render its opinion using the data available at the time of consultation.  Consol. Salmonid Cases, 713 F. Supp. 2d at 1157-58; supra at 6.  In the unlikely event bottom mapping produces new information indicating that the trunk cable will affect critical habitat in a manner or to an extent not previously considered, the ESA provides for reinitiation of consultation.  50 C.F.R. § 402.16(a); NMFS AR 1732, 1931.

Finally, Plaintiffs assert that NMFS failed to consider the potential impact of sonar on critical habitat. Pls.' Br. 38-39. However, because right whales are unlikely to respond to the sound sources associated with proposed sonar training activities, NMFS rationally determined that the activities "should not reduce the conservation value of the designated critical habitat for right whales," NMFS AR 548, 1926, even assuming sonar use on the USWTR would be detectable in right whale critical habitat -- which, at its closest point, is 35 NM from the westernmost boundary of the range.

## C. NMFS's "No Jeopardy" Opinion For Sea Turtles Is Supported By The Record And Entitled To Deference

Plaintiffs next challenge NMFS's conclusion that installation of the USWTR is not likely to adversely affect listed sea turtles and that USWTR operations are not likely to jeopardize the continued existence of any sea turtle species, contending that NMFS failed to: (1) adequately consider the impacts of installation; (2) issue an ITS authorizing sea turtle take during installation; and (3) adequately consider the risk of ship strikes and entanglement during USWTR operations. Pls.' Br. 36-37. Plaintiffs' arguments fail.

First, NMFS's conclusion that USWTR installation is not likely to adversely affect sea turtles is amply supported by the record. See NMFS AR 1844-46, 1928; DON160616; supra at 22-24. Plaintiffs' reliance on a comment from a Navy employee mistakenly comparing cable installation to beach renourishment projects is misplaced. Even if such projects were comparable (which is not the case), the existence of disparate views "does not render the BiOp[] arbitrary and capricious." Kandra v. United States, 145 F. Supp. 2d 1192, 1210 (D. Or. 2001); Nat'l Wildlife Fed'n v. Norton, 306 F. Supp. 2d 920, 928 n. 15 (E.D. Cal. 2004).

Second, the mere *possibility* that a sea turtle could be taken during USWTR installation does not require preparation of an ITS, as Plaintiffs assert. Consistent with the jeopardy standard discussed above, NMFS is required to prepare an ITS only when the agency finds no jeopardy

but concludes that "the project is *likely* to result in incidental takings."  Or. Natural Res. Council v. Allen, 476 F.3d 1031, 1034 (9th Cir. 2007) (emphasis added); see Ariz. Cattle Growers' Ass'n v. FWS, 273 F.3d 1229, 1241 (9th Cir. 2001) (rejecting argument that FWS "should be permitted to issue an [ITS] whenever there is a possibility, no matter how small, that a listed species will be taken").  Because NMFS determined that USWTR installation is not likely to adversely affect listed sea turtles, NMFS was not required to prepare an ITS.  Furthermore, Plaintiffs fail to explain how the *lack* of an ITS authorizing take during construction causes them any injury that would be sufficient to support Article III standing.

Finally, NMFS considered the risk of ship strikes and entanglement,  NMFS AR 1863, 1875, 1882-83, rationally concluding that USWTR operations are "not likely to interact with sufficient numbers of . . . sea turtles, if they interact with any sea turtles at all," to jeopardize the continued existence of any of the affected species.  NMFS AR 1928.  NMFS conclusion is amply supported by the record.  NMFS AR 1863, 1875, 1882-83, 1928; DON160615-16, 160617-20; supra at 24-25.  While the available data did not allow NMFS to calculate the specific probability that sea turtles may be affected or a number of sea turtles, if any, likely to be taken during USWTR operations, NMFS AR 1875, 1926-28, these uncertainties do not invalidate NMFS's "no jeopardy" opinion.  "Time and again courts have upheld agency action based on the 'best *available*' science, recognizing that some degree of speculation and uncertainty is inherent in agency decision-making, even in the precautionary context of the ESA."  Oceana v. Evans, 384 F. Supp. 2d 203, 219 (D.D.C. 2005).  Plaintiffs' "attempt to equate an absence of data with a failure to analyze does not succeed."  Id. at 231.

Because NMFS's BiOp is consistent with the ESA and the best available data, the Navy reasonably relied on the BiOp to satisfy its obligations under ESA Section 7(a)(2).  See Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy, 898 F.2d 1410, 1415 (9th Cir. 1990).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in favor of the Defendants.[17]

DATED:  October 6, 2011                    Respectfully submitted,


                                           EDWARD J. TARVER
                                           UNITED STATES ATTORNEY

                                            /s/ Ruth H. Young
                                           Assistant United States Attorney
                                           Georgia Bar No. 198489
                                           100 Bull Street
                                           Post Office Box 8970
                                           Savannah, GA  31412
                                           (912) 652-4422
                                           Ruth.Young@usdoj.gov

                                           IGNACIA S. MORENO
                                           Assistant Attorney General

                                           /s/ Joanna K. Brinkman
                                           JOANNA K. BRINKMAN, Trial Attorney
                                           Natural Resources Section
                                           United States Department of Justice
                                           Environment and Natural Resources Division
                                           P.O. Box 663, Washington, D.C.  20530
                                           Tele: (202) - 305-0476
                                           Fax:  (202) 305-0267
                                           Joanna.Brinkman@usdoj.gov

---

[17] To the extent the Court may rule in favor of Plaintiffs on any issue, Defendants would respectfully request the opportunity to submit a supplemental brief addressing appropriate relief, if any.  Although Plaintiffs assert that the EIS and BiOp should be vacated, vacatur is unwarranted under the APA if the agency's error was not prejudicial or is easily correctable.  See 5 U.S.C. § 706 (in reviewing agency action and determining appropriate relief under the APA, "due account shall be taken of the rule of prejudicial error"); Heartland Reg'l Med. Ctr. v. Sebelius, 566 F.3d 193, 198 (D.C. Cir. 2009) (remand without vacatur is appropriate "[w]hen an agency may be able readily to cure a defect in its explanation of a decision" and vacatur would have a "disruptive effect").

/s/   *Kevin W. McArdle*

KEVIN W. McARDLE, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife and Marine Resources Section
Benjamin Franklin Station, P.O. Box 7369
Washington, D.C. 20044-7369
(202) 305-0219
Kevin.McArdle@usdoj.gov

Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 6, 2011, I electronically filed a copy of the forgoing document with the Clerk of the Court using the CM/ECF system which will automatically notify all counsel of record of the filing via e-mail.


*<u>/s/ Kevin W. McArdle</u>*