# In the United States District Court
## for the Southern District of Georgia
### Brunswick Division

FILED
U.S. DISTRICT COURT
2012 SEP -6  PM 3: 13
CLERK_____
SO DIST. OF GA.

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, | * | |
| THE HUMANE SOCIETY OF THE | * | |
| UNITED STATES, WHALE AND DOLPHIN | * | |
| CONSERVATION SOCIETY, NATURAL | * | |
| RESOURCES DEFENSE COUNCIL, | * | |
| CENTER FOR A SUSTAINABLE COAST, | * | |
| FLORIDA WILDLIFE FEDERATION, | * | |
| SOUTH CAROLINA COASTAL | * | |
| CONSERVATION LEAGUE, NORTH | * | |
| CAROLINA WILDLIFE FEDERATION, | * | |
| ANIMAL WELFARE INSTITUTE, | * | |
| OCEAN MAMMAL INSTITUTE, CITIZENS | * | |
| OPPOSING ACTIVE SONAR THREATS, | * | |
| and CETACEAN SOCIETY | * | |
| INTERNATIONAL. | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| vs. | * | CV 210-014 |
| | * | |
| UNITED STATES DEPARTMENT OF THE | * | |
| NAVY, RAY MABUS, SECRETARY OF | * | |
| THE NAVY, NATIONAL OCEANIC AND | * | |
| ATMOSPHERIC ADMINISTRATION, | * | |
| NATIONAL MARINE FISHERIES | * | |
| SERVICE, and GARY LOCKE, SECRETARY | * | |
| OF COMMERCE. | * | |
| | * | |
| Defendants. | * | |

## ORDER

Presently before the Court are Cross-Motions for Summary Judgment filed by the Plaintiffs and the Defendants in this action. See Dkt. Nos. 73, 76. Upon due consideration,

1

Defendants' Motion for Summary Judgment is **GRANTED**, and

Plaintiffs' Motion for Summary Judgment is **DENIED**.


**INTRODUCTION**

This action is predicated on alleged violations by one or

more of the Defendants under the National Environmental Policy

Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 et seq., the Endangered

Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq., and the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

Plaintiffs are twelve environmental groups[1] who challenge the

United States Department of Navy's ("Navy") decision to install

an Undersea Warfare Training Range ("USWTR") off the coast of

Jacksonville, Florida.  At the heart of this dispute is the fact

that the USWTR is to be located offshore of federally-designated

critical habitat and adjacent to the only known calving grounds

of the highly endangered North Atlantic right whale.


**FACTUAL BACKGROUND**

The USWTR's stated purpose is to enable the Navy to train

effectively in a shallow water environment at a suitable

location for Atlantic Fleet anti-submarine warfare ("ASW")

---

[1] The environmental groups are Defenders of Wildlife, The Humane Society of
the United States, Whale and Dolphin Conservation Society, Natural Resources
Defense Council, Center for Sustainable Coast, Florida Wildlife Federation,
South Carolina Coastal Conservation League, North Carolina Wildlife
Federation, Animal Welfare Institute, Ocean Mammal Institute, Citizens
Opposing Active Sonar Threats, and the Cetacean Society International.

\O 72A
Rev. 8/82)

capable units. DON181854.[2]  It will enhance the Navy's ASW training exercises by providing real-time feedback to the units engaged in those training activities. Dkt. No. 76 at 6.  With this purpose in mind, the Navy has been planning the development of the USWTR for well over a decade.

On May 13, 1996, the Navy first published its Notice of Intent to prepare an environmental impact statement ("EIS") for an undersea warfare range somewhere along the east coast. Dkt. No. 73 at 3.  The four alternative sites originally considered were the Gulf of Maine, Wallops Island, Virginia, off the coast of North Carolina, and offshore of Charleston, South Carolina. Dkt. No. 73 at 3.  In 2005, the Navy released a draft EIS ("DEIS") proposing to locate the USWTR off the coast of North Carolina. Id.  However, in September 2008, the Navy changed course and released a new DEIS changing the preferred alternative from North Carolina to the present site offshore of the Georgia/Florida border. Id.

On June 26, 2009, after evaluating public comments on its revised DEIS, the Navy issued a Final EIS ("FEIS") for the installation and the operation of the USWTR at the preferred site in the Jacksonville Operating Area. DON181852.  The Navy also prepared a Biological Assessment and initiated formal consultation with the National Marine Fisheries Service ("NMFS")

---

[2] "DON___" refers to the Navy's Administrative Record for its Record of Decision.

pursuant to the ESA. DON160498; DON185886.  The NMFS's
Biological Opinion followed on July 28, 2009. NMFS AR 1731.[3]
Finally, on July 31, 2009, the Navy issued its Record of
Decision ("ROD") approving construction of the USWTR at the
preferred site within the Jacksonville Operating Area.
DON185885.  Construction is expected to take at least five years
to complete.  Id.

The Navy has conducted ASW training in the Jacksonville
Operating Area for over sixty (60) years. DON185892.  The
current plan is to construct the USWTR within this Jacksonville
Operating Area. Dkt. No. 76 at 6.  Construction of the USWTR
will involve the placement of undersea cables and transducer
nodes in a 500-sqaure-nautical-mile area of the ocean.
DON181854.  Transducer nodes are acoustic devices that transmit
and receive acoustic signals from ships and submarines operating
within the USWTR, which allows the position of participants to
be determined and stored electronically for both real-time and
future evaluation. DON181857.  This instrumented area would then
be connected to the shore via a single trunk cable. DON181854.
According to the Navy, this construction has not yet commenced,
and will be completed no sooner than 2014. Dkt. No. 76 at 7
(citing DON185885).

---

[3] "NMFS AR __" refers to the NMFS's Administrative Record for its Biological
Opinion.

O 72A
Rev. 8/82)

The parties dispute the scope of the USWTR.  The Navy argues that the USWTR will be constructed in a relatively small portion of the Navy's existing Jacksonville Operating Area. Dkt. No. 76 at 1.  According to the Navy's Record of Decision: "Submarines, ships and aircraft all currently conduct ASW training in the JAX OPAREA and will be the principal users of the USWTR." DON185886.  The Navy, therefore, argues that the USWTR is "not expected to cause any significant change to training already occurring in the area." Dkt. No. 76 at 1. Plaintiffs, in contrast, argue that the Navy's characterization of the proposed action is not accurate, as the entire point of the USWTR is to concentrate intensive ASW exercises from the vast Jacksonville Operating Area (spanning tens of thousands of square miles) into the USWTR instrumented area. Dkt. No. 80 at 2.  Plaintiffs also point out that, unlike the rest of the Jacksonville Operating Area, the USWTR would involve the installation outlined above. Id. at 3.

What is not in dispute is that the USWTR is to be constructed adjacent to the calving grounds of the North Atlantic right whale, which is "the world's most critically endangered large whale species and one of the world's most endangered mammals." DON154895.  The Southeastern United States is the only known calving ground for North Atlantic right whales and is, therefore, vital to the population. DON144853.  Despite

O 72A
Rev. 8/82)

protection from commercial whaling since 1935, the remaining population has failed to fully recover. DON154895. The best current estimate of minimum population is 313 whales. Id. (citing Waring et al., 2007). Due to this fragile status, and "[b]ecause of the species' low reproduction level and small population size, even low levels of human-caused mortality can pose a significant obstacle for North Atlantic right whale recovery." Id.

Plaintiffs' legal attack on the Navy occupies many fronts; but, at its core, Plaintiffs argue that the Navy has failed to adequately analyze the potential environmental impact the proposed USWTR will have on right whales and other protected species. Much of Plaintiffs' allegations against the Navy stems from Plaintiffs' belief that the Navy has recommended the Jacksonville site for the USWTR without analyzing both the installation and operation phases of the action. Dkt. No. 73. While Plaintiffs certainly argue that the Navy's installation analysis was flawed, the heart of Plaintiffs' allegations is that the Navy has committed to this site without analyzing the operations phase of the project. Id.

Specifically, Plaintiffs contend that the Navy selected the Jacksonville site without the surveys necessary to assess densities for marine mammals, including the densities of right whales in the area. Dkt. No. 73 at 4. In this regard,

AO 72A
Rev. 8/82)

Plaintiffs note that right whale scientists and the Georgia Department of Natural Resources have expressed concerns with the Navy's plans to go forward without such information. Id. at 4-5. In a similar vein, Plaintiffs charge the Navy with segmenting its analysis by only conducting such research after it released its FEIS selecting Jacksonville as its preferred alternative. Id. at 5. The Navy, for its part, disputes this contention and maintains that it conducted the appropriate analysis required under federal law.

Plaintiffs' argument of unlawful segmentation also applies to the Navy's ROD, where the Navy only authorizes the installation phase of the USWTR.  Plaintiffs maintain that the ROD has the practical effect of approving the $100 million dollar construction of the range, while delaying an analysis over its use. Dkt. No. 73 at 7.  The Navy responds that these segmentation allegations are unfounded, as the FEIS and ROD both fully analyzed the operations and installation phases of the USWTR. The Navy also points out that the ROD does not approve the operations component because of timing considerations, not due to a lack of analysis.[4]

---

[4] The Navy claims that it deferred any decision to implement training on the USWTR because of the need to first obtain Marine Mammal Protection Act ("MMPA") take regulations from the NMFS, which are subject to a five-year time limit. Dkt. No. 76 at 9 (citing DON185885).  Therefore, according to the Navy, had it sought to obtain MMPA take regulations covering USWTR operations in 2009, they would expire before operations commenced. Id.

As for the NMFS, Plaintiffs argue that it was derelict of its agency responsibilities.  Specifically, Plaintiffs argue that the 2009 Biological Opinion issued by the NMFS is legally deficient. Dkt. No. 73 at 7.  This allegation is based on Plaintiffs' belief that the NMFS's analysis of the USWTR was incomplete and that it irrationally makes findings not supported by the facts before the agency. Id.

In accordance with Plaintiffs' contention that Defendants are acting in violation of the ESA, NEPA, and APA, they brought suit in this Court on January 28, 2010. Dkt. No. 1.  Plaintiffs' Original Complaint was followed shortly thereafter with an Amended Complaint. Dkt. No. 24.  In this Amended Complaint, Plaintiffs ask the Court to, among other things, (1) declare that the Navy Defendants have violated both NEPA and the ESA, (2) declare that the NMFS Defendants have violated the APA and ESA, (3) vacate the Navy's FEIS and ROD, (4) vacate the NMFS's Biological Opinion, and (5) remand the FEIS, ROD, and Biological Opinions for further preparation. Dkt. No. 24 at 55.  On August 22, 2011, Plaintiffs moved for summary judgment as to all of its claims. Dkt. No. 73.  On October 6, 2011, Defendants filed a cross-motion for summary judgment opposing Plaintiffs' motion and seeking summary judgment on Defendants behalf. Dkt. No. 76.

O 72A
:ev. 8/82)

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.  A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).  Where, as here, cross-motions for summary judgment have been filed, the court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. Sun Life Assur. Co. of Canada (U.S.) v. Williams, 2008 WL 762204, at *5 (M.D. Ga. Mar. 18, 2008) (citing Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To

⊃ 72A
ev. 8/82)

satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325.   If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

**STANDARD OF REVIEW**

Judicial review of the agency actions at issue, both under NEPA[5] and the ESA,[6] are governed by the Administrative Procedure Act, 5 U.S.C. § 706.   The APA provides that a court shall "set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. at § 706(2)(A).   The arbitrary and capricious standard is "exceedingly deferential." Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541 (11th Cir. 1996).   In fact, even in the context of summary judgment, an agency action is entitled to great deference. Pres. Endangered Areas of Cobb's

---

[5] See Little Lagoon Pres. Soc'y, Inc. v. U.S. Army Corps of Eng'rs, 2008 WL 4080216, at *15 (S.D. Ala. Aug. 29, 2008) ("[T]he determination of whether the [agency] fulfilled its NEPA obligations must be examined though the lens of the Administrative Procedure Act . . . .").
[6] See Miccosukee Tribe of Indians of Florida v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009) ("Biological opinions are final agency actions subject to judicial review under the Administrative Procedure Act." (internal citation omitted)).

AO 72A
(Rev. 8/82)

History, Inc. v. U.S. Army Corps of Eng'rs, 87 F.3d 1242, 1246 (11th Cir. 1996).

The Court is not authorized to substitute its judgment for the agency's so long as the agency's conclusions are rational. Miccosukee Tribe of Indians of Florida v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009). Instead, "[t]he Court's role is to ensure that the agency came to a rational conclusion, 'not to conduct its own investigation.'" Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008) (quoting Pres. Endangered Areas of Cobb's History, 87 F.3d at 1246).

However, an agency action may be found arbitrary and capricious:

> where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Miccosukee Tribe of Indians, 566 F.3d at 1264 (quoting Alabama-Tombigbee Rivers Coal. v. Kempthorne, 477 F.3d 1250, 1254 (11th Cir. 2007)).

.O 72A
Rev. 8/82)

**DISCUSSION**

A. The National Environmental Policy Act of 1969

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  Its procedures ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. Id. at § 1500.1(b); see also Wilderness Watch and Pub. Emp. for Envtl. Responsibility v. Mainella, 375 F.3d 1085, 1094 (11th Cir. 2004) ("NEPA essentially forces federal agencies to document the potential environmental impacts of significant decisions before they are made, thereby ensuring that environmental issues are considered by the agency and that important information is made available to the large audience that may help to make the decision or will be affected by it."). NEPA's requirements are procedural and are designed to ensure that an agency adequately assesses the environmental impacts of actions they undertake. City of Oxford, Ga. v. Fed. Aviation Admin., 428 F.3d 1346, 1352 (11th Cir. 2005); see also Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 756-57 (2004) ("NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions."). Accordingly, "NEPA itself does not mandate particular results." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 23 (2008)

AO 72A
(Rev. 8/82)

(quoting <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 350 (1989)).

The mechanism implemented under NEPA to ensure that environmental information is available is the requirement that a federal agency prepare an EIS if that agency proposes "a major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).  The first step in the EIS process is determining whether it is necessary.[7]  Here, this step is not in dispute, as the Navy did indeed prepare an EIS. DON181852-182848.

The EIS "shall provide full and fair discussion of significant environmental impacts" of a proposed action. 40 C.F.R. § 1502.1.  The EIS does so by identifying the direct, indirect, and cumulative impacts of the proposed action,[8] including an analysis of alternatives of the proposed action, 42 U.S.C. § 4332(C)(iii), and a discussion of means to mitigate adverse environmental impacts. 40 C.F.R. § 1502.16(h).  Even

---

[7] In determining whether an EIS is necessary, the agency must first surmise whether the proposal is one which: (1) Normally requires an EIS; or (2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion). 40 C.F.R. § 1501.4(a).  If not covered by the proceeding section, the agency must prepare an environmental assessment (40 C.F.R. § 1508.9). <u>Id.</u> § 1501.4(b). Based on the environmental assessment, a determination is then made as to whether an EIS is needed. <u>Id.</u> § 1501.4(c).

[8] Direct effects are those which are caused by the action and occur at the same time and place.  Indirect effects are those which are caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable. <u>Id.</u> § 1508.8(a)~(b).  Cumulative impacts are impacts from "past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." <u>Id.</u> § 1508.7.

AO 72A
(Rev. 8/82)

though the agency's decision is entitled to deference, the Court must ensure that the agency took a "hard look" at the environmental consequences of the proposed action.  Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1216 (11th Cir. 2002).  In determining whether an agency has complied with NEPA, the reviewing court's only role "is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive." Fund for Animals, Inc. v. Rice, 85 F.3d 535, 547 (11th Cir. 1996) (internal citations omitted).

Plaintiffs argue that the Navy has failed to comply with NEPA in four ways: (1) by failing to comply with 40 C.F.R. § 1502.22; (2) by unlawfully segmenting its analyses, through deferring analysis of USWTR's operation until after the construction was authorized; (3) by failing to take a "hard look" at the potential impacts that the proposed action will have on the North Atlantic right whale, manatees, and sea turtles; and (4) by including a mitigation analysis that is arbitrary and capricious.  The Court addresses each argument below.

a. Compliance with 40 C.F.R. § 1502.22

The Code of Federal Regulations provides that when an "agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact

14

statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking." 40 C.F.R. § 1502.22. Further, "[i]f the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement." Id. § 1502.22(a).

Plaintiffs allege that the Navy has violated 40 C.F.R. § 1502.22(a) by failing to obtain information essential to a reasoned choice among alternative locations for the USWTR. Dkt. No. 80 at 3. Specifically, Plaintiffs contend that the Navy failed to obtain essential baseline data on marine mammal populations and bottom habitat in the USWTR area prior to issuing its FEIS. Dkt. No. 73 at 10. Instead, Plaintiffs insist that the Navy only began to gather such information for the Jacksonville location in February and June 2009, leaving no time for this information to be considered by decision-makers or reviewed by the public before making a final decision on the location of the USWTR. Id.

In response, the Navy argues that it gathered and analyzed sufficient baseline information for marine mammal density and bottom habitat and, only after considering that information, made its final decision to locate the USWTR in the Jacksonville

Operating Area. Dkt. No. 82 at 6.  Further, the Navy argues that
references made in the record noting the need for further
studies do not mean that no baseline data previously existed or
that the information previously relied upon was somehow
insufficient to support the agency's decision. Id.  Stated
differently, the Navy asserts that the "mere fact that the Navy
intends to do more comprehensive research in the future does not
render the analysis in the EIS arbitrary or capricious." Id. at
8.  The Navy does not argue that information related to baseline
data on marine mammal populations and bottom habitat is not
essential.  Rather, the Navy submits that the information that
it relied on was not incomplete or unavailable. Id. at 6.
Therefore, the Court will turn to the record and discern what
the Navy relied upon and determine whether that information was
incomplete.

Plaintiffs' contention that the Navy illegally deferred
required analysis of baseline data on marine mammal populations
and bottom habitat is based upon statements made by the Navy at
various points within the record that indicate the Navy's plan
to conduct further analysis.  For example, in its FEIS the Navy
responds to concerns about the proximity of the USWTR to right
whale critical habitat and breeding grounds by noting that:

> Site A range is far offshore from recognized right
> whale critical habitat.  The Navy will be implementing
> mitigation measures as stated in Chapter 6.  The Navy

16

> initiated a program in the spring of 2009 that is
> monitoring marine mammals at the Jacksonville USWTR
> site.  Through the Navy's marine mammal monitoring
> program, we will be able to establish baseline
> occurrence information.

DON183390; see also DON183350 (in responding to concerns that

the DEIS does not include mitigation for impacts to benthic

habitats, the Navy responds by stating: "The Navy is conducting

bottom mapping surveys at the Jacksonville site.  Data can be

used to characterize potential biological habitats and hard

bottom."); DON185885 (commenting within the summary of the ROD

reasoning that "[b]ecause operation of the USWTR is not

anticipated to occur until at least 2014, the analysis regarding

the environmental effects from training on the USWTR in the

Final Overseas Environmental Impact Statement/Environmental

Impact Statement (OEIS/EIS), will be updated in a future

OEIS/EIS closer in time to the date when the training will

begin").

The Navy's plans to conduct further studies do not

necessarily establish that it failed to comply with 40 C.F.R. §

1502.22.  Indeed, the Court is aware of no authority within this

Circuit that dictates that the Navy would be required to

independently gather such baseline data under NEPA at all.  As

the Navy correctly points out, courts in other jurisdictions

have found compliance with NEPA in instances of unknown baseline

data, Gaule v. Meade, 402 F. Supp. 2d 1078, 1089 (D. Alaska

2005), and in instances, such as this one, where the agency relies on previous studies for its baseline analysis. Theodore Roosevelt Conservation P'ship v. Salazar, 605 F. Supp. 2d 263, 281 (D.D.C. 2009), aff'd, 616 F.3d 497 (D.C. Cir. 2010). Furthermore, acknowledgement on the part of the Navy that further studies would be useful does not indicate a violation of NEPA. See Churchill Cnty. v. Norton, 276 F.3d 1060, 1082 (9th Cir. 2001) ("[Though a]dditional studies undoubtedly would fill in relevant details regarding groundwater resources under each of the action alternatives[,] . . . the Service relied on current information, not outdated studies or technology.").

The issue presently in dispute is whether data on marine mammal populations and bottom habitat was "essential to a reasoned choice among alternatives" and whether that information was incomplete or unavailable. 40 C.F.R. § 1502.22(a). This issue does not turn on what the Navy does in the future, but rather, on what the Navy consulted in preparing its FEIS.

With regards to the marine mammal density data, the Navy consulted the Navy OPAREA Density Estimates ("NODE") for the Southeast OPAREAs: VACAPES, CHPT, JAX/CHASN, and Southeastern Florida & Autec-Andros, DON121653, which notes "density estimates are needed to assist in the determination of the potential impacts of military operations to marine mammal and

.O 72A
Rev. 8/82)

sea turtle species."[9]  Accordingly, the stated goal of the NODE is to "provide a compilation of the most recent data and information on the occurrence, distribution, and density of marine mammals and sea turtles in this area."[10]  Notably, NODE specifically includes density estimates for various marine mammals, including the North Atlantic right whale. See, e.g., DON121711-DON121722 (providing Atlantic density surface of the North Atlantic right whale for various months of the year based upon Southeast Marine Resource Assessment polygons).  The Navy also specifically cites numerous reports within the FEIS concerning marine mammal density. See DON182086; DON182088; see also DON182655 (producing Table 6-2 depicting a range of estimates for marine mammal species – including the right whale – found in the USWTR study area in reliance on Palka, 2006; Hain et al., 1999; and Palka, 2005b).

Turning to the bottom habitat surveys, the Navy also points to specific provisions in the record which it analyzed and relied on in producing the FEIS. See, e.g., DON182044-182045 (discussing sea bottom habitat); see also DON182699 (referencing "2001 Distribution of Bottom Habitats on the Continental Shelf

---

[9] The NODE specifically lists the North Atlantic right whale as one of the species where survey data existed. DON121688.
[10] The study area ranges from the U.S./Canada border and is bounded to the south by the territorial waters of Cuba and to the west by the Key West Complex.  The Narragansett Bay, Atlantic City, VACAPES, CHPT, and JAX/CHASN OPAREAs, as well as southeastern Florida, are all located within this region. DON167266.

19

from North Carolina to the Florida Keys, Washington D.C.: SEAMAP Bottom Mapping Project"); DON182827 (referencing "Wenner E.L., P. Hinde, D.M. Knott, and R.F. Van Dolah, 1984, A temporal and spatial study of invertebrate communities associated with hardbottom habitats in the South Atlantic Bight. Seattle, Washington, National Marine Fisheries Service. NOAA Technical Report NMFS 18: 1-106"). Moreover, the Navy specifically discussed the hard bottom data internally in an attempt to ensure that the EIS used a more recent form of the SEAMAP data. DON123536-37.

As is made clear from the record, the Navy analyzed marine mammal densities and bottom habitat surveys in forming the FEIS. That the Navy plans to conduct further thorough studies in the future in no way vitiates this prior analysis. To decide otherwise would provide a disincentive for agencies who wish to go beyond what is required under NEPA. Therefore, the Court is satisfied that the Navy did not have "incomplete" or "unavailable" information with regards to marine mammal densities and bottom habitat surveys. As a result, the strictures of 40 C.F.R. § 1502.22 were not prompted, and the Navy was not required to make clear that such information was lacking.

O 72A
Rev. 8/82)

b. Segmentation

Actions that are closely related are deemed connected and should be discussed in the same EIS. 40 C.F.R. § 1508.25(a)(1).[11] In determining the proper scope of an EIS, "courts have considered such factors as whether the proposed segment (1) has logical termini, (2) has substantial independent utility, (3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects." Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 439 (5th Cir. 1981).[12]  Stated differently, if "proceeding with one project will, because of functional or economic dependence, foreclose options or irretrievably commit resources to future projects, the environmental consequences of the projects should be evaluated together." O'Reilly v. U.S. Army Corp of Eng'rs, 477 F.3d 225, 236 (5th Cir. 2007).  This requirement is in place so that agencies "may not evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components, each without a significant impact." Pres. Endangered

---

[11] "Actions are connected if they: (i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; (iii) Are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1)(i)-(iii).

[12] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before the close of business on September 30, 1981.

.O 72A
Rev. 8/82)

Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs, 916
F. Supp. 1557, 1562 (N.D. Ga. 1995) (quoting Coal. of Sensible
Transp., Inc. v. Dole, 826 F.2d 60, 68 (D.C. Cir. 1987)).

The parties' argument over segmentation in this case
is unique.  In most instances the disputed issue is whether
actions are related and, therefore, must be analyzed in the
same EIS. See, e.g., Pres. Endangered Areas of Cobb's
History, Inc. v. U.S. Army Corps of Eng'rs, 87 F.3d 1242
(11th Cir. 1996).  Here, there is no dispute that the
installation and operation components of the USWTR are to
be discussed in the same EIS.  Rather, the contested issue
is whether the Navy did, in fact, analyze the operations
component of the USWTR.  In this sense, there is no real
dispute as to the connectedness of the operation and
installation components of the project. Instead,
Plaintiffs' true argument is that the Navy did not
adequately analyze the operations component of the USWTR.

Plaintiffs argue that, by deferring analysis of USWTR's
operation until after the construction was authorized, the Navy
has unlawfully segmented its analysis. Dkt. No. 73 at 15.  In
essence, Plaintiffs contend that the Navy has attempted to
obtain authorization of the construction of the USWTR without
properly examining the operations to be performed there.

The Navy denies this contention, maintaining that in preparing the USWTR FEIS, the Navy fully analyzed the impacts of both construction and operation of the planned range. Dkt. No. 76 at 15.  The Navy further asserts that it postponed a final decision to authorize the operations phase of the USWTR to avoid wasting resources by securing authorization under the Marine Mammal Protection Act ("MMPA") that would expire before the covered operations commenced. Dkt. No. 82 at 3.  In short, the Navy admits that the construction and operation components are connected actions, and it maintains that both were analyzed in the USWTR FEIS.

Plaintiffs contend that the Navy violated 40 C.F.R. § 1508.25(a) by failing to consider the environmental impacts of the operations component of the project. Dkt No. 73 at 15.  The Navy is quick to point out, however, that the USWTR FEIS was prepared "to assess the potential effects of installing and operating a USWTR offshore of the east coast of the United States." DON18156 (emphasis added); see also DON185885 (ROD)(noting that the Navy has "carefully weigh[ed] the environmental consequences of the installation and operation of the proposed action"); DON185886 (ROD) (stating that "both the installation phase and training phase of the USWTR are fully analyzed in the [FEIS]").  However, this assertion is perhaps undermined by the Navy's plans to create another EIS with

23

regards to the operations component of the proposed action. See
DON185885 (noting that "[t]he decision to implement training on
USWTR will be based on the updated analysis of environmental
effects in a future OEIS/EIS").

In response to Plaintiffs' labeling its future EIS plans as
evidence of segmenting, the Navy retorts that the "additional
NEPA analysis [that] will occur in connection with the decision
to authorize training on the USWTR is of no moment, because that
analysis will focus on alternative training and testing
scenarios, including tempo of activities - not on the location
of the range." Dkt. No. 82 at 4.  Further, the Navy adds that it
has no obligation to revisit or reanalyze its decision as to the
USWTR's location. Id.

After carefully considering the parties' respective
contentions, the Court is satisfied that the Navy did not
segment its analysis of the USWTR.  Section 1508.25(a) of the
Code of Federal Regulations requires that connected actions "be
discussed in the same impact statement."  This provision,
however, does not mandate that all connected actions be approved
in the same ROD, as Plaintiffs' argument suggests.  Rather, this
provision requires that an agency study impacts of the entire
project at the same time. See Stewart Park and Reserve Coal.,
Inc. (SPARC) v. Slater, 352 F.3d 545, 559 (2d Cir. 2003)
("Segmentation is an attempt to circumvent NEPA by breaking up

24

one project into smaller projects and not studying the overall
impacts of the single overall project."). The Navy's FEIS
analyzed both the installation and operation phases of the
USWTR, and, therefore, it did not unlawfully segment the
proposed action's analysis. As a result, the real question is
whether the Navy provided inadequate analysis for the operations
component of the USWTR. This issue will be fully addressed
throughout the course of this Order as it pertains to
Plaintiffs' specific legal challenges under NEPA and the EPA.

Further, the Navy did not violate 40 C.F.R. § 1506.1(a) as
Plaintiffs suggest.[13] This is because the Navy did not commit
itself to the Jacksonville Operating Area until after assessing
the environmental impacts of the installation and operation
components of the USWTR, in accordance with NEPA. The authority
cited by Plaintiffs on this point is not persuasive, as each of
those cases involved the commitment of resources prior to
environmental analysis. See, e.g., Metcalf v. Daley, 214 F.3d
1135, 1144-45 (9th Cir. 2000) (finding that an agency had
violated NEPA by signing two binding contracts before preparing
the environmental assessment); Save the Yaak Comm. v. Block, 840

---

[13] 40 C.F.R. § 1506.1(a) provides that:

> a) Until an agency issues a record of decision as provided in §
> 1505.2 (except as provided in paragraph (c) of this section), no
> action concerning the proposal shall be taken which would:
> (1) Have an adverse environmental impact; or
> (2) Limit the choice of reasonable alternatives.

F.2d 714, 718 (9th Cir. 1988) (holding that the agency had violated NEPA because "[i]n this case, the reconstruction contracts were awarded prior to preparation of the [environmental assessments]"). In contrast, here the Navy did not commit to the Jacksonville Operating area until after such analysis was completed. Accordingly, the Court is satisfied that the Navy did not unlawfully segment its analysis, as the FEIS considered both the installation and operations phases of the USWTR. As to whether this analysis is adequate, the Court will address that argument in relation to the specific deficiencies alleged.

c. Hard Look

"An agency has met its 'hard look' requirement if it has 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1216 (11th Cir. 2002) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)). In this context, the Court is duty-bound to ensure that the agency took a hard look at the environmental consequences of the proposed action. Nat'l Parks Conservation Ass'n, Inc. v. U.S. Army Corps of Eng'rs, 446 F. Supp. 2d 1322, 1336 (S.D. Fla. 2006) (citing North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1541 (11th

Cir. 1990)).  However, it is not required that the agency reach the same conclusion that the reviewing court would reach. Instead, the agency "must merely have reached a conclusion that rests on a rational basis." City of Oxford, Ga. v. Fed. Aviation Admin., 428 F.3d 1346, 1352 (11th Cir. 2005).  The Court is not to "fly speck" the Navy's EIS but is instead to be guided by a "rule of reason." Citizens for Mass Transit, Inc. v. Adams, 630 F.2d 309, 313 (5th Cir. 1980).  In this light, a reviewing court may overturn an agency's decision only if:

> (1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise.

City of Oxford, 428 F.3d at 1352 (citing Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1216 (11th Cir. 2002)).

Plaintiffs assert that the Navy failed to take a "hard look" and adequately consider the risks for (1) North Atlantic right whales and other marine mammals, (2) sea turtles, and (3) manatees.  For the reasons set forth below, the Court finds that the Navy's decision regarding the environmental impacts to these three groups was not "arbitrary, capricious, or an abuse of discretion," and therefore, the Court declines to substitute its judgment

AO 72A
(Rev. 8/82)

for that of the Navy. <u>Pres. Endangered Areas of Cobb's
History, Inc. v. U.S. Army Corps of Eng'rs</u>, 87 F.3d 1242,
1246 (11th Cir. 1996).

> i.   *Right Whales*

Plaintiffs first argue that the Navy failed to adequately
consider the risks that the USWTR posed to the North Atlantic
right whale. Dkt. No. 73 at 18.  Plaintiffs point out that
mothers and their calves are primary occupants of the critical
habitat in Georgia and Florida and that these occupants are the
species most vulnerable and important segments of the
population. <u>Id.</u>  Additionally, while Plaintiffs acknowledge the
FEIS's recognition that the right whale is among the world's
most endangered species, Plaintiffs' argue it simply does not
adequately address the risks the USWTR poses to the species. <u>Id.</u>
Specifically, Plaintiffs argue that the Navy failed to
adequately consider risks posed by ship strikes, entanglement in
discarded debris, and the impact of sonar operations. <u>Id.</u>  The
Navy disputes these allegations.

> 1. Ship Strikes

As Plaintiffs point out, ship strikes are the greatest
source of mortality for right whales. Dkt. No. 73 at 18 (citing
NMFS AR 1789).  The effects are intensified because a
disproportionate number of ship strike victims are female right
whales. <u>Id.</u> (citing DON154896).  This threat undoubtedly has

severe environmental consequences because, as previously noted, the right whale is "the world's most critically endangered large whale species and one of the world's most endangered species." Id. at 3 (citing DON154895).

Although the risk is considerable, the Navy performed extensive analysis regarding the risks posed to the right whales by ship strikes.  In doing so, the Navy found that ship strikes are an issue of concern for the right whale, DON182360 (citing MMC 2008; Nelson et al., 2007), specifically with regards to potential stranding, avoidance behavior, changes in dive patterns, and fatalities. Dkt. No. 76 at 18 (citing DON182358-60).  In short, the Navy was fully apprised of the dangers that ship strikes pose to the right whale.

In considering the magnitude of the threat of ship strikes on right whales, the Navy reviewed the historical record of ship strikes by the Navy during Navy operations in the Jacksonville Operating Area. Dkt. No. 82 at 11.  Based on this record, the Navy submits that in its sixty (60) year history of training in the area, there has not been one instance of a Navy vessel striking a whale. Id. (citing DON080034).  The historical record also indicates that the Navy has already placed protective measures into practice to avoid harming the right whale.  Such protective measures have been in place since 1997 and include the funding of an Early Warning System ("EWS") to provide daily

AO 72A
(Rev. 8/82)

aerial surveillance flights during calving season.[14] Dkt. No. 76
at 19.  Since the onset of the EWS, the Navy has transited
through right whale critical habitat without incident.  Id.
Additionally, in 2004, the Navy and the NMFS coordinated to
identify seasonal right whale "occurrence patterns." DON182360.
As a result of this effort, the Navy has identified areas where
its guidance "calls for extreme caution and operation at a slow,
safe speed" at specified coastal and port reference points.[15] Id.

     To compliment the efforts discussed above, the Navy has
outlined protective measures for the critical habitat itself.
Notably, these protective measures are "tailored according to
the temporal and spatial distribution of right whales at each
location." DON182360.  For the Southeast these measures include
(1) an annual message sent to all ships prior to the calving
season, (2) moving through the critical habitat in the most
direct manner possible, avoiding north-south transits during the
calving season, (3) using extreme caution and operating a slow,
safe speed, and (4) to the extent practicable and consistent
with mission, training, and operations, limiting vessel

---

[14] The Early Warning System is a collaborative effort that involves
comprehensive aerial surveys conducted during the North Atlantic right whale
calving season.  Surveys are flown daily, weather permitting, from December
1st through March 31st. DON182084.  The purpose of the surveys is to locate
North Atlantic right whales and provide whale detection and reporting
information to mariners in the calving ground in an effort to avoid
collisions with this endangered species. Id.
[15] This guidance also "reiterates previous instructions that Navy ships post
two lookouts, one of whom must have completed marine mammal recognition
training, and emphasizes the need for utmost vigilance in performance of
these lookout duties." DON182360.

AO 72A
(Rev. 8/82)

operations in critical habitat to daylight and periods of good visibility. DON182360-61.

Although Plaintiffs contend that Defendants are unable to cite to anything in the record that "meaningfully analyzes" the potential impacts on right whales, Dkt. No. 78 at 13, it is clear from the foregoing that the Navy indeed took a "hard look" at the potential impacts of ship strikes on the right whale within the meaning of NEPA.  In doing so, the Navy concluded that the threat that ship strikes pose to the right whales, while not impossible to avoid, is not expected in the area of the proposed USWTR. Dkt. No. 82 at 20.  The Court is not required to agree with this assessment but, instead, must ensure that the Navy took a "hard look" at the environmental impacts. See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 23 (2008) (noting that NEPA's requirements are procedural and the statute itself "does not mandate particular results" (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989))).  Here, the Navy has done so.

2. Entanglement

Plaintiffs argue that the Navy failed to take a "hard look" at the possibility that right whales will become entangled in discarded debris from the air launch accessories and parachutes used on the range. Dkt. No. 73 at 20.  This alleged failure is significant because fishing gear entanglement is the second

31

largest source of mortality for right whales. Id. (citing NMFS AR 1789). Specifically, Plaintiffs contend that the Navy's conclusion that entanglement is "unlikely" is flawed because it was reached in a cursory manner without meaningful analysis. Id. at 20-21.

The Navy responds, in turn, by arguing that it did consider the risk of entanglement from the installation and operation of the USWTR. Dkt. No. 76 at 20. In doing so, the Navy analyzed the risk that discarded materials could have on right whales. See, e.g., DON182318 (discussing the potential impacts that discarded control wires and flex hoses will have on sea turtles, whales, or other animals); DON182363 (analyzing the potential for sea turtles or marine mammals to encounter an expended parachute assembly). The Navy, however, determined that the parachute's design, which includes weights designed to sink the parachute from the surface within fifteen (15) minutes, reduces the risk of entanglement. Dkt. No. 76 at 20-21 (citing DON096581; DON162252). Furthermore, contrary to Plaintiffs' assertion, the Navy did consider the risk of billowing and determined that it was unlikely as, "once the expended parachute assembly has landed, it and its housing are expected to lay flat on the seafloor, as observed at other locations." Id. at 21 (citing DON182363). The Navy also reasoned that discarded debris associated with torpedoes "will not easily loop or

32

tangle[,]" making it unlikely that these materials "will result in the entanglement of any sea turtles, whales, or other animals." DON182318.

The record makes clear that the Navy considered the environmental consequences of the proposed action as it relates to right whale entanglement with regards to parachutes and other discarded debris. Further, the Navy has "articulated a satisfactory explanation" as to why the proposed action would be unlikely to have a significant impact on right whales with regards to entanglement, and there is "a rational connection between the facts found and the choice made.'" Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1216 (11th Cir. 2002) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)). As such, the Navy has fulfilled its obligation.

### 3. Impacts from Sonar Exercises

Lastly, with respect to the right whales, Plaintiffs contend that the Navy failed to take a "hard look" at the impact that the systems used during exercises on the USWTR, particularly the mid-frequency sonar, would have on right whales. Dkt. No. 73 at 21. The record reveals, however, that the Navy consulted the NMFS to address the potential effects to marine mammals from sound associated with USWTR. DON182367. In doing so, the Navy concluded that "the potential exists for

moderate, but recoverable, effects to occur to sea turtles and
marine mammals from the introduction of sound into the
environment.  However, with the implementation of proper
mitigations, no significant impacts are anticipated." Id.  This
conclusion is rationally related to the analysis set forth in
section 4.3-64 of the FEIS. See DON182434-35 (analyzing the
impacts of low, mid, and high frequency on right whales).  As a
result, it is evident that the Navy took the "hard look"
required under NEPA regarding the potential environmental
impacts that sonar exposure could have on the right whales.

   *ii.  Sea Turtles*

   Plaintiffs next argue that the FEIS fails to consider the
risks posed to threatened and endangered sea turtles resulting
from installation activities, ship strikes, and entanglement.
Dkt. No. 73 at 22.  Contrary to Plaintiffs' contention, the Navy
did indeed take a "hard look" at the potential impacts that the
USWTR could have on sea turtles.

   1. Installation

   First, the Navy thoroughly considered the potential impacts
that the installation of the UWSTR could have on sea turtles.
Namely, the Navy rationally concluded that the risk of a ship or
the burial vehicle striking a sea turtle was minimal. Dkt. No.
76 at 22.  The Navy came to this conclusion based on a
combination of the fact that the cable installation will proceed

34

at slow speeds[16] and its reliance on studies which show sea turtles evade vessels traveling at such slow speeds. See, e.g., DON182508 (citing a study for the proposition that turtles frequently fled in encounters with a slow-moving (2.2 knots) vessel); DON160498 (noting the "ability of turtles to detect approaching vessels in the water via auditory and/or visual cues would be expected based on knowledge of their sensory biology"). Additionally, the vessels will be required to have lookouts, reducing the likelihood of a ship strike during installation. See DON185910 (stating that "all cable installation vessels will be required to have lookouts that assist in advising the captain when a marine mammal or sea turtle is in the vicinity"). The record is clear that the Navy adequately considered the potential impacts that ship strikes could have on sea turtles and rationally concluded that the risk was minimal due both to the speed of the vessel and the mitigation techniques employed.

Aside from ship strikes during installation, the Navy also properly considered whether there was a risk that cable burial could disturb a sea turtle in the process of brumating.[17] The Navy again rationally concluded that the risk was minimal because only a small number of sea turtles brumate in the area

---

[16] The speed of the installation ship will be 1 to 3.7 km/hr or 0.5 to 2 NM/hr. DON182350.

[17] Brumation is the reptilian equivalent to hibernation.

AO 72A
(Rev. 8/82)

for short periods during the winter[18] and cable installation will be suspended between November 15 and April 15. See DON185909 (noting that cable installation would be suspended during the North Atlantic right whale calving season, November 15 through April 15).

## 2. Entanglement

The Navy also considered the potential impacts of sea turtles becoming entangled and rationally concluded that the risk was low. The Navy cites studies that have found interactions between sea turtles and parachutes generally take place at the surface or in the water column. DON160619. The parachute assemblies used for this project are designed to float for a short time and then sink to the bottom. Id. Based on this information, the Navy rationally concluded that the risk of entanglement would be greatly reduced due to the amount of time that sea turtles were exposed to the parachutes. Further, although Plaintiffs posit that the Navy failed to consider the risk of the parachutes billowing, Dkt. No. 73 at 23, the Navy did indeed consider the risk and discounted the possibility in reliance on a 2005 study. DON182363 (citing ESG, 2005). As a

---

[18] The Navy cites a study that found sea turtles generally rely on migration to avoid northern winters. DON182351 (citing Ultsch, 2006). Further, in reliance on this study and others, the Navy concluded that based on observations and temperature requirements "[s]ea turtles may possibly brumate off the coast of Florida near the proposed Site A USWTR location for short periods of time during cold winters." Id.

36

result, the record reveals that the Navy adequately considered the potential risks posed to sea turtles based on entanglement.

### 3. Ship Strikes

The Navy considered the potential impacts that ship strikes could have on sea turtles and rationally determined that these strikes would not significantly impact them.  This conclusion was based on a combination of sea turtles' ability to detect approaching vessels in the water via auditory and/or visual cues based on knowledge of their sensory biology, (DON160498; DON182508), and the use of lookouts specifically trained to detect sea turtles. DON182359.  While Plaintiffs disagree with the Navy's conclusion that ship strikes do not pose a significant risk to sea turtles, the Court finds that the Navy's conclusion is satisfactory in that the explanation bears a rational connection to the facts found. Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1216 (11th Cir. 2002). Consequently, the Court is satisfied that the Navy took a "hard look at the environmental consequences of the proposed action" with respect to sea turtles. Id.

### iii. Manatees

Plaintiffs also contend that the Navy failed to take a "hard look" at the impacts of construction or operations on the range of manatees. Dkt. No. 73 at 24.  The record reveals,

AO 72A
(Rev. 8/82)

however, that the Navy did indeed take a "hard look" at potential impacts that the proposed action could have on manatees for both installation and operations of the USWTR.

### 1. Installation

As for the installation, the Navy examined evidence showing that manatees are only likely to be in shallow areas near shore. See DON182135 (noting that manatees are "fairly restricted to shallower nearshore waters" (citing Wells et al., 1999) and that manatees occur in "very shallow waters of 2 to 4m (7 to 13 ft) in depth generally close to the shore" (citing Beck et al., 2004)). As a result, the Navy concluded that manatees are only reasonably likely to occur in the shallow area where the trunk cable portion of the USWTR may be installed. See DON182136 ("Manatees are expected in the freshwater, estuarine, and nearshore coastal waters in or near the cable range portion of Site A throughout the year. They are not expected in the offshore portions of the Jacksonville OPAREA."). This portion of the installation will be installed through horizontal drilling, meaning that vessels will not be used in the process. DON181937. Therefore, it was rational to conclude that this process would not adversely affect manatees.

### 2. Operations

The Navy also analyzed potential impacts on manatees from operation of the USWTR. In light of the evidence that manatees

AO 72A
(Rev. 8/82)

occupy nearshore waters, the Navy concluded that sonar usage would be unlikely to impact the manatees. This conclusion was reached based on studies that have shown that manatees do not exhibit strong startle responses or an aggressive nature towards stimuli, DON182428 (citing Bowles et al., 2004), the fact that manatees would not likely show a strong reaction or be disturbed from their normal range of behaviors, and the fact that limited active sonar activities would take place in the manatee habitat. DON182428. The Navy's conclusion in this regard was clearly rationally connected to the evidence presented in the record.

The potential for manatee ship strikes was also examined by the Navy. The USWTR will be located fifty (50) nautical miles offshore, a location much farther from shore than traditional manatee habitat. The Navy expects vessel traffic to occur at roughly the same frequency in the manatee habitat as has historically occurred.[19] Dkt. No. 76 at 27. This observation, when combined with the mitigation techniques planned,[20] led the Navy to the rational conclusion that the operations portion of the USWTR would not have a significant impact on the manatees due to ship strikes. It is clear from the foregoing that the Navy has examined the relevant data with regards to risks posed to manatees associated with the proposed action and has offered

---

[19] Notably, the Navy expects vessel traffic to actually decrease from Mayport Naval Station. DON165419.
[20] For example, by using extensively trained lookouts. DON182359.

a satisfactory explanation for its decision.  Accordingly, the Navy has fulfilled its "hard look" requirement under NEPA.  <u>Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29, 43 (1983).

d. Mitigation

Plaintiffs' final challenge under NEPA is that the Navy's analysis of mitigation techniques is arbitrary and capricious. Dkt. No. 73 at 24.  The Navy responds by noting that it fulfilled its obligations regarding mitigation analysis and that Plaintiffs simply wish the Navy would have adopted Plaintiffs' favored mitigation measures. Dkt. No. 76 at 28.  The record reveals that the Navy fulfilled its obligations in considering mitigation measures.

The Supreme Court has noted that "one important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences." <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 351 (1989).  This "requirement is implicit in NEPA's demand that an EIS must discuss any adverse environmental effects which cannot be avoided should the proposal be implemented." <u>Okanogan Highlands Alliance v. Williams</u>, 236 F.3d 468, 473 (9th Cir. 2000) (internal citations and quotations omitted).  The Supreme Court in <u>Robertson</u> also found that "[t]here is a fundamental distinction, however, between a requirement that mitigation be

40

discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." 490 U.S. at 352.

The Navy's FEIS includes an extensive mitigation analysis. This mitigation analysis includes, a detailed description of mitigation with respect to acoustical effects on marine animals, (section 6.1), a discussion of the mitigation related to vessel transits, (section 6.2), a description of the mitigation measures that would be employed during cable installation, (section 6.4), a statement of dedication to dynamic mitigation as conditions change with time, (section 6.5), and a discussion of the other mitigation measures that have been considered and rejected, (section 6.6). DON182647-182682. Plaintiffs' specific attacks on this analysis evolve from their contention that the Navy's usage of lookouts is ineffective and charges that the Navy has arbitrarily refused other mitigation measures.

First, the Navy's decision to use professionally trained lookouts is based on its belief that these lookouts have been an integral part of the mitigation measures it has had in place since 1997, during which time no strikes have occurred. Dkt. No. 76 at 28 (citing DON183907). As this conclusion is rationally related to the underlying record of success the Navy has had utilizing this measure, the Court is satisfied that this

AO 72A
(Rev. 8/82)

determination is not arbitrary and capricious.  Second, the Navy
did consider the mitigation measures Plaintiffs discuss in their
motion, Dkt. No. 73 at 25-28, and rationally rejected them.
Specifically, the Navy properly considered restricting
operations during calving season and limiting speeds to 10-
knots.  With regards to these two suggestions, the Navy reasoned
that "any reduction of training (including seasonal, weather- or
light based restrictions) would prohibit sailors from achieving
satisfactory levels of readiness needed to accomplish their
mission" and that "[t]raining differently than what would be
needed in an actual combat scenario would decrease training
effectiveness and reduce the crew's abilities." DON182678;
DON182680.  Despite Plaintiffs' objections to this rationale,
this Court is to give "great deference to the professional
judgment of military authorities concerning the relative
importance of a particular military interest." Winter v. Natural
Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (quoting Goldman
v. Weinberger, 475 U.S. 503, 507 (1986)).

Here, the Navy has met its requirement to discuss
mitigation in sufficient detail to ensure that the environmental
consequences have been fairly evaluated.  Therefore, the Navy is
in full compliance with this requirement as stated under
Robertson. 490 U.S. 332, 352 (1989).  Consequently, the Court is
satisfied that the Navy's mitigation analysis satisfied the

"hard look" requirement of NEPA and was not arbitrary or capricious.

### e. NEPA Compliance

Based on the discussion above, the Court is satisfied that the Navy fully complied with its responsibilities under NEPA. As a result, the Court grants summary judgment in Defendants' favor as to Plaintiffs' claims arising under NEPA.

## B. The Endangered Species Act

The policy of Congress in initiating the ESA was to mandate "that all Federal departments and agencies . . . seek to conserve endangered species and threatened species." 16 U.S.C. § 1531(c)(1); see also Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184 (1978) ("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."). In accordance with this policy, the Secretary of the Interior is charged with publishing a list of all species determined by him or the Secretary of Commerce to be engendered or threatened in the Federal Register. 16 U.S.C. § 1533(c)(1).

Section 9 of the ESA establishes a prohibition of the "taking"[21] of any member of a listed endangered species. 16

---

[21] The ESA defines the term "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The Code defines "harm" in this context as

U.S.C. § 1536(a)(2).  Section 7 of the ESA requires that federal agencies "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species" or destroy critical habitat. Id. at § 1536(a)(2).  To comply with this provision, the ESA requires that a federal agency consult with the National Marine Fisheries Service ("NMFS") or U.S. Fish and Wildlife Service ("FWS") under certain circumstances.  Such consultation is required whenever an action "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a).  If it is determined that the action "may affect" a listed species or critical habitat, formal consultation is required. Id.[22]

In determining whether formal consultation is necessary, the acting agency prepares a "biological assessment" to evaluate the potential effects "on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected

---

"an act which actually kills or injures wildlife.  Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

[22] Formal consultation is not required, however, if:

> as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat. Id. at § 402.14(b)(1).

by the action." 50 C.F.R. § 402.12(a). If formal consultation is necessary, the NMFS or FWS is responsible for issuing a "biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4).[23] If, after consultation, the NMFS determines that the proposed action will not jeopardize the continued existence of the listed species but that an incidental taking of the species may occur, the NMFS issues an "incidental take statement" containing reasonable and prudent measures necessary or appropriate to minimize the impact of the incidental take. 16 U.S.C. § 1536(b)(4); see also Or. Natural Res. Council v. Allen, 476 F.3d 1031, 1036 (9th Cir. 2007) ("The FWS must issue an Incidental Take Statement if the [Biological Opinion] concludes no jeopardy to listed species or adverse modification of critical habitat will result from the proposed action, but the action is likely to result in incidental takings.").

In preparing its Biological Opinion the NMFS is to use "the best scientific and commercial data available." Miccosukee Tribe of Indians of Florida v. United States, 566 F.3d 1257, 1265

---

[23] If the NMFS concludes the action is likely to jeopardize the continued existence of the listed species, it must suggest "reasonable and prudent alternatives" which can be taken by the acting agency to ensure that its actions do not jeopardize the continued existence of the listed species. 16 U.S.C. § 1536(b)(3)(A).

AO 72A
(Rev. 8/82)

(11th Cir. 2009); 16 U.S.C. § 1536(a)(2); 50 C.F.R. §
402.14(g)(8).  Generally, the agency decides which data and
studies are the "best available" because the decision is itself
a scientific determination deserving deference. Id. (citing
Marsh v. Or. Natural Res. Council, 490 U.S. 360, 377-78 (1989)).

   a. Manatees

   Plaintiffs' first argument under the ESA is that the Navy
failed to consult with the NMFS or FWS regarding the potential
effects that the proposed action could have on the West Indian
manatee, as is mandated by 16 C.F.R. § 402.14(a).  The Navy's
biological assessment for the USWTR enumerates multiple ways in
which manatees may be affected by the project. See, e.g.,
DON150137 ("Manatees are . . . particularly susceptible to
vessel interactions and collisions with watercraft constituting
the leading cause of mortality." (citation omitted)).
Plaintiffs argue that this finding requires that the Navy
initiate consultation.

   The Navy did, in fact, consult the FWS informally.  The FWS
concurred with the Navy's determination that the USWTR would not
be likely to jeopardize the continued existence of the West
Indian manatee. Dkt. No. 76 at 30 (citing Ex. 1).  The FWS's
concurrence terminated the consultation process, and no further
action was required on the part of the Navy. Id.  As a result,

AO 72A
(Rev. 8/82)

the Navy fulfilled its obligations of consultation under 16
C.F.R. § 402.14.[24]

    b. NMFS's Biological Opinion

    Plaintiffs argue that the NMFS's biological opinion is
arbitrary and capricious because it fails to make connections
between the facts found and the conclusions reached. Dkt. No. 78
at 16.  Specifically, Plaintiffs contend that the NMFS has
failed to support its conclusion that installation activities
will not result in the "take" of endangered sea turtles and that
operations on the range will not cause "jeopardy" to right
whales. Dkt. No. 73.  Plaintiffs also contend that the NMFS
violated the ESA by failing to consider the "entire action" in
its jeopardy analysis. Id.  Finally, Plaintiffs assert that NMFS
has failed to support its conclusion that there will be no
adverse modification on critical habitat.

        i.   Sea Turtles

            1. Installation

    Plaintiffs submit that while the Biological Opinion listed
potential impacts on turtles associated with the installation
phase, it failed to "meaningfully analyze" the likelihood that

---

[24] This exhibit was not a part of the administrative record because the FWS is
not a part of the current lawsuit.  Plaintiffs contest the timing of the
Navy's consultation.  However, the timing argument likely runs into a
mootness problem, as even if consultation here was untimely, the Navy has
indeed fulfilled its obligations with the FWS. Cf. Sierra Club v. Glickman,
156 F.3d 606, 619 (5th Cir. 1998) (finding an appeal on compliance with 50
C.F.R. § 402.13(a) moot as the agency had fully fulfilled its obligations
since the Court's order).

AO 72A
(Rev. 8/82)

sea turtles will be taken in connection with these activities and to include an incidental take statement ("ITS") for any takes that may occur as required by the ESA. Dkt. No. 73 at 31. As for Defendants failure to meaningfully analyze, Plaintiffs contend that the conclusion that it is unlikely that any takes will occur during the installation phase is unexplained and unsupported by the record. Id. at 32. With regards to the ITS, Plaintiffs contend that the NMFS's own analysis provided evidence that a "take" of sea turtles "may occur" during installation, and thus, the NMFS has violated § 7(b)(4) of the ESA by not including an ITS. Id.

   The determination that USWTR installation is not likely to adversely affect or result in the incidental take of sea turtles is supported by the record and entitled to deference. The risk of ship strikes involving sea turtles was considered, see, e.g., NMFS AR 1845, 1882-83, 1928 (noting that the risk of ship strikes involving sea turtles is improbable because the ships move at such slow speeds and there will be dedicated observers on deck), as was the risk of entanglement, see, e.g., NMFS AR 1928 (analyzing the risk of entanglement).[25]  Furthermore, Plaintiffs' argument that the record does not explain how sea turtles are not at risk during the installation as it "can occur

---

[25] Further, the record reflects that "[d]ue to the narrow width of the ocean-bottom burial equipment, it is estimated that there would be an extremely low probability that installation equipment would come into direct contact with any turtle that may be on or in bottom sediments." DON160616.

AO 72A
(Rev. 8/82)

during nesting season" is also addressed. Dkt. No. 80 at 19-20.
This is because, as Defendants point out, installation does not
require any significant construction on the beach or adjacent
waters where sea turtles nest. Dkt. No. 82 at 18 (citing
DON182058; NMFS AR 1763).[26]  In sum, although Plaintiffs feel the
NMFS's analysis was inadequate, the Court is satisfied that
there is a rational connection between the facts found and the
conclusions reached.  Therefore, the Court cannot say that the
determination that the installation phase is unlikely to result
in a "taking" of a sea turtle was arbitrary and capricious.

Plaintiffs next argue that the NMFS illegally failed to
include an ITS for turtles in its Biological Opinion. Dkt. No.
73 at 32.  In support of this argument, Plaintiffs contend that
the "NMFS's own analysis in the [Biological Opinion] provided
evidence that take of listed species – i.e., sea turtles – 'may
occur' as a result of that installation." Dkt. No. 73 at 32
(citing 50 C.F.R. § 402.14(g)(7)).  However, the Biological
Opinion concluded that sea turtles are not likely to be
adversely affected by the installation phase. NMFS AR 1846; see
also NMFS AR 1930 (concluding that "we do not expect endangered
or threatened species to be 'taken' during the installation
phase of the proposed action").  The NMFS did not make a finding
that an "incidental taking" of sea turtles "may occur" during

---

[26] Additionally, sea turtle nesting activity, which takes place on the shore,
falls under the purview of the FWS, not the NMFS.

) 72A
:v. 8/82)

the operations phase of the USWTR.  The Court has already determined that the NMFS's determination regarding the "taking" of sea turtles was not arbitrary and capricious.  Suffice it to say, 50 C.F.R. § 402.14(g)(7) was simply not triggered in light of the rational conclusions reached by the NMFS pertaining to the risk of a "taking" to sea turtles during the installation phase.

### 2. Operation

Plaintiffs also challenge the Biological Opinion's determination that the operations phase will not result in jeopardy to sea turtles.  Specifically, Plaintiffs assert that the Biological Opinion fails to analyze whether a taking of sea turtles may occur due to ship strikes or whether sea turtles are at risk for entanglement from discarded debris used during Navy operations.  Id. at 36.

The record reflects that the NMFS did analyze the risk of ship strikes and entanglement in the Biological Opinion. See, e.g., NMFS AR 1875, 1928 (analyzing sea turtle exposure to parachutes); NMFS AR 1882-83 (analyzing the risk of ship strikes to sea turtles).  Further, aside from the Biological Opinion itself, the record reveals additional support for the NMFS's conclusion that the operations phase is unlikely to jeopardize the continued existence of sea turtles. See, e.g., DON160615-16 (analyzing the risk of torpedo strikes on sea turtles and

determining that the risk is "negligible"); DON160619 (examining the risks posed to sea turtles associated with the use of sensing devices); DON160619 (analyzing the risk of sea turtle entanglement and determining that the parachutes design "would greatly limit the amount of time that sea turtles are exposed to the parachutes"). Finally, contrary to Plaintiffs' implication, the NMFS did not attempt sidestep its obligation to make an accurate "no jeopardy" opinion and wait on future data. Nor would the NMFS be required to postpone its determination until future studies were performed, as they are required to consult the "the best scientific and commercial data available." Miccosukee Tribe of Indians of Florida v. United States, 566 F.3d 1257, 1265 (11th Cir. 2009); 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). Here, the record supports a determination that the NMFS fulfilled its obligation by relying on the "best available science" in issuing its "no jeopardy" opinion. Id.

### ii. Jeopardy of Right Whales

Plaintiffs next challenge the Biological Opinion's conclusion that operations on the USWTR will not cause jeopardy to the North Atlantic right whale. Dkt. No. 73 at 33. This challenge attacks the Biological Opinion's conclusion with regards to the risks posed to right whales due to ship strikes

and sonar usage.[27]   As explained below, the NMFS's "no jeopardy"

determination is rational and based on the best available

scientific data.   Therefore, the Biological Opinion is not

arbitrary and capricious and is entitled to deference.

Moreover, the deference owed to this "no jeopardy" determination

is especially strong as the NMFS had to make predictions over

the likelihood of ship strikes during USWTR activities.

Miccosukee Tribe of Indians, 566 F.3d at 1271; see also Balt.

Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87,

102 (1983) (stating that, when an agency "is making predictions,

within its area of special expertise, at the frontiers of

science . . . as opposed to simple findings of fact, a reviewing

court must generally be at its most deferential").

   1. Ship Strikes and Sonar Usage

   The Biological Opinion included an exposure analysis which

specifically examined the likelihood of a ship strike during the

operations phase of the USTWR. NMFS AR 1864-66.   The NMFS

ultimately concluded that Navy vessels would have a 0.0000472

---

[27] To the extent that Plaintiffs challenge the NMFS's failure to consider the
risk of entanglement to right whales, such an assertion is unfounded. See,
e.g., DON160567 (noting that "[e]ntanglement and drowning of a marine mammal
in a parachute would be unlikely, since the parachute would have to land
directly on an animal, or an animal will have to swim into it before it
sinks").   That this analysis is included in the Biological Assessment rather
than the Biological Opinion does not matter, as judicial review is based on
the entire record. See In re Operation of Mo. River Sys. Litigation, 421 F.3d
618, 634 (8th Cir. 2005) ("[T]here is no requirement that every detail of the
agency's decision be stated in the [Biological Opinion].   The rationale is
present in the administrative record underlying the document, and this is all
that is required.").

AO 72A
(Rev. 8/82)

probability of striking a whale in any year or a probability of 0.000236 over the five-year period of any permit the NMFS might issue for the operations phase of the USWTR.[28] NMFS AR 1866. Based on this analysis, the Biological Opinion concludes that, while it cannot say that a ship strike is absolutely impossible, the probabilities are sufficiently miniscule to conclude that a strike is not likely.[29] Id.  Based on this statistical analysis, it cannot be said that the Biological Opinion's ultimate conclusion that the operations phase of the USTWR is "not likely" to jeopardize the continued existence of the right whale is arbitrary or capricious.

Plaintiffs' challenges to this finding are unavailing. First, Plaintiffs contend that the NMFS failed to consider the best available science, which Plaintiffs argue demonstrates that right whales exposed to mid-frequency alarm sounds are especially vulnerable to ship strikes. Dkt. No. 80 at 18 (discussing the study by Nowacek et al., 2004).  This study does not, however, undermine the estimates provided in the Biological Opinion.  This is because, as Defendants point out, the database used by the NMFS to calculate the figures does not exclude

---

[28] This estimate of the probability of a future collision was derived by using the number of steaming days in which U.S. Navy vessels engaged during 2006 and 2007 as representative of the annual number of steaming days between 1945 and 2009 and using the number of whales that the Navy has struck over that sixty (60) year time interval. NMFS AR 1866.

[29] While Plaintiffs repeatedly point out that the death of one right whale due to a ship strike would be devastating to the species as a whole, the consequences of this risk do not change the soundness of the Navy's statistically-based conclusion that a ship strike is highly unlikely.

AO 72A
(Rev. 8/82)

collisions involving sonar. Dkt. No. 82 at 16 (citing DON080195). Furthermore, there are no reported instances of sonar causing marine mammals to surface and collide with ships. Id. (citing DON183325).

Next, Plaintiffs argue that the NMFS's probability calculation contains "fundamental flaws." Dkt. No. 80 at 18. In making this argument, Plaintiffs make a number of observations that they feel the NMFS should have considered in making its calculation. See Dkt. No. 80 at 18 (arguing (1) that the calculation failed to take into account the fact that there are areas where right whale concentration would be higher and (2) the study relied upon, which catalogued ship strikes (DON080195), warns that "the actual number of strikes is undoubtedly much greater than reported here"). The calculations were not flawed.

With regards to Plaintiffs' first challenge, Defendants correctly note that the strike estimate would be zero had the NMFS limited the analysis to the Jacksonville Operating Area, as there have been no ship strikes involving Navy vessels and any large whale species in this area since 1945. Dkt. No. 82 at 15 (citing DON080206-18; NMFS AR 1865). Second, the NMFS did not fail to compensate for underestimations of ship strikes, as the Large Whale Ship Strike Database makes clear that federal vessels are more likely to report and are likely over-

54

represented. Id. (citing DON080198-99). In arriving at its
calculations, the NMFS relied on the Large Whale Ship Strike
Database, which is "the most comprehensive set of data to date
on this subject." DON080195. Plaintiffs make no attempt to show
that better data is available, and thus, the Court is satisfied
that the NMFS consulted the best available science in making its
probability assessment.

The NMFS also analyzed the potential impacts that sonar
could have on the right whale in coming to its "no jeopardy"
determination. The NMFS found that the right whale is not
likely to respond to high-frequency sound sources associated
with the proposed training activities. NMFS AR 1925. In
analyzing mid-frequency active sonar, the NMFS noted that the
evidence of whether right whales are likely to respond is
equivocal. See id. (noting that while the Nowacek et al., 2004
study found that "alert stimulus caused whales to immediately
cease foraging behavior and swim rapidly to the surface, [the
study], offer[ed] no information on whether the whales were
probably responding to the low- or mid-frequency components of
the signal"). However, while acknowledging this ambiguity, the
NMFS goes on to rationally conclude that "right whales seem less
likely to devote attentional resources to stimuli in the
frequency ranges of mid-frequency active sonar" and, therefore,
"are not likely to respond physiologically or behaviorally to

AO 72A
(Rev. 8/82)

sounds in this frequency range." NMFS AR 1926.  Although Plaintiffs disagree with this assessment, the NMFS certainly considered the effect that sonar could have on the right whale.

Under the APA, this Court is to give substantial deference to the NMFS's decisions as to "what evidence to find credible" and "drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue," finding such decisions inadequate only where they are arbitrary, capricious, or an abuse of discretion.  Nat'l Wildlife Fed'n v. Souza, 2009 WL 3667070, at *5 (S.D. Fla. Oct. 23, 2009) (quoting Sierra Club v. Van Antwerp, 526 F.3d 1353, 1361 (11th Cir. 2008)).  Here, the arguments made by Plaintiffs over the NMFS's shortcomings fall far short of what is required to amount to decisions that are arbitrary, capricious, or an abuse of discretion.

   *iii. Whether NMFS Considered the Entire Action*

Plaintiffs next contend that the Biological Opinion is arbitrary and capricious because it fails to consider the entire action in its jeopardy analysis for right whales. Dkt. No. 73 at 37; see also Dkt. No. 80 at 14 (citing Wild Fish Conservancy v. Salazar, 628 F.3d 513, 521 (9th Cir. 2010) ("[T]he ESA requires the biological opinion to analyze the effect of the *entire* agency action.")).  More specifically, Plaintiffs argue that the

NMFS failed to analyze both the installation and operation of the USWTR. Dkt. No. 80 at 14.

Much of Plaintiffs' arguments in this regard come in the form of supposed admissions on the part of the Navy and the NMFS that the Biological Opinion only analyzed the installation phase of the action. See, e.g., DON185918 (ROD) ("[T]he Navy's section 7 consultation under the ESA is only with regard to the installation of the range.  The Navy will initiate another formal consultation under Section 7 of the ESA to address ASW training on the USWTR in the 2014/2015 timeframe");[30] NMFS AR 1731 (Cover Page of Biological Opinion) (noting that "[t]his opinion concludes that the U.S. Navy's proposal to install an Undersea Warfare Training Range (USWTR) is not likely to adversely affect endangered or threatened species under NMFS' jurisdiction or critical habitat that has been designated for those species").[31]

Defendants respond by arguing that just because the NMFS acknowledged that its issuance of any MMPA "take" authorization covering USWTR operations would trigger a new consultation resulting in a new biological opinion does not reveal any flaw

---

[30] Defendants counter this statement by noting that the issuance of any MMPA (which the Navy plans to do before it commences the operations phase) will trigger a new consultation, resulting in a new biological opinion. Dkt. No. 82 at 14.

[31] Plaintiffs neglect, however, to point out that the next sentence states: "We have concluded that anti-submarine warfare *training* activities the U.S. Navy plans to conduct on USWTR are likely to adversely affect endangered whales, but [are] not likely to jeopardize the continued existence of those whales." NMFS AR 1731 (Cover Page of Biological Opinion) (emphasis added).

in the existing Biological Opinion. Dkt. No. 76 at 35. Further, Defendants argue that the Biological Opinion clearly analyzed both the operations and installation portions of the proposed action. See, e.g., DON185886 (ROD) (noting that the "NMFS provided the Navy with a Biological Opinion (BO) on July 28, 2009, in which it analyzed the effects of both installation and use of the USWTR"); NMFS AR 1731-32 (Cover Page of Biological Opinion) ("We have concluded that anti-submarine warfare training activities the U.S. Navy plans to conduct on USWTR are likely to adversely affect endangered whales, but [are] not likely to jeopardize the continued existence of those whales.").

Irrespective of "admissions" as to whether the Biological Opinion analyzed only the installation phase or both the installation and operation phases of the proposed action, the content of the NMFS itself clearly analyzes both the installation and operations of the USWTR. For example, pages 1925-26 of the Biological Opinion analyze the training activities that are likely to occur during the operations phase of the proposed USWTR. NMFS AR 1925-26. After a discussion of the ASW training's effects on right whales - including estimates of the number of right whales that might be exposed to the active sonar and the expected response of these affected whales to differing levels of frequency - the NMFS ultimately concludes that the "anti-submarine warfare training activities associated

with the Operations Phase of the Undersea Warfare Training Range are not likely to adversely affect the population dynamics, behavioral ecology, and social dynamics of individual North Atlantic right whales in ways or to a degree that will reduce their fitness." Id.; see also NMFS AR 1913 (analyzing probable responses of right whales to activities that are likely to occur during the operations phase).  Similar analyses of the operations phase of the proposed USWTR are also included for sea turtles, see, e.g., NMFS AR 1916-17 (analyzing sea turtles response to varying levels of sonar frequency and concluding that "mid-frequency active sonar associated with the proposed exercises 'may affect, but is not likely to adversely affect'. . . loggerhead sea turtles"); NMFS AR 1918 (analyzing sea turtle responses to underwater detonations) and sperm whales, see, e.g., NMFS AR 1914 (analyzing probable responses of sperm whales to sonar training).

To be clear, this is just a sampling of specific instances where the Biological Opinion analyzed the operations phase of the USWTR.[32]  It is true, as Plaintiffs point out, that "Defendants cannot use their need to comply with the MMPA in the future as an excuse for not consulting on USWTR operations now."

_____

[32] In addition to these specific examples, Defendants point out numerous other occasions in which the Biological Opinion analyzes the operations phase of the proposed action. See Dkt. No. 82 at 13 n.6 (citing NMFS AR 1734-46; 1752-53; 1847-63; 1864-79; 1879-1928; 1929). Notably, Plaintiffs at no point discuss these portions of the Biological Opinion.

Dkt. No. 80 at 15.  However, the inverse is also true.
Defendants' acknowledgement that another Biological Opinion will
have to be conducted pursuant to the MMPA does not mean that the
current Biological Opinion is insufficient.  With this in mind,
the Court is convinced from the foregoing that the NMFS did not
fail to analyze the entire action.  Rather, the record reveals
that the NMFS analyzed the entire action, including both the
installation and the operation phases of the USWTR.  Therefore,
the Court cannot say that the NMFS acted arbitrarily and
capriciously in this regard.

> *iv.  Adverse Modification to Critical Habitat*

Finally, Plaintiffs argue that the Biological Opinion
arbitrarily concludes that neither installing nor operating the
USWTR is likely to adversely modify critical habitat for the
right whale in violation of 50 C.F.R. § 402.14(g)(4).[33] Dkt. No.
73 at 38.  Specifically, Plaintiffs contend that the Biological
Opinion fails to discuss whether the installation of the trunk
cable would adversely affect right whale habitat. Id.  Likewise,
Plaintiffs assert that the Biological Opinion does not discuss

---

[33] During formal consultation, this provision requires the service to
"[f]ormulate its biological opinion as to whether the action, taken together
with cumulative effects, is likely to jeopardize the continued existence of
listed species or result in the destruction or adverse modification of
critical habitat." 50 C.F.R. § 402.14(g)(4).

AO 72A
(Rev. 8/82)

the potential impacts that sonar may have on the critical habitat.[34] Id. at 39.

The record reveals that the NMFS considered the potential impact on the critical habitat of the right whale.  First, the Biological Opinion considered the potential impacts that the cable installation could have on the right whale habitat.  As a preliminary matter, installation will not occur during the right whale calving season. NMFS AR 1746.  Furthermore, the Biological Opinion includes an analysis as to whether the cable itself will impact the right whale and discusses a study which found that even an unburied cable has a "minimal statistically-significant effect on the biota of the cable route." NMFS AR 1846 (citing Korgan Study).

Additionally, the NMFS did consider whether sonar activities would potentially affect right whale critical habitat.  The record reveals that the right whales critical habitat was considered with regards to sonar and that it was rationally determined that the Navy's active sonar training

---

[34] Plaintiffs also contend that making any analysis of the impacts of the cable installation on critical habitat would be meaningless because the Navy had not completed its bottom mapping at the time the Biological Opinion was released. Dkt. No. 73 at 39.  However, as Defendants point out, the NMFS is required to render its opinion using the best available data at the time of the consultation. Sw. Ctr. for Biological Diversity v. Babbitt, 215 F.3d 58, 60 (D.C. Cir. 2000); see also Heartwood, Inc. v. U.S. Forest Serv., 380 F.3d 428, 436 (8th Cir. 2004) ("The requirement that agencies use the 'best scientific and commercial data available,' . . . does not require an agency to conduct new studies when evidence is available upon which a determination can be made.").

AO 72A
Rev. 8/82)

activities should not reduce the conservation value of the designated habitat. NMFS AR 548;[35] see also NMFS AR 1926.

The NMFS rationally supported its position that the critical habitat of the right whale would not be adversely impacted by the USWTR.  Accordingly, its conclusion in this regard is entitled to deference, as it is not arbitrary and capricious.

c. The Navy's Reliance on the Biological Opinion

Plaintiffs' final argument is that the Navy has failed to ensure against jeopardy to listed species in violation of the ESA by relying on a flawed Biological Opinion. Dkt. No. 73 at 39.  In essence, Plaintiffs' position is that the Court should find the Biological Opinion arbitrary and capricious, and that the Navy's decision to rely on this Biological Opinion was arbitrary and capricious as well.  In this regard, Plaintiffs cite an Eleventh Circuit opinion, Fla. Key Deer v. Paulison, 522 F.3d 1133, 1144 (11th Cir. 2008), which cites a Ninth Circuit opinion, Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy, 898 F.2d 1410, 1415 (9th Cir. 1990), which stands for the proposition that the "decision to rely on [the] biological

---

[35] This conclusion was derived from a consideration of the Navy's mitigation measures: "the northern units of right whale critical habitat would not be exposed to mid-frequency active sonar at received levels greater than about 170 dB . . . [and] [b]ecause North Atlantic right whales are not likely to respond to high-frequency sound sources associated with the proposed training activities, high-frequency sound sources associated with the Navy's active sonar training activities should not reduce the conservation value of the designated critical habitat." NMFS AR 548.

AO 72A
Rev. 8/82)

opinion must not have been arbitrary and capricious." However, as the Eleventh Circuit noted in Paulison, the Ninth Circuit qualified this statement by stating "another agency's reliance on that opinion will satisfy its obligations under the [ESA] if a challenging party can point to no 'new' information – *i.e.,* information the [NMFS] did not take into account – which challenges the opinion's conclusions." Id.

Plaintiffs, as the challenging party, "bear[] a heavy burden to prove that the [agency] was arbitrary and capricious in relying upon the [NMFS] determination of a matter firmly within that agency's area of expertise." Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1222 (11th Cir. 2002). Here, as noted above, the NMFS has identified reasonable justifications for its "no jeopardy" determination in the Biological Opinion. Furthermore, Plaintiffs have pointed to no new information that the NMFS failed to consider which would call into question the Biological Opinion's conclusions. Paulison, 522 F.3d at 1144. Accordingly, Plaintiffs have failed to satisfy this heavy burden.

d. ESA

Based on the discussion above, the Court is satisfied that the NMFS fully complied with its responsibilities under the ESA. As a result, the Court grants summary judgment in Defendants' favor on Plaintiffs' claims arising under ESA.

AO 72A
Rev. 8/82)

**CONCLUSION**

The Court is satisfied that the Defendants complied fully with NEPA, the ESA, and the APA. As a result, Defendants' Motion for Summary Judgment is **GRANTED**, and Plaintiffs' Motion for Summary Judgment is **DENIED**. The Clerk of Court is instructed to close the case and enter an appropriate judgment.

**SO ORDERED**, this 6th day of September, 2012.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

O 72A
:ev. 8/82)